**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11<br>Case No. 01-16034 (AJG) |
| ENRON CORP., *et al.*, | |
| | Jointly Administered |
| Reorganized Debtors. | |

| | |
|---|---|
| SPRINGFIELD ASSOCIATES, L.L.C., | |
| Defendant-Appellant, | District Court<br>Case No. 06-07828 (RJH) |
| v. | |
| ENRON CORP., | |
| Plaintiff-Appellee. | |

| | |
|---|---|
| DK ACQUISITION PARTNERS, *et al.*, | |
| Defendant-Appellants, | Case No. 06-07837 (RCC) |
| v. | |
| ENRON CORP., | |
| Plaintiff-Appellee. | |

| | |
|---|---|
| DK ACQUISITION PARTNERS, LP, *et al.*, | |
| Defendant-Appellants, | Case No. 06-07838 (PKC) |
| v. | |
| ENRON CORP., | |
| Plaintiff-Appellee. | |

| | |
|---|---|
| BEAR, STEARNS & CO., INC., | |
| Defendant-Appellant, | Case No. 06-07829 (VM) |
| v. | |
| ENRON CORP. | |
| Plaintiff-Appellee. | |

| | |
|---|---|
| DK ACQUISITION PARTNERS, L.P., | |
| Defendant-Appellant, | Case No. 06-07803 (JGK) |
| v. | |
| ENRON CORP., | |
| Plaintiff-Appellee. | |
| STRATEGIC VALUE MASTER FUND, LTD., *et al.*, | |
| Defendant-Appellants, | Case No. 06-07804 (NRB) |
| v. | |
| ENRON CORP., | |
| Plaintiff-Appellee. | |
| BEAR, STEARNS & CO., INC., | |
| Defendant-Appellant, | Case No. 06-07805 (KMK) |
| v. | |
| ENRON CORP., et al., | **[ORAL ARGUMENT REQUESTED]** |
| Plaintiff-Appellees. | |

**MEMORANDUM OF LAW OF APPELLANTS
DK ACQUISITION PARTNERS, L.P., RCG CARPATHIA MASTER FUND LTD.,
RUSHMORE CAPITAL-I, L.L.C. AND RUSHMORE CAPITAL–II, L.L.C.**

# TABLE OF CONTENTS

**Page**

Table Of Contents ........................................................................................................ i

Table Of Authorities ................................................................................................... ii

JURISDICTION ........................................................................................................1

ISSUES PRESENTED.................................................................................................1

APPLICABLE STANDARD OF REVIEW ...............................................................2

PRELIMINARY STATEMENT ................................................................................2

STATEMENT OF THE CASE AND FACTS............................................................8

RELEVANT STATUTES ........................................................................................13

I    THE BANKRUPTCY COURT'S EQUITABLE SUBORDINATION
ORDERS SHOULD BE REVERSED.................................................................13

    A.    The Bankruptcy Court Improperly Applied The Doctrine Of "Equitable
Subordination" To Subordinate The Claims Of Innocent Purchasers ..........14

    B.    The Bankruptcy Court Disregarded The Long-Standing Congressional
Policy Of Protecting Innocent Transferees ...................................................18

    C.    Instead Of Adhering To Principles Of Equitable Subordination, The
Bankruptcy Court Substituted Inapt Analogies To The Law Of
Assignment And Priority Wage Claims.........................................................24

    D.    The Bankruptcy Court's Decision Impermissibly Extended The Doctrine
Of Equitable Subordination, Making Decisions "At The Level Of Policy
Choice" That Should Be Reserved For Congress To Decide .......................27

II    THE BANKRUPTCY COURT'S SECTION 502(D) RULING
SHOULD BE REVERSED ................................................................................34

    A.    The Statutory Language ...............................................................................34

    B.    Section 502(d) Does Not Provide For Disallowance Of Claims Of
Innocent Purchasers ....................................................................................38

    C.    Metiom Was Wrongly Decided ...................................................................43

CONCLUSION.......................................................................................................45

## TABLE OF AUTHORITIES

### CASES

*Aguilar* v. *United States (In re Aguilar)*,
    312 B.R. 394 (D. Ariz. 2003)...................................................................................16

*In re America's Shopping Channel, Inc.*,
    110 B.R. 5 (Bankr. S.D. Cal. 1990) .........................................................................41

*BedRoc Ltd., LLC* v. *Unites States*,
    541 U.S. 176 (2004)..................................................................................................35

*Begier* v. *I.R.S.*,
    496 U.S. 53 (1990)....................................................................................................17

*Benjamin* v. *Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th. Cir. 1977) .........................................................................5, 15, 25

*Caminetti* v. *United States*,
    242 U.S. 470 (1917).................................................................................................35

*Campbell* v. *U. S. (Matter of Davis)*,
    889 F.2d 658 (5th Cir. 1989) ...................................................................................36

*Carnegia* v. *Georgia Higher Educ. Assistance Corp.*,
    691 F.2d 482 (11th Cir. 1982) .................................................................................25

*In re Centennial Textiles, Inc.*,
    227 B.R. 606 (Bankr. S.D.N.Y. 1998) ...................................................................30

*Citibank, N.A.* v. *Tele/Resources, Inc.*,
    724 F.2d 266 (2d Cir. 1983).....................................................................................25

*Comm. of Unsecured Creditors* v. *Williams Patterson, Inc.*
    *(In re Wood & Locker, Inc.), No. MO 88 CA 011*,
    1988 U.S. Dist. LEXIS 19501 (W.D. Tex. June 20, 1988) ..................................36, 37, 40, 44

*Connecticut Nat'l Bank* v. *Garmain*,
    503 U.S. 249 (1992)..................................................................................................35

*Dorr Pump &Mfg. Co.* v. *Heath (In re Dorr Pump & Mfg. Co.)*,
    125 F.2d 610 (7th Cir. 1942) ...................................................................................25

*Dougherty* v. *Carver Fed. Sav. Bank*,
    112 F.3d 613 (2d Cir. 1997).....................................................................................29

*Edelman* v. *Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen Foods, Inc.),*
80 B.R. 848 (Bankr. W.D. Mich. 1987)...................................................................................41

*Elliott Assocs. L.P.* v. *Banco de la Nacion,*
194 F.3d 363 (2d Cir. 1999)...................................................................................................28

*Enron Corp.* v. *Avenue Special Situations Fund II, LP (In re Enron Corp.),*
333 B.R. 205 (Bankr. S.D.N.Y. 2005).............................................................................8, 10

*Enron Corp.* v. *Avenue Special Situations Fund, II, LP (In re Enron Corp.),*
340 B.R. 180 (Bankr. S.D.N.Y. 2006)...................................................................................12

*Esposito* v. *Noyes (In re Lake Country Invs.),*
255 B.R. 588 (Bankr. D. Idaho 2000)...................................................................................16

*First Int'l Servs. Corp.* v. *Apollo Sign Co. (In re First Int'l Servs. Corp.),*
37 B.R. 856 (Bankr. D. Conn. 1984) .....................................................................................41

*Fletcher* v. *Peck,*
10 U.S. 87 (1810)...................................................................................................................21

*Goldie* v. *Cox,*
130 F.2d 695 (8th Cir. 1942) .................................................................................................25

*In re Grabill Corp.,*
976 F.2d 1126 (7th Cir. 1992) ...............................................................................................43

*Greenville Banking & Trust Co. v. Selcow,*
25 F.2d 78 (3d Cir. 1928) ......................................................................................................36

*Holloway* v. *Internal Revenue Service (In re Odom Antennas, Inc.),*
340 F.3d 705 ..........................................................................................................................36

*Holt* v. *Federal Deposit Ins. Corp. (In re CTS Truss, Inc.),*
868 F.2d 146 (5th Cir. 1989) .................................................................................................15

*In re Ionosphere Clubs, Inc.,*
922 F.2d 984 (2d Cir. 1990)....................................................................................................2

*In re Iridium Operating LLC,*
No. 01 Civ. 5429 (GBP)2005 WL. 756900 (S.D.N.Y. April 4, 2005) ....................................2

*Isaac* v. *Temex Energy, Inc. (In re Amarex, Inc.),*
853 F.2d 1526 (10th Cir. 1988) .............................................................................................33

*Jizarian* v. *Raichle (In re Stirling Homex Corp.)*,
    579 F.2d 206 ......................................................................................32

*Jodson* v. *Corcoran*,
    58 U.S. 612 (1854).................................................................................21

*Katchen* v. *Landy*,
    382 U.S. 323 (1966)..........................................................................41, 44

*Kendall* v. *Sorani, et al. (In re Richmond Produce Co.,)*,
    195 B.R. 455 (N.D. Cal. 1996) ...........................................................23

*Kingsway Revocable Trust* v. *Fed. Savs. & Loan Ins. Corp.*
    *(In re C.P.C. Dev. Co. No. 5)*,
    113 B.R. 637 (Bankr. C.D. Cal. 1990)................................................18

*Kittay* v. *Atlantic Bank of New York (In re Global Service Group, LLC)*,
    316 B.R. 451 (Bankr. S.D.N.Y. 2004)................................................15

*Lazar* v. *California (In re Lazar)*,
    237 F.3d 967 (9th Cir. 2001) ..............................................................16

*In re Lifschultz Fast Freight*,
    132 F.3d at 349 ..............................................................................31, 33

*Max Sugarman Funeral Home, Inc.* v. *A.D.B. Investors*,
    926 F.2d 1248 (1st Cir. 1991)..............................................................23

*In re Metiom*,
    301 B.R. 634 (Bankr. S.D.N.Y. 2003).....................................42, 43, 44

*Midlantic Nat'l Bank* v. *N.J. Dep't of Env'l Prot.*,
    474 U.S. 494 (1986)..............................................................................41

*Missouri Dept. of Revenue* v. *L.J. O'Neill Shoe Co. (In re L.J. O'Neill Shoe Co.)*,
    64 F.3d 1146 (8th Cir. 1995) ...............................................................33

*Official Comm. of Unsecured Creditors of Sunbeam Corp.* v. *Morgan Stanley & Co., Inc.*
    *(In re Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002).....................................15, 16, 25

*People's Sav. Bank* v. *Bates*,
    120 U.S. 556 (1887)..............................................................................21

*Petitioning Creditors of Melon Produce, Inc.* v. *Braunstein*,
    112 F.3d 1232 (1st Cir. 1997)..............................................................37

*Rodriguez* v. *United States*,
    480 U.S. 522 (1987) ...................................................................................31

*Schwartz* v. *Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*,
    352 F.3d 671 (2d Cir. 2003) .......................................................................33

*Shropshire, Woodlife & Co.* v. *Bush*,
    204 U.S. 186 (1907) ...................................................................................26

*Smart World Techs., LLC* v. *Juno Online Svcs., Inc. (In re Smart World Techs., LLC)*,
    423 F.3d 166 (2d Cir. 2005) .......................................................................32

*Spacek* v. *Thomen (In re  Universal Farming Indus.)*,
    873 F.2d 1334 (9th Cir. 1989)) ..................................................................16

*Swarts* v. *Siegel*,
    117 F. 13 (8th Cir. 1902) ............................................................................44

*Trone* v. *Smith (In re Westgate-California Corp.)*,
    642 F.2d 1174 (9th Cir. 1981) ....................................................................20

*United States* v. *California & Oregon Land Co.*,
    148 U.S. 31 (1893) .....................................................................................21

*United States* v. *Dunn*,
    268 U.S. 121 (1925) ...................................................................................21

*United States* v. *Noland*,
    517 U.S. 535 (1996) ...................................................................6, 15, 26, 31

*United States* v. *Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) ...................................................................................35

*Westgate-California Corp* v. *First Nat'l. Fin. Corp.*,
    650 F.2d 1040 (9th Cir. 1981) ....................................................................16

*Wilson* v. *Huffman (In re Missionary Baptist Found. of America)*,
    818 F.2d 1135 (5th Cir. 1987) ....................................................................18

### STATUTES

11 U.S.C. § 105(a) ............................................................................32, 33

11 U.S.C. § 502(d) ...........................................................................7, *passum*

11 U.S.C. § 510(c) ...........................................................................................1, *passum*

11 U.S.C. § 550(b)(1) ................................................................................................19

28 U.S.C. § 158(a) ......................................................................................................1

28 U.S.C. § 1930 .......................................................................................................33

11 U.S.C.A. § 93[g] ..................................................................................................36

## LEGISLATIVE HISTORY

124 Cong. Rec. 32,416 (1978) ................................................................................32

124 Cong. Rec. 32350 (1978) ..................................................................................17

124 Cong. Rec. 32989 (1978) ..................................................................................17

124 Cong. Rec. 33989 (1978) ..................................................................................32

124 Cong. Rec. 517406 (daily ed. Oct. 6, 1978); 124 Cong. Rec. 11089 ..................17

Bankruptcy Code. H.R. No. 95-595, 95th Cong., 1st Sess. 375-376 (1977) ................41

H.R. 8200, 95th Cong., lst Sess., § 510 (1977)........................................................32

H.R. Rep. No. 95-595 at 359 (1978).............................................................14, 17, 37

H.R. Rep. No. 595, 95th Cong., lst Sess. 359 (1977) .................................................32

S. Rep. No. 989, 95th Cong., 2d Sess. 74 (1978) .............................................14, *passum*

## MISCELLANEOUS

4 *Collier on Bankruptcy* ¶¶ 502.05[3], 510.05[1] (15th ed. rev. 2005) .........................39

*Andrew DeNatale and Prudence B. Abram, The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus. Law. 417, 428 (1985)...................................31

Pursuant to 28 U.S.C. § 158(a) and Rules 8009 and 8010 of the Federal Rules of Bankruptcy Procedure, Defendants-Appellants DK Acquisition Partners, LP, RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C., and Rushmore Capital-II, L.L.C. ("Defendants" or "Appellants") submit this Memorandum of Law, in the adversary proceedings styled *In re Enron Corp.*, Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. Nos. 05-01025, 05-01029, 05-01074 and 05-01105 (AJG) (the "Coordinated Actions"), in support of their appeals from (a) the Orders Denying Defendants' Motions to Dismiss Plaintiffs' First Cause of Action For Equitable Subordination of Claims Held by Defendants, entered by the Bankruptcy Court for the Southern District of New York (Gonzalez, J.) (the "Bankruptcy Court") in the Coordinated Actions on or around December 23, 2005 (collectively, the "Subordination Orders"), and (b) the Order Denying Defendants' Motion to Dismiss Plaintiffs' Second Cause of Action For Disallowance of Claims Held by Defendants entered by the Bankruptcy Court in one of the Coordinated Actions on April 28, 2006 (the "Disallowance Order").[1]

## JURISDICTION

This Court has jurisdiction pursuant to section 158(a)(3) of title 28 of the United States Code.

## ISSUES PRESENTED

The issues presented on appeal are:

1.    Did the Bankruptcy Court err in holding that a claim asserted by a transferee is subject to subordination under Section 510(c) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") solely because a predecessor-in-interest

---

[1]    Although the parties to all of the Coordinated Actions fully briefed the issues concerning both plaintiffs' equitable subordination and disallowance causes of action, the Bankruptcy Court has entered an opinion and order with respect to the disallowance cause of action in only one of the Coordinated Actions, Adv. Pro. No. 05-01029 (AJG).

-- but not the transferee -- allegedly engaged in conduct that would warrant equitable

subordination if the predecessor-in-interest still held the claim;

       2.      Did the Bankruptcy Court err in further holding that a transferee whose

claim is subject to subordination based solely on the alleged misconduct of a predecessor-in-

interest cannot assert defenses of an innocent transferee that acquires a claim in good faith and

for value;

       3.      Did the Bankruptcy Court err in holding that a claim asserted by a

transferee is subject to disallowance under Section 502(d) of the Bankruptcy Code solely

because a predecessor-in-interest of the transferee -- but not the transferee -- allegedly received

and failed to repay an avoidable transfer;  and

       4.      Did the Bankruptcy Court err in further holding that a transferee whose

claim is subject to disallowance solely because a predecessor-in-interest allegedly received and

failed to repay an avoidable transfer is not permitted to assert defenses of an innocent transferee

that acquires claims in good faith and for value.

## APPLICABLE STANDARD OF REVIEW

Each of these four issues involves a pure question of law, and is thus subject to *de*

*novo* review. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990) (explaining that

a district court reviews a bankruptcy court's conclusions of law *de novo*); *In re Iridium*

*Operating LLC*, no. 01 Civ. 5429 (GBP), 2005 WL 756900, at *4 (S.D.N.Y. April 4, 2005)

(same).

## PRELIMINARY STATEMENT

This is an appeal from two series of decisions by the Bankruptcy Court which

held that a purchaser of loans or other debt in the distressed markets can have its claims

equitably subordinated or disallowed in a Chapter 11 proceeding if a debtor has a claim against

3263838_3.DOC

any prior owner of the claim -- (i) even if the purchaser purchased its loan or claim in good faith, for value, and without any knowledge of any claims by the debtor against the earlier owner of such claim, and (ii) even if the debtor's claims against the prior owner of the loan or claim are completely unrelated to the loan or claim bought by the purchaser.

Defendants are financial firms which regularly purchase and sell debt in the distressed markets -- well established markets on which billions of dollars of bank loans and debt are purchased and sold each day.  Early in the Enron Chapter 11 proceedings, Defendants purchased the participations of Fleet National Bank ("Fleet") in certain ordinary-course-of-business, prepetition bank loans made to Enron under short-term and long-term revolving lines of credit.  Specifically, Defendants purchased, in the aggregate, in excess of $29 million of prepetition loans made by Fleet to Enron as part of the consortiums of lending banks under a $1.75 billion short-term revolving credit facility and under a $1.25 billion long-term credit facility, for which Fleet has not been repaid.  In each instance, Defendants purchased their loans in the market from other financial institutions and did not purchase the loans directly from Fleet.

It is undisputed that Defendants purchased the revolving credit loans for value long before any claims were asserted by Enron against Fleet, and that at the times of the purchases, Defendants had no knowledge of any claims by Enron against Fleet.  Long after Defendants had purchased the loans -- in some instances up to a full year after the loans were purchased -- Enron asserted certain claims against Fleet arising out of transactions totally unrelated to the revolving credit loans which had been acquired by the Defendants.

A significant period of time after that, Enron brought the proceedings from which these appeals are taken, including the proceeding against Defendants, seeking (i) to "equitably subordinate" the revolving credit loans purchased by the Defendants under Section 510 of the

Bankruptcy Code or (ii) to disallow those claims under Section 502(d) of the Bankruptcy Code. In that proceeding, no claim was made that the Defendants had engaged in any improper conduct, that Defendants had any knowledge of any claims against Fleet at the times of their purchases, or that the claims purchased by Defendants indirectly from Fleet in the distressed market were in any way related to any wrongdoing, preferences or avoidable transfers. Enron sought to equitably subordinate or disallow the claims not on the basis of any alleged inequitable or wrongful conduct by any of the Defendants, but rather on basis of Enron's contention that it had legal claims against Fleet.

In essence, Enron argued, and the Bankruptcy Court held, that, if a bank or other party enters into dozens or even hundreds of pre-petition transactions with a debtor, and is alleged to have engaged in improper conduct or to have received a preference or fraudulent conveyance in connection with any one of those numerous transactions, then the debtor can seek to equitably subordinate or disallow the claims of any direct or indirect purchaser which has purchased a loan, notes, or a claim from that bank or other seller, even if the purchaser purchased its claim in good faith, for value, with no notice of any preference or wrongdoing and the loan, note or other claim purchased is unrelated to any preference, fraudulent conveyance, or claim of wrongdoing.

The Bankruptcy Court's decisions not only threaten to seriously disrupt the well-established markets for distressed loans, bonds and other debt, but are contrary to long established precedent governing the doctrine of "equitable subordination" and the Congressional understanding of the doctrine when it adopted Section 510(c) of the Bankruptcy Code, the plain language of Section 502(d) of the Bankruptcy Code, and the Congressional policies set forth in that and other provisions of the Bankruptcy Code. Moreover, Congress has, in the past, carefully

limited the liability of innocent purchasers under the Bankruptcy Code. The rulings by the Bankruptcy Court represent impermissible and, we believe misplaced, extensions of the law "at the level of policy choice" which should be reserved for Congress, rather than the Bankruptcy Court; if there is a policy decision to be made as to whether the doctrine of "equitable subordination" should be expanded to apply to innocent purchasers, it should be made by Congress.

Contrary to the Bankruptcy Court's "equitable subordination" rulings, the doctrine of "equitable subordination" is a judicially-created remedy which has been applied where the holder of the claim to be equitably subordinated has *itself* engaged in wrongful conduct. "Equitable subordination" is meant to be applied only in "extraordinary" circumstances, and the statute which authorizes the judicially-created remedy -- Section 510(c) of the Bankruptcy Code -- prohibits the imposition of such a remedy unless it is consistent with well-established "principles of equitable subordination." Under numerous decisions, including the leading decision by the Fifth Circuit in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th. Cir. 1977), the fundamental requirement for equitable subordination of a claim is a finding of misconduct on the part of the particular claimant holding the claim, and "equitable subordination" is not applicable to innocent claimholders. (*See* cases at pp. 15-16 below.) Likewise, the legislative history of Section 510(c), which authorized subordination of claims "under the principals of equitable subordination," shows that Congress understood the doctrine to apply only where the holder of the claim *itself* engaged in wrongdoing. (*See* discussion at pp. 16-17 below.)

As the Supreme Court has held, if the doctrine of equitable subordination is to be extended "at the level of policy choice," it should be done by Congress, not by the courts. *See*

*United States v. Noland*, 517 U.S. 535, 543 (1996). That is plainly what the Bankruptcy Court did here in extending the doctrine of equitable subordination to innocent purchasers. Moreover, as discussed in the *amicus* brief submitted by the major industry associations, the Bankruptcy Court's decision, if left to stand, would inflict significant damage on major segments of the financial markets for distressed securities, in which billions of dollars of loans and debt are traded each day, by creating legal uncertainties, impairing the pricing of loans and debt because of increased risks, and creating the potential for extensive litigation up and down chains of title of loans, notes and other debt traded actively in the distressed markets.

Indeed, in other provisions of the Bankruptcy Code which are helpful at the very least by analogy, Congress has itself provided protection to parties which have purchased their claims or property in "good faith" without knowledge of wrongful conduct. The Bankruptcy Code permits liability to be imposed on subsequent transferees only in very limited circumstances -- and in all such circumstances Congress included express protections for innocent transferees. Even where the purchaser of property itself purchases the very property that is subject to the fraudulent conveyance or preference claim (which is not the case here), the Bankruptcy Code provides that purchaser a safe harbor if it purchased its claim in good faith without knowledge of the avoidable transfer. The Bankruptcy Court ignored this long-standing Congressional policy of protecting innocent transferees and instead erected a *per se* strict liability standard under which all participants in the market for bankruptcy claims purchase claims at their peril. In so doing, the Bankruptcy Court announced a rule that is inequitable, punitive, and highly disruptive to the distressed debt market.

The absence of any precedent permitting the equitable subordination of claims held by innocent transferees demonstrates that subordinating such claims cannot be grounded in

"principles of equitable subordination," as provided in Section 510(c).  Indeed, neither the

Bankruptcy Court nor the plaintiffs below offered any authority for the proposition that

principles of equitable subordination permit subordination in such circumstances, and the

Bankruptcy Court instead justified its holding by reference to areas of law that have nothing to

do with equitable subordination at all and cases that are simply inapposite.

Similarly, the Bankruptcy Court's rulings that it can disallow the claims of

innocent purchasers under Section 502(d) is flatly at odds with the language of Section 502(d), as

well as a long line of cases interpreting the provision.  Section 502(d) provides that the court may

disallow the claim "of any entity from which property is recoverable" under the preference or

fraudulent conveyance provisions and which is *itself* the holder of the property constituting the

preference or fraudulent conveyance and is therefore in a position to return the property:

> "(d) Notwithstanding subsections (a) and (b) of this section, the
> court shall disallow any claim <u>of any entity from which property is
> recoverable under section 542, 543, 550, or 553 of this title</u> or that
> is a transferee of a transfer avoidable under section 522(f), 522(h),
> 544, 545, 547, 548, 549, or 724(a) of this title, <u>unless such entity or
> transferee has paid the amount, or turned over any such property,
> for which such entity or transferee is liable under section 522(i),
> 542, 543, 550, or 553 of this title.</u>"  (Emphasis added)

As Section 502(d) states, and as the courts have repeatedly emphasized, the purpose of the

statute is to require an entity which is *itself* holding an avoidable conveyance (*i.e.*, property

constituting a preference or fraudulent conveyance),  and is *itself* in a position to return that

property to the estate, to either return the property or face the disallowance of its claims.  (*See*

cases at pp. 35-36 below)  Section 502(d) does not entitle a debtor to seek disallowance of the

claims of an innocent purchaser who does not hold an avoidable transfer simply because some

prior holder of one of its claims received a preference or fraudulent conveyance in connection

with some completely unrelated transaction.

## STATEMENT OF THE CASE AND FACTS

On or about May 14, 2001, long before the filing of Enron's Chapter 11 petitions, Enron and various participating banks, including Fleet, entered into a 364-day Revolving Credit Agreement (the "Short-Term Revolving Credit Agreement") pursuant to which the foregoing banks loaned Enron $1,750,000,000 in secured loans.  *See* the complaint filed by Enron in *In re Enron Corp.*, Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. No. 05-01029 (the "Complaint") Appendix at Tab 1, Ex. A ¶ 41 (hereinafter App. __ at __).  As one of the participating banks, Fleet loaned Enron $53,666,666.67 or approximately 3 percent of the $1,750,000,000 facility.  *See* the Declaration of David Elkind filed in support of the Defendant's Motion to Dismiss (the "Elkind Dec.") ¶ 2 (citations other than to the Appendix shall be to documents listed in the Designation of Record).

On or about May 18, 2000, Enron and various participating banks, including Fleet, entered into a $1,250,000,000 Long-Term Revolving Credit Agreement (the "Long-Term Revolving Credit Agreement" and, together with the Short-Term Revolving Credit Agreement, the "Revolving Credit Agreements") pursuant to which the foregoing banks loaned Enron $1,250,000,000 in secured loans.  (Complaint ¶ 41)  As one of the participating banks, Fleet loaned Enron $20,833,333.33 or approximately 17% of the $1,250,000,000 facility.

On or about December 2, 2001, Enron and various of its affiliates (collectively, the "Debtors") filed petitions for relief pursuant to Chapter 11 of the Bankruptcy Code.  *See In re Enron Corp., et al.,* Case No. 01-16034 (AJG).  *See Enron Corp.* v. *Avenue Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).  Additional Enron affiliates filed Chapter 11 petitions thereafter.  (*Id.*)

Between March 12, 2002, and March 12, 2003 -- long before any claims were asserted by Enron against Fleet -- Defendants purchased, through the distressed debt market,

portions of the short-term and long-term revolving credit loans, and the claims against Enron

arising out of those loans, which had originally been owned by Fleet.  In each instance,

Defendants purchased the loans in the market from financial institutions which had themselves

purchased the loans originally held by Fleet. None of the Defendants acquired the loans directly

from Fleet.[2]

        On or about September 24, 2003 -- long after Defendants had purchased the

revolving credit claims -- Enron filed an action (Adversary Proceeding No. 03-09266, the

"MegaClaim Action") against various banks and other defendants other than Fleet seeking,

among other things, equitable subordination or disallowance of the banks' claims based on

allegations that the banks had engaged in wrongful conduct or had received preferences or

fraudulent conveyances under Sections 547 or 548 of the Bankruptcy Code. (*See, e.g.*, App. 1

Ex. A at ¶¶ 1266J-66N.)  Fleet was <u>not</u> even named as a defendant in the initial complaint in the

MegaClaim Action.  (*Id*.)  Indeed, no claims were asserted against Fleet until December, 2003,

eight months to a year and a half after Defendants had purchased their revolving credit loans.  In

Enron's subsequent "Amended Megacomplaints" in the MegaClaim Action, the first of which

was filed in December, 2003, Enron joined Fleet and an entity organized by Fleet as "Additional

---

[2]        On or about March 12, 2002, Defendant Rushmore-I purchased $10 million principal
amount of the claim arising out of the Short-Term Revolving Credit Agreement originally held
by Fleet from Goldman Sachs Credit Partners, L.P.  (Elkind Dec. ¶ 4; Complaint ¶ 48)
        On or about March 25, 2002, Defendant Rushmore-II purchased a $2,750,000 principal
amount claim arising out of the Long-Term Revolving Credit Agreement originally held by Fleet
from JP Morgan Chase Bank.  (Elkind Dec. ¶ 5; Complaint ¶ 49)
        On or about October 24, 2002, Credit Suisse First Boston ("CSFB") purchased from Fleet
$29.5 million of Fleet's claim arising out of the Short-Term Revolving Credit Agreement.
(Elkind Dec. ¶ 5)  On or about March 12, 2003, Defendant DK Acquisition purchased from
CSFB $14.5 million of the foregoing claim arising out of Short-Term Revolving Credit
Agreement.  (Elkind Dec. ¶ 6; Complaint ¶ 46)  On or about November 27, 2002, Defendant
RCG Carpathia acquired $5 million principal amount of the claim arising out of the Short-Term
Revolving Credit Agreement which CSFB had purchased from Fleet.  (Elkind Dec. ¶ 6;
Complaint ¶ 47)

Defendants" in the case, rather than as one of the principal "Bank Defendants," asserting against them preference and fraudulent conveyance claims relating to two transactions. (First Amended Megacomplaint ¶¶ 124-126, 369, 377 and Counts 1-3 and 6-10 ; App. 1 Ex. A at ¶¶ 124-126A, 316-317, 374-377 and Counts 1-3 and 6-10) None of the claims against Fleet in the MegaClaim Action had anything to do with the Revolving Credit Agreements or the revolving credit loans made thereunder. (*Id.*) Specifically, the Fourth Amended Megacomplaint alleged that Fleet had received partial repayments of obligations owed by the Debtors in connection with two transactions unrelated to the revolving credit loans, and that those repayments allegedly constituted preferences or fraudulent conveyances under Sections 547 or 548 of the Bankruptcy Code. Fleet disputes the claims against it in the MegaClaim Action.

Starting on January 10, 2005, Enron filed the adversary complaints against various purchasers of bank debt, all of whom were alleged to have purchased their debt prior to the assertion of and without knowledge of any claims by Enron against the original bank holders of those loans. [3] On January 12, 2005, Enron filed this proceeding against Defendants in the Bankruptcy Court. (*See Enron Corp.* v. *Avenue* Special *Situations Fund II, LP, et al.*, Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01029 (AJG) (Bankr. S.D.N.Y.)) In this proceeding, as in the others, Enron sought either (i) to equitably subordinate under Section 510(c) of the Bankruptcy Code, or (ii) to disallow under Section 502(d) of the Bankruptcy Code, the revolving credit claims purchased by Defendants based upon the completely unrelated claims asserted against Fleet in the MegaClaim Action. (App. 1 at ¶¶ 1-4, 51, 52, 56, 60)

---

[3]     In addition to the complaint in the proceeding against the Defendants, *see Enron Corp. v. Springfield Associates, L.L.C., et al.*, Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01025 (AJG) (Bankr. S.D.N.Y.), *Enron Corp. v. Bear, Stearns & Co. and Rushmore Capital-I L.L.C.*, Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01074 (AJG) (Bankr. S.D.N.Y.) and *Enron Corp. v. Bear, Stearns & Co. et al*, Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01105 (AJG) (Bankr. S.D.N.Y.).

There is no claim in the MegaClaim Action or the Complaint in this proceeding that the revolving credit loans which were purchased by Defendants involved any illegal or wrongful conduct of any kind or that any preferences, fraudulent conveyances or avoidable transfers were made to Fleet, to the Defendants, or to any other party in connection with those loans.  Nor is any claim made that Defendants in this proceeding engaged in any wrongful conduct or had any knowledge whatsoever, at the time they purchased the revolving credit claims, of any of the claims asserted against Fleet in the MegaClaim Action -- claims which were not even asserted until long after Defendants had purchased the revolving credit loans. Similarly, no claim is made in the Megaclaim Action or in the Complaint in this proceeding that the loans made to Enron pursuant to the Revolving Credit Agreements caused Enron any harm; to the contrary, since no portion of the $3 billion of loans to Enron under the Revolving Credit Agreements was repaid prior to Enron's Chapter 11 petition date, the loans have provided Enron and its estate with a sizeable windfall.  (Similarly, no claim is made in any of the related actions that any of the defendants therein engaged in any wrongful conduct, that they had any knowledge of any claims by any of the original bank holders of their loans, or that the claims against the banks are in any way related to the loans which they purchased in good faith and for value.)

On April 1 and May 18, 2005, respectively, Defendants, and the defendants in the related actions, filed motions to dismiss their actions on the grounds, among other things, that Section 510(c) did not permit equitable subordination of the claims of innocent transferees and that Section 502(d) does not permit disallowance of the claim of an innocent transferee simply because a prior owner of the claim is alleged to have received a preference or a fraudulent

conveyance in some unrelated transaction.[4]

The Bankruptcy Court held a hearing on the Defendants' motions and the motions in the related actions on August 9, 2005.

By decision dated November 17, 2005 (the "Subordination Opinion"), and order dated December 23, 2005 (the "Subordination Order"), the Bankruptcy Court denied Defendants' motions to dismiss Enron's equitable subordination claims. (Between November 17 and November 28, 2005, the Bankruptcy Court issued substantially identical opinions denying the motions to dismiss the equitable subordination claims in the related actions, and between December 20 and 23, 2005, the Bankruptcy Court entered the orders implementing those decisions.)

On January 19, 2006, Defendants (and the defendants in the related actions) filed motions for leave to appeal the orders denying the motions to dismiss the equitable subordination claims. Enron opposed those motions for leave to appeal.

By decision dated March 31, 2006 (the "Section 502(d) Opinion"), and order dated April 28, 2006, the Bankruptcy Court denied Defendants' motion to dismiss Enron's claims for disallowance under Section 502(d) of the Bankruptcy Code. *See* App. 4. On April 28, 2006, the Bankruptcy Court entered an order implementing the Section 502(d) Decision. On May 26, 2006, Defendants filed their motion for leave to appeal the orders denying the motions to dismiss the Section 502(d) claims, and Enron thereafter filed papers opposing those motions.

By Opinion and Order dated September 5, 2006, this Court granted the motions

---

[4]    On April 27, 2005, the Bankruptcy Court entered an order (the "Scheduling and Intervention Order") in each of the Coordinated Actions that, among other things, authorized the Intervenor Banks to intervene in each of the Coordinated Actions for the purpose of submitting briefs and making oral arguments in support of the Motions to Dismiss in the Bankruptcy Court and on any subsequent appeals.

for leave to appeal the decisions and orders of the Bankruptcy Court denying the motions to dismiss Enron's equitable subordination claims and its claims for disallowance under Section 502(d) of the Bankruptcy Code.  On September 11, 2006, this Court so ordered an Agreed Scheduling Order setting forth the briefing schedule for and other procedural matters related to the Appeal.

## RELEVANT STATUTES

Section 510(c) of the Bankruptcy Code provides, in relevant part:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.

Section 502(d) of the Bankruptcy Code provides:

"(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."

## I

## THE BANKRUPTCY COURT'S EQUITABLE SUBORDINATION ORDERS SHOULD BE REVERSED

In holding that a debtor can assert "equitable subordination" claims against an innocent purchaser of loans, debt or other claims in the marketplace simply because the debtor has some unrelated claim against a prior holder in the chain of title, the Bankruptcy Court committed fundamental errors with far-reaching consequences to the distressed debt markets and impermissibly expanded the doctrine of "equitable subordination" to allow the subordination of claims of innocent purchasers.  The Bankruptcy Court (i) disregarded the well-established body

of case law governing "equitable subordination" and "principles of equitable subordination" referred to in Section 510(c) of the Bankruptcy Code that constrain a bankruptcy court's ability to subordinate an otherwise-allowed claim under that provision of the Bankruptcy Code; (ii) ignored the statements of Congressional intent in adopting Section 510(c) of the Bankruptcy Code; and (iii) ignored the Congressional policy in the Bankruptcy Code of protecting innocent transferees. Moreover, even if there were a policy decision to be made as to whether the doctrine of "equitable subordination" should or should not be expanded to apply to innocent purchasers, that is a fundamental policy decision which should be made by Congress, not the courts, particularly given the protection that Congress has provided to "good faith" purchasers throughout the Bankruptcy Code.

A.    **The Bankruptcy Court Improperly Applied**
      **The Doctrine Of "Equitable Subordination" To**
      **Subordinate The Claims Of Innocent Purchasers**

Section 510(c) of the Bankruptcy Code instructs courts to adhere to "principles of equitable subordination" in determining whether to subordinate a claim under the provision. ("[A]fter notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. . . ."). As both the cases and the legislative history of Section 510 show, an essential element for the subordination of an otherwise allowable claim is a showing that the holder of the claim, *itself*, engaged in some form of wrongdoing, and Congress clearly understood that to be the case when it enacted Section 510(c) of the Bankruptcy Code.[5]

---

[5]    The legislative history of Section 510(c) demonstrates that Congress's use of the phrase "principles of equitable subordination" referred to well-settled case law existing at the time Congress enacted Section 510. See S. Rep. No. 95-989 at 74 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5860 ("[A]ny subordination ordered under this provision must be based on principles of equitable subordination. These principles are defined by case law . . .";

con't...

As the Fifth Circuit held in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th. Cir. 1977), and as many other decisions similarly have held, it has long been established that a claim may be disallowed under the doctrine of "equitable subordination" only if the claimant, itself, has engaged in some type of wrongful conduct. As recognized by the Supreme Court and numerous other courts and commentators, the Fifth Circuit's decision in *Mobile Steel*, provides the controlling three-part test for determining if a claim can be equitably subordinated. *See United States* v. *Noland*, 517 U.S. at 539-39; *Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004); *Official Comm. of Unsecured Creditors of Sunbeam Corp.* v. *Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002); 4 ALAN N. RESNICK, ET AL., Collier on Bankruptcy ¶ 510.05[1] (15th ed. 2005). The *Mobile Steel* test provides that a claim may be subordinated upon the basis of three essential findings:

> (i)　　The *claimant* must have engaged in some type of inequitable conduct.
>
> (ii)　　The misconduct must have resulted in injury to the creditors . . . or conferred an unfair advantage on the claimant. And
>
> (iii)　　Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel*, 563 F.2d at 700 (citations omitted) (emphasis added).[6]

---

H.R. Rep. No. 95-595 at 359 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6315 ("[Section 510(c)] is intended to codify case law, such as *Pepper v. Litton* . . . and *Taylor v. Standard Gas and Electric Co.* . . ."); see also *Holt v. Fed. Deposit Ins. Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148 (5th Cir. 1989) (noting that Congress's intent in drafting Section 510(c) was to "incorporate doctrines that had been well-developed in the courts for several decades preceding the enactment of the Bankruptcy Code").

[6]　　Courts require a greater showing to establish grounds for equitable subordination of the claims of a non-insider. As against non-insiders, equitable subordination is warranted only if the claimant's conduct is "egregious" and "severely unfair" to other creditors. *In re Sunbeam Corp.*, 284 B.R. at 364.

Similarly, other courts have emphasized that a fundamental prerequisite for equitable subordination of a claim is some wrongful conduct by the holder of that claim. *See, e.g., Schulman v. California (In re Lazar)*, 237 F.3d 967, 985, n.19 (9th Cir. 2001) ("Equitable subordination requires that . . . the *claimant* who is to be subordinated has engaged in inequitable conduct . . . .") (citations omitted) (emphasis added) *Spacek v. Thomen (In re Universal Farming Indus.)*, 873 F.2d 1334,1337 (9th Cir. 1989)) (same) ; *Aguilar* v. *United States (In re Aguilar)*, 312 B.R. 394, 399 (D. Ariz. 2003) (same); *Esposito* v. *Noyes* (*In re Lake Country Invs.*), 255 B.R. 588, 604 (Bankr. D. Idaho 2000) (same); *In re Sunbeam Corp)*, 284 B.R. at 363 (the purpose of Section 510(c) is "to subordinate an otherwise legally valid claim when the *claimant* has engaged in conduct that makes it unjust or unfair for the *claimant* to share pro rata with similarly situated creditors") (emphasis added); *Westgate-California Corp* v. *First Nat'l. Fin. Corp.*, 650 F.2d 1040, 1043-44 (9th Cir. 1981) (noting that a creditor's claim could not be subordinated solely on the basis of principal's alleged misconduct without a finding that principal acted on behalf of creditor or that creditor was the principal's alter ego).[7]

In adopting Section 510, Congress indicated its clear understanding that misconduct by the holder of the claim was the essential element for subordination of a claim under the "principles of equitable subordination" referred to in Section 510(c).

The Senate Report expressly stated that a "claim may normally be subordinated only if its *holder* is guilty of misconduct." S. Rep. No. 95-989 at 74 (emphasis added). Floor

---

[7]     As discussed in the Intervenors' Memorandum of Law on these appeals, the only exception to the requirement of wrongdoing for equitable subordination of claims is for claims for tax penalties and for claims which are, in substance, claims for equity rather than creditor claims. As discussed in the Intervenors' Memorandum of Law, those exceptions are completely innapposite here and do not provide a basis for subordinating the claims good faith purchasers of creditor claims. (Intervenor Banks Memorandum of Law on the Issue of Equitable Subordination and Disallowance of Transferred Claims dated October 10, 2006, 16-20.)

statements by Congressmen DeConcini and Edwards similarly stated that misconduct by the

holder of the claim was a prerequisite to equitable subordination:

> It is intended that the term "principles of equitable subordination"
> follow existing case law and leave to the courts development of
> this principle.  To date, under existing law, a claim is generally
> subordinated *only if [sic] holder of such claim is guilty of
> inequitable conduct*, or the claim itself is of a status susceptible to
> subordination, such as a penalty or a claim for damages arising
> from the purchase or sale of a security of the debtor.

124 CONG. REC. 32989, 33998 (1978) (statement of Hon. Dennis DeConcini) (emphasis added);

124 CONG. REC. 32350, 32398 (1978) (statement of Rep. Don Edwards) (same).[8]

    In discussing a different subsection of  Section 510, the House Report (at 194-

196) illuminated the limits of the equitable subordination doctrine:

> Professor Kripke has made clear that … *the doctrine of equitable
> subordination is inapplicable as between two innocent third
> parties*.  His statement is supported by the opinion of the Second
> Circuit in *In re Credit Industrial Corp.*, in which the court noted:
>
>> "Equitable subordination, which is founded upon
>> estoppel, is the doctrine invoked by the courts to
>> *deny equal treatment to creditors based on some
>> inequitable or unconscionable conduct in which
>> they have engaged*, or a special position which they
>> occupy vis-a-vis the bankrupt that justifies
>> subordination of their claims. . . ."

H.R. Rep. No. 95-595 at 196 (1978) (emphasis added).

    It is significant that neither Enron, nor the Bankruptcy Court in its decision, could

cite even a single decision which has actually held that the doctrine of "equitable subordination"

could be applied to subordinate the claims held by innocent purchasers, let alone purchasers who

had acquired claims completely unrelated to any alleged misconduct.  The one case cited by the

---

[8]    Floor statements of Congressmen DeConcini and Edwards are persuasive evidence of Congressional intent with respect to its passage of the Bankruptcy Code.  *See Begier v. I.R.S.*, 496 U.S. 53, 64 n.5 (1990).

Bankruptcy Court as somehow authorizing the application of the doctrine to someone other than a wrongdoer -- *Wilson v. Huffman (In re Missionary Baptist Found. of America)*, 818 F.2d 1135, 1146 (5th Cir. 1987) (App. 3 at p. 23) -- in fact provides no support whatsoever for the Bankruptcy Court's ruling.  To the contrary, in *Missionary Baptist*, the Court held that the creditor's claim could be subordinated only because of its <u>own</u> implication in wrongful conduct, and that the situation might well be entirely different if the claim had been sold and the claimant was itself an innocent purchaser, as is precisely the case here. [9]

In short, the cases and the legislative history of Section 510(c) make clear that the doctrine of equitable subordination requires a showing of wrongful conduct by the holder of the claim, and does not authorize the subordination of claims of an innocent purchaser simply because the debtor can assert some claim of wrongful conduct by a prior owner which is completely unrelated to the claim purchased by the transferee.

**B.    The Bankruptcy Court Disregarded The Long-Standing<br>Congressional Policy Of Protecting Innocent Transferees**

As set forth above, the Bankruptcy Court's expansion of Section 510(c) to permit

---

[9]    In *Missionary Baptist*, the Court actually held that the creditor's claim could be subordinated only because of its <u>own</u> implication in wrongful conduct, and that the situation would be different if the claimant were itself an innocent party.  In *Missionary Baptist*, the claimant was the general partner of an insider who breached his fiduciary obligations to the Debtor, and an equal co-owner with the same insider of a corporation which, along with the partnership, engaged in insider transactions with the Debtor.  Based on that set of facts, the court found that the non-insider claimant's "connection to the [wrongdoer] and his involvement in the transactions that form the basis of his claim against the Debtor allow us to conclude that subordination of the [claimant's] claim could be supported on the basis of identifiable inequitable conduct on the [insider's] part."  *Id* at 1146.  The court <u>expressly</u> <u>contrasted</u> that scenario to one in which a claim "is in some way passed by an inequitable actor to an innocent, uninvolved bystander," commenting that, in that situation, "there might be reasons to find that subordination . . . would be contrary to the principles of equitable subordination. . ."  *Id.*

*See also Kingsway Revocable Trust* v. *Fed. Savs. & Loan Ins. Corp. (In re C.P.C. Dev. Co. No. 5)*, 113 B.R. 637 (Bankr. C.D. Cal. 1990) (noting that California law distinguishes between a claimant who succeeds to a claim by operation of law -- who may be subject to equitable subordination -- and a "bonafide purchaser for value who takes without notice").

subordination of claims held by innocent transferees based solely on the alleged misconduct of a predecessor-in-interest in connection with an unrelated transaction is contrary to well established "principles of equitable subordination."  In addition to the case law governing "equitable subordination" and the statements of Congressional understanding underlying Section 510(c), other provisions of the Bankruptcy Code reflect a strong Congressional intent favoring the protection of innocent purchasers and demonstrate, at the very least, that the policy decisions adopted by the Bankruptcy Court should be made by Congress, not the courts.  The Bankruptcy Court compounded its error by misstating the relevance of those provisions to the issues involved here and by mischaracterizing the applicable standard of "good faith."

      The Bankruptcy Code permits trustees and debtors-in-possession to pursue remedies against subsequent transferees in only a handful of circumstances and, in each instance, expressly protects innocent, good faith, for-value transferees.  For example, Section 550(b)(1), which deals with the estate's rights to recover property from a subsequent transferee of an "avoided transfer," provides that the trustee may sue to recover the transferred property or its value from a subsequent transferee, but provides a defense for "a transferee that takes for value . . . and without knowledge of the voidability of the transfer avoided."  11 U.S.C. § 550(b)(1).  Section 550(b)(1) demonstrates (a) that, where Congress intended to impose liability on subsequent transferees, it knew how to do so (and chose not to do so in Section 510(c) by not referring to transferees); and (b) that, where Congress did create a remedy against subsequent transferees, it provided protection to "good faith" purchasers for value.

      In addition to Section 550(b)(1), many other sections of the Bankruptcy Code protect innocent transferees.  *See, e.g.,* Section 363(m) (protecting the validity of a post-petition sale or lease of property to good faith purchasers); Section 364(e) (protecting the validity of

debts incurred to and security interests granted in favor of good faith post-petition lenders);

Section 365(i) (protecting the expectations of good faith purchasers under rejected executory

contracts for the sale of real property); Section 542(c) (protecting good faith post-petition

transferors of property of the estate); Section 542(d) (permitting insurance companies required to

make automatic transfers under existing contracts to transfer property of the estate in good faith);

Section 548(c) (granting a lien to good faith transferees whose transfer is voidable under

Section 548 to the extent of value given); and Section 549(c) (protecting good faith post-petition

purchasers of real property).  As demonstrated by the foregoing provisions, the entire structure of

the Bankruptcy Code reveals a Congressional intent to protect innocent transferees.

        In adopting its "strict liability" rule for transferees, the Bankruptcy Court focused

on the fact that there is no explicit provision in the Bankruptcy Code establishing a defense to

equitable subordination under Section 510(c) for good faith transferees.  But this is a classic

"Catch 22."  As discussed above, at the time the Bankruptcy Code was enacted, the well-

established "principles of equitable subordination" made clear that misconduct by the holder of

the claim was the *sine qua non* of equitable subordination.  Since no case had ever subordinated

claims in the hands of any innocent party -- and Congress regarded equitable subordination as

entirely unavailable against innocent parties (*see* pp. 16-17 above) -- there was no conceivable

reason for Congress to provide a defense to equitable subordination for good faith transferees.

Equitable subordination simply had no applicability to the innocent.

        If the Bankruptcy Court was going to depart from established principles of

equitable subordination and expand the reach of equitable subordination to claims transferees,

fundamental principles of equity mandate the recognition of a good faith defense.  See *Trone v.*

*Smith* (*In re Westgate-California Corp.*), 642 F.2d 1174 (9th Cir. 1981) ("Subordination is an

equitable power and is therefore governed by equitable principles.")

For nearly two centuries, courts have consistently protected the rights of an innocent transferee against challenges by parties with equity-based claims against the transferor. Chief Justice Marshall acknowledged this in 1810:

> Titles, which, according to every legal test, are perfect, are acquired with that confidence which is inspired by the opinion that the purchaser is safe. If there be any concealed defect, arising from the conduct of those who had held the property long before he acquired it, of which he had no notice, that concealed defect cannot be set up against him. He has paid his money for a title good at law, he is innocent, whatever may be the guilt of others, and equity will not subject him to the penalties attached to that guilt. All titles would be insecure, and the intercourse between man and man would be very seriously obstructed, if this principle be overturned.

*Fletcher v. Peck*, 10 U.S. 87, 133-34 (1810) (Marshall, C.J.). Since then, courts of equity have repeatedly recognized this principle. *See United States v. Dunn*, 268 U.S. 121, 132 (1925) (The "beneficiary of a trust may . . . follow the trust res fraudulently diverted until it reaches the hands of an innocent purchaser for value."); *United States v. California & Oregon Land Co.*, 148 U.S. 31, 40-41 (1893) (referencing different contexts in which parties who take for value and without notice of a defect are protected from disputes between prior parties); *People's Sav. Bank v. Bates*, 120 U.S. 556, 564 (1887) (Harlan, J.) (acknowledging that a party who takes for value and without notice is "unaffected by any equities existing between antecedent parties"); *Jodson v. Corcoran*, 58 U.S. 612, 615 (1854) ("a purchaser of a *chose in action*, or of an equitable title, must abide by the case of the person from whom he buys, and will only be entitled to the remedies of the seller; and yet, there may be cases in which a purchaser, by sustaining the character of a *bona fide* assignee, will be in a better situation than the person was of whom he bought. . ."); 3 JOHN NORTON POMEROY & SPENCER W. SYMONS, A TREATISE ON EQUITY JURISPRUDENCE, §777 at 111 (5th Ed. 1941) (a bona fide purchaser for value without notice will

3263838_3.DOC

take property protected against the equitable remedies of the original defrauded owner).  The

Bankruptcy Court's refusal to recognize a good faith defense to an equitable doctrine is clearly

erroneous.

Compounding its error, the Bankruptcy Court concluded that *even if* a good faith

defense was available with respect to the equitable subordination of claims under Section 510(c),

no claims transferee could ever establish the prerequisites of the defense.  According to the

Bankruptcy Court, because all claim transferees, by definition, know they are purchasing claims

of a debtor and know that a debtor (or trustee) is obliged to investigate each claim and assert any

defense, including equitable subordination, all claim transferees are "on notice" of potential

claims for equitable subordination.  (*See* App. 3 at pp. 47-50.)  Under the Bankruptcy Court's

formulation, purchasers are on notice of any and every conceivable claim -- including

preference, fraudulent conveyance, and even securities and antitrust claims -- simply because the

debtor has an obligation to investigate such claims if they exist.

The Bankruptcy Court's interpretation of "good faith" in this context is

completely unprecedented and untenable.  The fact that a debtor is in Chapter 11 does not mean

that the purchaser of a claim knows or is on notice that some earlier owner of a loan, claim, or

note received a preference or fraudulent conveyance or engaged in any improper conduct --

particularly where, as here, the claims against the earlier owner are based upon completely

unrelated claims and the preference, fraudulent conveyance, or improper conduct does not even

relate to the revolving credit loans that were purchased by the Defendants.

In support of its interpretation of the "good faith" requirement, the Bankruptcy

Court cited to preference and fraudulent conveyance decisions in which the purchaser of

property knew that a prior owner had received the property from the debtor during the statutory

preference period and the question was whether the subsequent owner knew or was on notice of the fact that the debtor was insolvent *at time of the transfer*. The elements of a preference claim are the receipt of a transfer within 90 days of the debtor's bankruptcy at a time when the debtor was insolvent; the elements of a fraudulent conveyance are a transfer by the debtor without reasonably equivalent consideration in return which leaves the debtor insolvent or without adequate capital. (*See* Sections 547 and 548 of the Bankruptcy Code.)   In those circumstances, knowledge by a purchaser of the debtor's financial impairment *at the time of a transfer from the debtor to the prior owner* can create an inference that the purchaser knew or was on notice of the preference or fraudulent conveyance claim, and it was *that* knowledge -- *not* knowledge of the debtor's bankruptcy months or years later -- which can give rise to an inference of knowledge or notice of the claim against the prior owner.  *See Max Sugarman Funeral Home, Inc.* v. *A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991) (recipient of transfer of property had contemporaneous knowledge of the nature and scope of the transfers and was well aware of the unmanageable indebtedness and the likelihood of bankruptcy).  *See also Kendall* v. *Sorani, et al. (In re Richmond Produce Co.)*, 195 B.R. 455, 464 (N.D. Cal. 1996) (transferee was aware that the transferor had been experiencing financial difficulties in the months leading up to the transfer).  Here, by contrast, there is no basis for an inference that the Defendants were on notice of the claims against Fleet.  First, the claims against Fleet arise out of transactions which are completely unrelated to the loans purchased by the Defendants; second, the claims against Fleet arise out of transactions occurring *well before* the Chapter 11 proceedings; and, third, there is not even a suggestion that the Defendants had any knowledge of the transactions between Enron and Fleet giving rise to the claims against Fleet.

Knowledge of the debtor's bankruptcy at the time of a claim transfer is not an

element of an equitable subordination action and thus would not put a transferee on notice of any but the most theoretical risk of equitable subordination.[10]  To adopt such a test in the context of 510(c) is to define away the good faith defense because any purchaser of a bankruptcy claim must, by definition, be aware of the debtor's bankruptcy.[11]

The only logical application of a good faith defense to Section 510(c) would consider whether the transferee knew or had reason to know of misconduct by a predecessor-in-interest at the time of the transfer.  Here, there is no contention that the Defendants knew or had reason to know of any misconduct by a predecessor-in-interest.

**C.    Instead Of Adhering To Principles Of Equitable Subordination, The Bankruptcy Court Substituted Inapt Analogies To The Law Of Assignment And Priority Wage Claims**

In ruling that Section 510(c) permits a court to subordinate a claim held by an innocent transferee based solely on the misconduct of a predecessor-in-interest, the Bankruptcy Court ignored the well-developed case law defining the doctrine of equitable subordination. Instead, the Bankruptcy Court justified this erroneous expansion of the doctrine by analogizing to two inapposite areas of law:  the law of assignments and case law addressing transferees of priority wage claims.  Of the 53 pages of the Subordination Opinion, the Bankruptcy Court devoted only five to explaining the legal foundation for its conclusion that a court may equitably

---

[10]    By contrast, the debtor's solvency is generally an element of an avoidance claim. Knowledge of the debtor's insolvency at time of transfer arguably puts a transferee on notice that the trustee may have a viable avoidance claim.

[11]    Moreover, the Bankruptcy Court's contention that "a purchaser of a claim, by definition, knows that it is purchasing a claim against a debtor and is on notice that any defense or right of the debtor, including equitable subordination, may be asserted against that claim" (App. 3 at p. 48) is mere question-begging.  Until the Bankruptcy Court's ruling, no court had ever held that the trustee or debtor in possession may seek equitable subordination of claims held by transferees that have not themselves engaged in misconduct.  How can it then be said that all transferees are on notice of the risk of equitable subordination of their claims?

subordinate the claims of an innocent transferee on the basis of a transferor's misconduct. (*See* App. 3 at pp. 29-33.) In those pages, the Bankruptcy Court failed to cite a single case involving equitable subordination. Instead, the Bankruptcy Court cited four cases involving the law of assignments (*see* App. 3 at pp. 29-30) and two cases involving the priority of assigned wage claims (*see* App. 3 at pp. 30-32). Neither the law of assignments nor the law governing the priority of assigned wage claims has any bearing whatsoever on whether Section 510(c) permits subordination of a claim in the hands of an innocent transferee.

Invoking case law dealing with claims assignments, the Bankruptcy Court reasoned that "[t]he transfer of a claim does not change the nature of the claim" (App. 3 at pp. 30).[12] But here, the Bankruptcy Court simply assumed its conclusion. If the potential for equitable subordination in the hands of a transferor changes the very "nature" of the claim -- becoming an attribute of the claim (as Enron argued) -- then assignment law dictates that this attribute will travel with the claim upon assignment. However, if (as the case law reflects) equitable subordination is a remedy available only against particular claimants found to have engaged in misconduct, equitable subordination cannot be an attribute that travels with a claim but, rather, a remedy whose availability depends on the attributes of the particular claimant.[13] The law of assignments simply has no bearing on the question.

---

[12]    The Bankruptcy Court cites four cases discussing the law of assignments. A discussion of equitable subordination appears in the concurring opinion of one of those cases, *see Goldie v. Cox*, 130 F.2d 695 (8th Cir. 1942), and the other four make no mention of equitable subordination, *see Dorr Pump &Mfg. Co.* v. *Heath (In re Dorr Pump & Mfg. Co.),* 125 F.2d 610 (7th Cir. 1942); *Carnegia* v. *Georgia Higher Educ. Assistance Corp.*, 691 F.2d 482 (11th Cir. 1982); *Citibank, N.A.* v.*Tele/Resources, Inc*., 724 F.2d 266 (2d Cir. 1983). None of these cases provide any reason to establish a rule that is contrary to the *Mobile Steel* test.

[13]    *Mobile Steel* makes clear that equitable subordination does not address the validity of a claim., 563 F.2d at 688. It is, instead, a remedy available against particular claimants. *Id.*; *In re Sunbeam Corp.*, 284 B.R. at 363.

In addition to relying on the law of assignment, the Bankruptcy Court turned to a case involving the priority of assigned wage claims, and specifically *Shropshire, Woodlife & Co. v. Bush*, 204 U.S. 186 (1907). (*See* App. 3 at pp. 32 ("The principle set forth in *Shropshire* can be applied to the instant case").) In *Shropshire*, the Supreme Court held that an assignment does not affect the statutory priority afforded to wage claims, reasoning that "[t]he character of the debts was fixed when they were incurred, and could not be changed by an assignment. They were precisely one of the classes of debts which the statute says are 'debts to have priority.' " *Id.* at 189.

*Shropshire* simply has no relevance to the scope of Section 510(c). The statutory priority of wage claims derives from the "character" of the claim itself. The "character" of the claim -- *i.e.,* a claim for wages -- does not change upon its assignment. But the priority adjustment resulting from equitable subordination does not derive from the "character" of the claim, but from a particular claimant's misconduct (which, as the Bankruptcy Court found, may be entirely unrelated to the claim to be subordinated, *see* App. 3 at pp. 22-28). *See Noland*, 517 U.S. at 541, 543 (holding that the Sixth Circuit had improperly authorized equitable subordination of claims based on their "nature"). In relying on *Shropshire*, the Bankruptcy Court once again has simply assumed the truth of the proposition it set out to prove: that the potential for "equitable subordination" in the hands of a predecessor-in-interest becomes an attribute of a claim rather than remaining a remedy available against a particular type of claimant. There is nothing in the principles of equitable subordination that would support the Bankruptcy Court's conclusion that the availability of equitable subordination against a particular prior holder becomes "attached to such claim and it travels with any subsequent transfer" (App. 3 at p. 33).

**D.    The Bankruptcy Court's Decision Impermissibly
Extended The Doctrine Of Equitable Subordination,
Making Decisions "At The Level Of Policy Choice"
That Should Be Reserved For Congress To Decide**

In expanding the doctrine of equitable subordination to allow the claims of an

innocent purchaser to be subordinated on the basis of completely unrelated transactions by a

prior owner of a claim, the Bankruptcy Court adopted a far-reaching new rule which would have

a serious adverse effect upon the important market for loans, debt, and claims.  The Bankruptcy

Court's decision would allow a debtor to seek subordination of the claim of any entity purchasing

loans, notes, debt or claims post-petition if the debtor could assert any claim against a prior

owner in the chain of title for alleged preferences, fraudulent conveyances or for any other

allegedly "wrongful" conduct, even if the purchaser had no knowledge of the claim and the claim

arose out of completely unrelated transactions.  As is explained more fully in the accompanying

Brief of *Amici Curiae* The Bond Market Association, The International Swaps and Derivatives

Association, The Securities Industry Association, and the Loan Syndication and Trading

Association submitted on this appeal, such a rule would have serious adverse consequences upon

the markets for distressed loans, debt, and claims.

The rule adopted by the Bankruptcy Court would result in a proliferation of

litigation.  Debtors believing that they had preference, fraudulent conveyance, or other claims

against banks or financial institutions would not only file claims against such banks or financial

institutions, but could also file legal equitable subordination (and Section 502(d) claims for

disallowance) against any entity which had directly or indirectly purchased a loan, note, debt, or

other claim from such bank or financial institution.  In the first instance, the Bankruptcy Court

ruling would result in a significant increase in litigation by debtors seeking to increase their

litigation leverage and generate additional recoveries by suing innocent purchasers in the chain

of title.  Here, for example, the Debtors have a complete remedy against each of the banks which they sued in the MegaClaim Litigation, and no claim is made that any such banks sold any of their loans to avoid a judgment or to secret their assets or that any of the banks did not receive fair consideration for the loans which they sold in the market.  Similarly, with the proliferation of litigation by debtors would come a proliferation of litigation up and down the chain of ownership.  Transferees who found that claims purchased in good faith were now objected to on the basis of some unrelated transaction by a prior owner, and that distributions declared in a Chapter 11 case were not being paid in respect of such claims, would naturally commence litigation against prior owners up and down the chain of title.

In addition to litigation that would result, the Bankruptcy Court's ruling would significantly impact the market for distressed loans, debt and claims.  Buyers cannot possibly do due diligence into all of the transactions between the prior owners of the loans, debt or claims and the debtors.  Banks may have literally hundreds of pre-petition transactions with a debtor.  There is no conceivable way that a purchaser buying a loan, note, debt, or claim on the distressed market can research every transaction between prior owners and the debtors.  As a result, the Bankruptcy Court's ruling would significantly increase the risks in purchasing loans, debt and claims, and the prices at which such loans, debt and claims could be bought or sold.  Indeed, it is possible that some issues would no longer be bought or sold at all because of the risks and potential litigation cost associated with such claims.  As the Second Circuit held in *Elliott Assocs. L.P.* v. *Banco de la Nacion*, 194 F.3d 363, 380 (2d Cir. 1999), a case involving the secondary claim market, the markets for distressed debt and claims play an important part in the

commercial marketplace and rulings which impair those markets should be disfavored.[14]

The Bankruptcy Court devoted a substantial portion of its opinion to "policy arguments" supporting its decision. The opinion focuses on the burden that the debtor allegedly would face if it was not permitted to subordinate the claims of innocent transferees based on misconduct by their predecessors-in-interest. (*See* Subordination Op. 34.) According to the Bankruptcy Court, that alleged burden includes the "necessity of collecting damages" in

---

[14]    In *Elliott Assocs. L.P. v. Banco de la Nacion*, 194 F.3d 363, 380 (2d Cir. 1999), the Second Circuit recognized the important role that the secondary claim market plays in providing lenders with an incentive to extend credit and took care not to adopt a construction of New York's champerty statute that would disrupt that market. In reversing the district court's construction of the statute, which would have allowed sovereign debtors to assert the champerty defense with greater ease, the Second Circuit observed:

> Given the mandate that "whenever possible, statutes should be interpreted to avoid unreasonable results," *Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d. 613, 624 (2d Cir. 1997), we also take note of the unreasonable results that might ensue were we to accept the district court's interpretation of Section 489. While the district court's rule might benefit the Debtors in the short run, the long term effect would be to cause significant harm to Peru and other developing nations and their institutions seeking to borrow capital in New York. The district court's interpretation would mean that holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming. This would therefore add significantly to the risk of making loans to developing nations with poor credit ratings. The additional risk would naturally be reflected in higher borrowing costs to such nations. It could even make loans to some of them unobtainable in New York. A well-developed market of secondary purchasers of defaulted sovereign debt would thereby be disrupted and perhaps destroyed even though its existence provides incentives for primary lenders to continue to lend to high-risk countries.

*Id*. at 380.

The Second Circuit's discussion of the importance of the secondary market for defaulted sovereign debt in *Elliott Assocs.* applies with equal force to the market for bankruptcy claims. But in stark contrast to the Second Circuit's concern over the market implications of a tenuous interpretation of a statute, the Bankruptcy Court ignored the issue altogether by simply denying that its decision would have any impact on the market. As explained above, the Bankruptcy Court's decision will, in fact, severely impact the distressed debt market. Just as the Second Circuit rejected as "unreasonable" a construction of the New York champerty statute that risked harming the secondary market in sovereign debt claims, so too should this Court undo the harm to the market for bankruptcy claims resulting from that interpretation.

"lawsuits against each of the original or previous holders who engaged in inequitable conduct," which would "delay the ultimate distributions by the debtor" (Subordination Op. 36).

      The Bankruptcy Court's argument, however, ignores the fact that, even under that Court's ruling, a debtor can only equitably subordinate the claims of an innocent transferee once it *establishes* misconduct by a predecessor-in-interest. Whether that factual question is litigated in an equitable subordination action against an innocent transferee or in a direct action by the debtor against the alleged wrongdoer, the burden or attendant delay will not be significantly different.[15] Moreover, any purported incremental "administrative burden" on a debtor unable to assert an equitable subordination claim against an innocent transferee is minor in comparison to the unfair burden it imposes on the innocent transferee and the disruptive effect it will have on the entire claims trading market.

      Even assuming that there were policy considerations to argue in favor of extending the doctrine of equitable subordination to subordinate the claims of innocent purchasers, those decisions involve fundamental policy issues which should be left for Congress, not the courts, to decide. Throughout the Bankruptcy Code, Congress has carefully limited remedies against purchasers -- even purchasers of the very property constituting a preference or fraudulent conveyance; Congress has also provided protections throughout to the Bankruptcy Code to "good faith" purchasers for value. (*See* discussion at pp. 19-24 above) Moreover, in the

---

[15]    In this action, of course, Enron has already instituted a lawsuit, the MegaClaim Action, against the Intervenor Banks and additional defendants seeking damages for the very same allegedly inequitable conduct underlying its claims for equitable subordination against the transferees. Enron instituted these multiple actions despite the fact that the law is clear that Enron cannot recover damages from the Intervenor Banks or the additional defendants in the MegaClaim Action and equitably subordinate the Credit Facility Claims based on the same conduct. *See In re Centennial Textiles, Inc.,* 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) ("[A] trustee cannot recover damages and equitably subordinate a claim based on the same wrong.") Thus any hypothetical concern about increased administrative burdens is entirely inapplicable in this case.

legislative history of Section 510(c) Congress indicated its understanding that applicable "principles of equitable subordination" required a showing of wrongdoing by the holder whose claim was to be subordinated.  (*See* discussion at pp. 16-18 above)  In the face of such evidence, and the impact of its ruling upon the markets, the issue addressed by the Bankruptcy Court's decision involves, at the very least, important policy considerations and judgments which should be left for Congress to decide.

      As the courts have made clear, conditional grants of power to a bankruptcy court, such as Section 510(c), should not be deemed to allow the courts to legislate new rules and doctrines involving important policy considerations simply because a court might deem it consistent with its own view of "equity" or its own broad interpretation of the statute's purpose. Indeed, in the context of Section 510(c) itself, the Supreme Court has emphasized that the statute does not permit a court to "adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." *United States* v. *Noland*, 517 U.S. 535, 539 (1986) (*quoting* Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law 417, 428 (1985)) (internal quotations omitted); *see also In re Lifschultz Fast Freight*, 132 F.3d at 349 ("A bankruptcy court should be doubly wary of using its power of equitable subordination.").[16]  As the Supreme Court further wrote in *Noland,* "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." *Id.*, at 543.

---

[16]    *See also Rodriguez v. United States,* 480 U.S. 522, 525-526 (1987) (per curiam) ("But no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice -- and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.") (emphasis in original).

Indeed, in adopting Section 510(c) of the Bankruptcy Code, Congress specifically rejected language that would have given the courts broad power to reorder priorities under a broad power of "doing equity" or "preventing unfairness."  The House of Representatives' first version of Section 510(c) would have allowed the subordination of claims "on equitable grounds."  H.R. 8200, 95th Cong. § 510 (1977).  The report accompanying H.R. 8200 emphasized that this language differed from, and was broader than, the existing doctrine of equitable subordination, because it would allow courts to order "subordination on any equitable grounds."  H.R. Rep. No. 95 - 595 at 359 (1977).  The final legislation, however, uses the narrowing phrase "under principles of equitable subordination."  *See* S. Rep. No. 95-989, 74 (1978); 124 Cong. Rec. 33989, 34016 (1978) (Statement of Sen. DeConcini); 124 Cong. Rec. 32350, 32416 (Statement of Rep. Edwards).[17]  The legislative history of Section 510(c) thus confirms that Congress consciously limited operation of the statute to circumstances consistent with historically-rooted principles of equitable subordination.

Decisions under Section 105(a) of the Bankruptcy Code are also instructive.  That section grants bankruptcy courts the equitable power to issue any order, process or judgment "that is necessary or appropriate to carry out the provisions of this title."  Bankruptcy Code, Section 105(a).  As courts have widely recognized, however, Section 105(a) is not a roving commission to do equity, and bankruptcy courts may exercise that power only where its preconditions are satisfied (*i.e.*, where issuance of the order, process or judgment is necessary or appropriate to carry out a specific provision of the Bankruptcy Code).  *See Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir.

---

[17]    Notably, the authority that Enron has cited in earlier briefing to support its proposition that "[the Second Circuit] has also recognized that the legislative history does not require misconduct" referred to the earlier, *superceded* version of the statute.  (*See* App. 6 at p. 35) (citing *Jizarian v. Raichle* (*In re Stirling Homex Corp.*), 579 F.2d Cir. 206, 215).

2005) (noting that "[t]he statutory language [of Section 105(a)] supports [a] limit on the equitable powers of the bankruptcy court" and that "the equitable power conferred by section 105(a) is the power to exercise equity in carrying out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing"); *Schwartz v. Aquatic Dev. Group, Inc.* (*In re Aquatic Dev. Group, Inc.*), 352 F.3d 671, 680 (2d Cir. 2003).  Thus, in *Schwartz*, the bankruptcy court invoked Section 105(a) to excuse the debtor from paying certain fees to the United States Trustee as required by 28 U.S.C. § 1930, reasoning that such relief was equitable and consistent with the Bankruptcy Code's purpose of providing a fresh start to deserving debtors.  *Id*. at 676.  The Second Circuit reversed the bankruptcy court's order, ruling that the relief granted by the bankruptcy court was not authorized by the Bankruptcy Code and that Section 105(a) does not grant courts the "power to invoke equity to further the purposes of the Code generally, or otherwise to do the right thing."  *Id*. at 680.

Similarly, in keeping with the general bankruptcy policy of treating creditors equally, courts have held that provisions of the Bankruptcy Code which create disparities or priorities among creditors should be narrowly construed.  *See, e.g., Missouri Dept. of Revenue v. L.J. O'Neill Shoe Co. (In re L.J. O'Neill Shoe Co.)*, 64 F.3d 1146, 1148 (8th Cir. 1995) ("It is well settled, however, that because . . . priorities in distribution . . . are contrary to the Bankruptcy Code's general policy of equal distribution, these priorities should be narrowly construed."); *Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir. 1988) ("Statutory priorities are to be narrowly construed because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors.") (internal quotations omitted).  This principle applies with equal force in the subordination context.  *See Lifschultz*, 132 F.3d at 349.

If Congress had intended to give courts the power to subordinate claims whenever subordination is necessary to "prevent injustice or unfairness in the bankruptcy context," Congress would have done so. Instead, Congress referred specifically in the statute to "principles of equitable subordination." Bankruptcy Code, Section 510(c). If a decision is to be made on expanding the doctrine of "equitable subordination" to apply to innocent purchasers, it should be made by Congress, which should determine under what circumstances, if at all, the doctrine should apply to subsequent transferees or innocent purchasers.

## II

## THE BANKRUPTCY COURT'S SECTION 502(D) RULING SHOULD BE REVERSED

In its separate decision denying the motions of the Defendants to dismiss Enron's claims under Section 502(d) of the Bankruptcy Code, the Bankruptcy Court held that Section 502(d) could be applied to disallow the claims of innocent purchasers who neither received nor held property constituting preferences or fraudulent conveyances based upon preference or fraudulent conveyance claims by the debtors against a prior owner of the claims. The Bankruptcy Court held that Section 502(d) could disallow the claim of a good faith purchaser of a loan, claim or note, even if the purchaser acquired its claim in good faith, for value, and without any notice of the preference or fraudulent conveyance claim against a prior owner, and even if the debtor's claim relates to a transaction between the debtor and the prior owner which is completely unrelated to the loan, claim or note that was purchased. The Bankruptcy Court's holding is directly at odds with the plain language of Section 502(d), the legislative history of the provision, the purposes of the statute, and the applicable authorities.

### A.     The Statutory Language

As the courts have held, the "preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it

says there' " *BedRoc Ltd., LLC* v. *Unites States*, 541 U.S. 176, 183 (2004) (quoting *Connecticut Nat'l Bank* v. *Garmain*, 503 U.S. 249, 253-54 (1992)).  When the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms' " *United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti* v. *United States*, 242 U.S. 470, 485 (1917)).

Section 502(d) of the Bankruptcy Code provides that the court may disallow the claim of an entity which is *itself* the holder of property constituting a preference or fraudulent conveyance and from whom the preference or fraudulent conveyance is recoverable and which refuses to return that property to the estate.  Section 502(d) states:

> "(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."  (Emphasis added)

As Section 502(d) states on its face, the statute allows the court to disallow a holder's claim only if the holder is *itself* the recipient of a preference or fraudulent conveyance, is *itself* the party holding the preference or fraudulent conveyance, and is *itself* in a position to return that property to the estate but refuses to do so.  Thus, Section 502(d) permits disallowance of the claim of "*any entity from which property is recoverable* under section 542, 543, 550, or 553 of this title" or "any entity . . . that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title" unless "*such* entity or transferee has paid the amount, or turned over the property for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." Bankruptcy Code, Section 502(d) (emphasis added).

3263838_3.DOC

In addition to the plain text of Section 502(d), the purpose of the statute makes clear that the statute applies to holders of property constituting a preference or fraudulent conveyance, not innocent purchasers of claims who neither received, nor hold, property returnable to the estate. As the courts have repeatedly emphasized, Section 502(d) is intended to coerce entities which are *themselves* recipients and holders of avoidable transfers to return the property to the estate or face disallowance of their claims. *See Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501, at *7-9 (W.D. Tex. June 20, 1988); *Campbell v. U. S. (Matter of Davis)*, 889 F.2d 658, 661 (5th Cir. 1989) ("The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders [requiring a party to return property to the estate]."); *Holloway v. Internal Revenue Service (In re Odom Antennas, Inc.)*, 340 F. 3d 705. 708 (8th Cir. 2003) (same);[18] *Greenville Banking & Trust Co. v. Selcow,* 25 F.2d 78, 79 (3d Cir. 1928) ("Section 57g of the Bankruptcy Act (11 USCA § 93[g]), permitting claimants to surrender preferences, was not intended as a penalty, but as a privilege, giving those holding preferences the option to keep their security and take no dividends from the estate, or surrender them and share in the distribution equally with the other

---

[18]    As the Court wrote in the *Odom* case:

"[T]he purpose of section 502(d) is to ensure compliance with judicial orders. *See In re Davis*, 889 F.2d 658, 661 (5th Cir. 1989). The language of *section 502(d)* expressly provides that the entity's claim is not disallowed if the entity or transferee 'paid the amount, or turned over any such property, for which such entity or transferee is liable.' 11 U.S.C. § 502(d). This language indicates section 502(d) should be used to disallow a claim after the entity is first adjudged liable; otherwise, the court could not determine if the exception applies. *Davis*, 889 F.2d at 661-62 (observing 'the legislative history and policy behind *section 502(d)* illustrate[] that the section is intended to have the coercive effect of insuring compliance with judicial orders' and *section 502(d)* 'is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate')." 340 F.3d at 706.

creditors."); *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997) ("The overall purpose of section 502 . . . was not 'to punish, but to give creditors an option. . . .' "); *1102(a)(1) Committee of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, 1988 U.S. Dist LEXIS 19501, *at 7-9 (W.D. Tex. June 20, 1988) (Holding that claims transferred by the original owner to a bank could not be disallowed under Section 502(d) on the basis of preference or fraudulent conveyance claims by the debtors against the original owner because the bank was not an entity holding property constituting the preference or fraudulent conveyance).

Similarly, in discussing the purposes of Section 502(d), both the Senate and House Reports issued with the adoption of the statute noted that the statute was intended to provide a remedy against the transferees of avoidable transfers who themselves have liability under one of the avoidance provisions of the Bankruptcy Code:

> Subsection (d) is derived from present law.  It requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over the property received <u>as required under the sections under which the transferee's liability arises</u>.

*See* H.R. Rep. No. 95-595, at 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309; S. Rep. No. 95-989, at 65 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5785, 5851 (emphasis added).

The Defendants, as the innocent purchasers of claims, meet none of the requirements of the statute.  Defendants are not the recipients of preferences or fraudulent conveyances, are not in possession of the property constituting preferences or fraudulent conveyances, and are not in a position to return such property to the estate.  To the contrary, Defendants are innocent purchasers of claims who purchased loans *completely unrelated* to any transactions in which Fleet is alleged to have received any preferences or fraudulent conveyances.  In the words of the statute, Defendants are neither (a) "entit[ies] from which

property is recoverable under section 542, 543, 550, or 553 of this title" nor (b) "any entity…that is a transferee[s] of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title."  Nor are the Defendants (x) entities which can possibly turn over the property claimed by Enron to constitute preferences or fraudulent transfers or (y) entities which are "liable under sections 522(i), 542, 543, 550, or 553 of [the Bankruptcy Code]."  *Id.*

Section 502(d) does not entitle a debtor to seek disallowance of the claims of an innocent purchaser who does not hold an avoidable transfer simply because some prior holder of one of its claims received a preference or fraudulent conveyance in connection with some completely unrelated transaction.

**B.      Section 502(d) Does Not Provide For
        Disallowance Of Claims Of Innocent Purchasers**

Largely disregarding the language of Section 502(d), the Bankruptcy Court held that Section 502(d) disallows claims, rather than providing a remedy in against the holders of claims who are also holders of property constituting a preference or fraudulent conveyance.  The Bankruptcy Court held that an entity purchasing a loan, claim or note can have its claim objected to under Section 502(d) if a prior holder in the chain of title is alleged to have received a preference or fraudulent conveyance, even  in connection with a completely unrelated transaction.  Nothing in the language or purposes of the statute supports such a result.  Contrary to the Bankruptcy Court's ruling, the language of the statute, the cases, and the commentators all make clear that Section 502(d) applies to *holders* of claims who themselves received and hold property constituting avoidable transfers; it does not apply to *claims* so as to cause their disallowance in the hands of any and all innocent purchasers.

Section 502(d) is notable for what it does *not* say:  it does *not* say that the court shall disallow any claim that "*originated*" with, "*was at some point held by*," or "*was held as of*

*the date of the filing of the petition by*," any entity fitting the statutory categories. It provides for disallowance of any claim "of an entity from which property is recoverable" where "such entity" is in a position to return the property and fails to do so. If Congress had wanted to say ". . . any claim of, *or claim acquired against the debtor from* an entity . . ." described in the section, Congress could easily have done so.

Where Congress intended the Bankruptcy Code to apply to transferees, it knew exactly how to do so, and it did so with great care. In Section 502(d), itself, Congress provided, in certain circumstances, for the disallowance of claims of transferees of the avoidable property, but Congress provided no authorization to the Bankruptcy Court for applying the statute to transferees of claims, to claims transferred to innocent purchasers, or to claims held by transferees of claims. In Section 502(d), Congress granted the Bankruptcy Courts the power to disallow claims of "any entity . . . that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title" unless "*such* entity or transferee has paid the amount, or turned over the property for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." Similarly, under Section 550(b), dealt with transferees: under that provision, a transferee of avoidable property is liable for a return of the property only if it did not purchase the property in good faith and without knowledge of the voidability of the transfer avoided . . . ." By contrast with the carefully crafted provisions of Sections 502(d) and 550(b), which, under certain circumstances, provide carefully delimited remedies against the transferees of the very property constituting the preference or fraudulent conveyance, there is *no* grant of any power in Section 502(d), or anywhere else in the Bankruptcy Code, to disallow the claims of claim transferees, let alone innocent purchasers of such claims.

In ruling that Section 502(d) could be applied to the claims of innocent purchasers, the Bankruptcy Court held that Section 502(d) imprints "disallowability" onto the *claim*, rather than just providing a remedy against a *creditor*. *See* App. 4 at pp. 26-32.   In effect, the Bankruptcy Court held that Section 502(d) focuses on claims, rather than the holder of the claim.  As the cases cited at pages 35-36 above, and the commentators, make clear, however, the focus of Section 502(d) is on the holders of a claim, not the claim itself.  The statute not imprint claims with disallowability in the hands of innocent purchasers.  Indeed, as stated in 4 *Collier on Bankruptcy* ¶ 502.05[3] at 502-59-60 (15th ed. rev. 2005):

> "The point of Section 502(d) is that the claim is disallowed <u>if the holder of that claim</u> is subject to action by the trustee for the avoidability of the transfer or the recovery of property.  <u>Rather than addressing itself solely to claims, the focus of Section 502(d) is upon creditors who receive voidable transfers</u>."  (Emphasis added.)

*See, also, 1102(a)(1) Committee of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, 1988 U.S. Dist LEXIS 19501, *at 7-9 (W.D. Tex. June 20, 1988) (holding that claims transferred to a bank could not be disallowed in the hands of the bank because the debtor had avoidance claims against the party which had transferred the claims to the bank):

> "The analytical tool to unlock the mysteries of Sec. 502(d) is to examine the enumerated sections to determine whether the transferee has liability [for a return of the avoidable transfer].  Where there is no liability under those sections, Sec 502(d) is not triggered . . .
>
> [T]here is no reason in law to overturn the Bankruptcy Court's finding that because the Bank is not the 'kind of creditor' from whom the trustee can recover property under Sec. 550, or the kind of creditor who is liable under Sec. 547, Sec. 502(d)['s] disallowance provision is not triggered."

The Supreme Court, commenting on the predecessor of 502(d) (which Congress presumptively had in mind when it adapted old Section 57g and inserted it as section 502(d) of

the Bankruptcy Code),[19] spoke to the very interpretative point in dispute here.  In *Katchen v. Landy*, 382 U.S. 323, 331 n.5 (1966), the Court concluded that Section 57g of the Bankruptcy Act, "is concerned with *creditors* rather than *claims*" (emphasis in original).  Cases decided under section 502(d) continue to rely on *Katchen* in construing the statute.  "Section 57(g) of the Act is very similar to section 502(d) of the Code, and the essential import of section 57(g) appears unchanged.  Thus, the teachings of *Katchen v. Lindy* remain relevant."  *In re America's Shopping Channel, Inc.,* 110 B.R. 5, 8 (Bankr. S.D. Cal. 1990); *see also, e.g., Edelman v. Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen Foods, Inc.)*, 80 B.R. 848, 850 (Bankr. W.D. Mich. 1987) ("The present Bankruptcy Code has a similar provision, § 502(d), which states that the court shall disallow any claim filed by an entity which has not returned any preference it has received. The legislative history to § 502(d) states that it is derived from the then present law, which would have been Section 57, sub. g of the Bankruptcy Act. S.Rep. No. 989, 95th Cong., 2nd Sess. 65, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5851. Therefore the *Katchen* analysis remains relevant and viable."); *First Int'l Servs. Corp. v. Apollo Sign Co. (In re First Int'l Servs. Corp.)*, 37 B.R. 856, 860 (Bankr. D. Conn. 1984) ("It would therefore appear that Code § 502(d) essentially tracks Act § 57g, that the *Katchen* rationale applies to cases and proceedings under the Code . . .").

> Given the limited and specific purpose of section 502(d), the Bankruptcy Court engaged in result-oriented judicial legislating when it extended the scope of section 502(d) to avoid the perceived "pernicious" result of "claims washing."  *See* Section 502(d) Op. at

---

[19]    *See Midlantic Nat'l Bank v. N.J. Dep't of Env'l Prot*., 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.  The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.") (internal citation omitted).

199-210.[20]  Enron's assertion that disallowing transferred claims advances section 502(d)'s

statutory purpose because "disallowing transferred claims can be very effective in coercing the

recipients of avoidable transfers to return them" amounts to an effort to create a policy rationale

for such mischief. Nothing in the legislative history of Section 502(d) or its predecessor, 57g, or

any case interpreting either of these provisions -- including *In re Metiom*, 301 B.R. 634 (Bankr.

S.D.N.Y. 2003), on which the Bankruptcy Court heavily relied -- reveals any Congressional

intent to conscript innocent transferees to enforce a debtor's defense against an unrelated third

party.

   What Enron's arguments make abundantly clear, however, is that the Section

502(d) Opinion, should it stand, will (a) substantially increase claims litigation, both by the

estate against innocent transferees and as between creditors (mostly for the economic benefit of

their respective attorneys), (b) depress the price of distressed debt, if it does not eliminate its

liquidity entirely, and (c) hold distributions on otherwise allowable claims of innocent

transferees hostage to completely unrelated litigation -- litigation over which the transferees have

no control, and which may, like the MegaClaim Action, continue for years.[21]  All these results

---

[20]  Significantly, the legislative history of section 550 of the Bankruptcy Code indicates Congress was well aware of the "pernicious" effects of "washing" a transaction through an innocent third party at the time it enacted the Bankruptcy Code. H.R. No. 95-595, 95th Cong., 1st Sess. 375-376 (1977); S.R. No. 95-989, 95th Cong., 2d Sess. 90 (1978) (noting that the "good faith" language in section 550 is intended to prevent a transferee from "washing" the transaction through an innocent third party).  The fact that section 502(d) and its legislative history is mute on this point compels the conclusion that Congress did not anticipate nor intend section 502(d) to apply to subsequent transferees.  The reason why is obvious -- section 502(d) applies to *creditors*, not claims.

[21]  Indeed, Enron's argument threatens to put innocent transferees into the untenable position of having to defend their transferor's prior actions to prove that the transferors did not receive an avoidable transfer or recoverable property.  This may cause transferees to seek intervention in adversary proceedings against their transferors if the transferees feel the transferor is not motivated to defend the action, or lacks the funds to do so. Clearly, Congress did not intend to

con't...

directly contradict core bankruptcy purposes. *See, e.g., In re Grabill Corp.,* 976 F.2d. 1126,

1126 (7th Cir. 1992) (noting that "[t]he whole scheme of bankruptcy administration rests on a

swift, efficient resolution of claims in a speedy trial...").

**C.    *Metiom* Was Wrongly Decided**

In support of its arguments, the Bankruptcy Court relied upon the decision of

another Bankruptcy Court in *In re Metiom*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), a case that no

other court has ever cited for the proposition at issue here.  When viewed in the context of its

facts, however, the *Metiom* decision is completely inapposite to the facts presented here[22]; and,

in any event, to the extent the *Metiom* decision (a bankruptcy court decision with no precedential

weight), is deemed applicable, that decision was decided and nothing in that decision should give

---

multiply the number of lawsuits and parties necessary to resolve avoidance actions when it
enacted section 502(d).

[22]    In *Metiom*, Intira, a trade vendor, had a pre-petition contract with Metiom.  Prior to
Metiom's chapter 11 filing, Intira had received a $170,000 payment on that contract, which was
alleged to be a preference under Section 547.  After the filing of Metiom's chapter 11, and in
plain violation of section 549 of the Bankruptcy Code, Intira had demanded and obtained a post-
petition payment of $92,672 from Metiom, outside of the "ordinary course" of Metiom's
business and without approval of the Bankruptcy Court, by refusing to return certain equipment
unless the payment was made.  Divine Acquisition, Inc. ("Divine") then acquired substantially
all of Intira's assets, including its claim against Metiom arising out of the very same contract
pursuant to which the preferential and unauthorized payments had been received, putting it
virtually in the position of Intira's successor.
    In *Metiom*, unlike this case, Divine purchased substantially all of Intira's assets and
claims, and either was, or should have been, on notice of the transactions between Intira and
Metiom.  In *Metiom*, unlike this case, the pre- and post-petition payments to Intira challenged
under Sections 547 and 549 of the Bankruptcy Code arose out of the very same transactions
under which Divine's bankruptcy claims (as successor to Intira) were asserted.  Indeed, it is
unclear from the decision whether Divine did or did not have knowledge of the transfers that
were challenged under Section 547 and 549 at the time it acquired its claims, and there is no
discussion in the decision of that issue.  Here, by contrast, (i) Defendants did not purchase all of
the assets of an assignor, but purchased only a single claim from a major financial institution
which had numerous transactions with the Debtor, (ii) the claims which Defendants purchased
are totally unrelated to the avoidable transfers alleged against Fleet, and (iii) there is no claim
made that Defendants had any knowledge of any alleged preference or fraudulent conveyance.

this Court pause in holding, as the Supreme Court has already held with respect to the predecessor statute, that section 502(d) "is concerned with *creditors* rather than *claims*." *Katchen*, 382 U.S. at 331 n.5. Three points about *Metiom* deserve emphasis:

*First*, it ignores the plain language of Section 502(d). *Metiom* was the first instance in which a court picked up the pen and rewrote the section to say that a court shall disallow any "claim that originated with an entity [with certain characteristics]" *or* any "claim that was at any time held by an entity [with such characteristics]" *or* perhaps any "claim held as of the date of the filing of the petition by an entity [with such characteristics]." These phrases do not appear in section 502(d), and nothing in its language warrants reading them in. Based on the plain language, *Metiom* reached the wrong result.

*Second*, the *Metiom* court worried about post-petition alteration of a claim. *See Metiom*, 301 B.R. at 643. But that very concern begins with the conclusion -- an erroneous one -- that section 502(d) has to do with the "claim" itself, rather than with the creditor holding it. A for-value claim transfer to an entity that owes nothing to the estate does not make the claim any "better." Rather, the claim in the hands of the transferee is no longer subject to the *personal* defenses aimed at the transferor.

*Third, Metiom's* only relevant citation is the century-old decision in *Swarts v. Siegel*, 117 F. 13 (8th Cir. 1902). However, as the District Court held in *Section 1102(a)(l) Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501, at *8 (W.D. Tex. June 20, 1988) in refusing to follow *Swartz,* the decision in that case involved facts far removed from the application of Section 502(d) to claims of innocent purchasers of claims. Thus, not only did the *Metiom* court perform an incorrect analysis, but it supported its conclusion with inapposite case law.

## <u>CONCLUSION</u>

For the foregoing reasons, this Bankruptcy Court's decisions denying the motions of Defendants to dismiss the Debtors' Complaint should be reversed.

Respectfully submitted,

Dated:  October 10, 2006   ROPES & GRAY LLP

By: <u>/s/ David Elkind</u>

David Elkind (DSE-4054)
Marc F Skapof (MFS-5746)
45 Rockefeller Plaza
New York, NY  10111-0087
(212) 841-5700

Matthew M. Burke
One International Place
Boston, MA  02110-2624
(617) 951-7000

Counsel for DK Acquisition Partners, LP, RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C. and Rushmore Capital-II L.L.C.