UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., *et al.*,<br><br>Reorganized Debtors. | Chapter 11<br>Case No. 01-16034 (AJG) |
| SPRINGFIELD ASSOCIATES, L.L.C.,<br><br>Defendant-Appellant,<br><br>v.<br><br>ENRON CORP.,<br><br>Plaintiff-Appellee. | District Court<br>Case No. 06-07828 (SAS)<br><br>Case No. 07-01957 (UA)[1]<br><br>**ORAL ARGUMENT REQUESTED** |

**OPENING BRIEF OF PERMITTED INTERVENOR BANK CITIBANK, N.A.
ON THE ISSUE OF EQUITABLE SUBORDINATION AND
DISALLOWANCE OF TRANSFERRED CLAIMS**

---

[1]  This case has been referred to the Honorable Shira A. Scheindlin as related to
Case No. 06-07828 (SAS).

## TABLE OF CONTENTS

Page(s)

JURISDICTION .......................................................................................................... 1

ISSUES PRESENTED ................................................................................................. 1

APPLICABLE STANDARD OF REVIEW .............................................................. 2

PRELIMINARY STATEMENT ................................................................................. 2

STATEMENT OF THE CASE ................................................................................... 5

THE BANKRUPTCY COURT'S OPINIONS ........................................................ 10
I.      THE SUBORDINATION OPINION ........................................................... 10
II.     THE DISALLOWANCE OPINION .............................................................. 11

ARGUMENT .............................................................................................................. 13
I.      A TRANSFEREE'S CLAIM CANNOT BE SUBORDINATED
        BASED SOLELY ON THE ALLEGED ACTS OF ITS
        PREDECESSOR-IN-INTEREST .................................................................. 13
        A.      Traditional "Principles Of Equitable Subordination"
                Require That The Claimant Must Have Engaged
                In Inequitable Conduct .................................................................... 13
        B.      The Bankruptcy Court Operated At A
                "Level Of Policy Choice" Reserved For Congress ...................... 25
II.     A TRANSFEREE'S CLAIM CANNOT BE DISALLOWED BASED
        SOLELY ON ITS PREDECESSOR-IN-INTEREST'S RECEIPT OF,
        AND FAILURE TO REPAY, AN AVOIDABLE TRANSFER ...................... 28
        A.      The Plain Language Of Section 502(d) Does Not
                Authorize Disallowance Of Claims Held By Claimants
                That Did Not Receive Avoidable Transfers .................................. 28
        B.      Disallowing A Transferee's Claim Based Solely On
                The Transferor's Receipt And Failure To Return Avoidable
                Transfers Is Inconsistent With The Statutory Purpose .............. 31
        C.      Metiom, On Which The Bankruptcy Court Relied,
                Misapplied A Fundamentally Different 100-Year-Old Case
                And Was Wrongly Decided ............................................................. 33
        D.      The Bankruptcy Court Engaged In Judicial Legislating ............ 36
III.    THE BANKRUPTCY COURT'S DECISIONS MAY SEVERELY
        DISRUPT THE DISTRESSED DEBT MARKETS AND FRUSTRATE
        THE REHABILITATIVE PURPOSES OF CHAPTER 11 .......................... 38

CONCLUSION ........................................................................................................... 43

# TABLE OF AUTHORITIES

Pages

## CASES

*Adams Fruit Co., Inc.* v. *Barrett*, 494 U.S. 638 (1990) ........................................................28

*Aguilar* v. *United States (In re Aguilar)*, 312 B.R. 394 (D. Ariz. 2003) ...........................18

*Am. Standard, Inc.* v. *Nass (In re Jack Kardow Plumbing Co.)*, 451 F.2d 123
    (5th Cir. 1971) ..........................................................................................................30

*In re America's Shopping Channel, Inc.*, 110 B.R. 5 (Bankr. S.D. Cal. 1990)..................30

*Begier* v. *I.R.S.*, 496 U.S. 53 (1990) .................................................................................15

*Benjamin* v. *Diamond (In re Mobile Steel Co.)*, 563 F.2d 692
    (5th Cir. 1977)..........................................................................................3, 4, 10, 17, 18

*In re Bevins*, 165 F. 434 (2d Cir. 1908) ............................................................................35

*Burden* v. *United States (In re Burden)*, 917 F.2d 115 (3d Cir. 1990) ...................13, 20, 21

*Caliolo* v. *Saginaw Bay Plastics, Inc. (In re Cambridge Indus. Holdings, Inc.)*,
    No. 00-1919, 2006 WL. 516764 (D. Del. Mar. 2, 2006) ........................................30

*Caminetti* v. *United States*, 242 U.S. 470 (1917)...............................................................28

*Campbell* v. *United States (In re Davis)*, 889 F.2d 658 (5th Cir. 1989)......................31, 32

*DeKalb County Div. of Family and Children Servs.* v. *Platter (In re Platter)*,
    140 F.3d 676 (7th Cir. 1998) ..................................................................................37

*Edelman* v. *Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen
    Foods, Inc.)*, 80 B.R. 848 (Bankr. W.D. Mich. 1987) ...........................................30

*Elliott Assocs., L.P.* v. *Banco de la Nacion*, 194 F.3d 363 (2d Cir. 1999) ..................38, 42

*Enron Corp., et al.* v. *Ave. Special Situations Fund II, LP, et al.*
    *(In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) ..........................*passim*

*Enron Corp.* v. *Springfield Assocs.*, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006)...........13

## TABLE OF AUTHORITIES
(Continued)

Pages

*Esposito* v. *Noyes (In re Lake Country Invs.)*, 255 B.R. 588
(Bankr. D. Idaho 2000) ..................................................................................18

*FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................30

*Goldie* v. *Cox*, 130 F.2d 695 (8th Cir. 1942) .......................................................23

*Hirsch* v. *Penn. Textile Corpl, Inc. (In re Centennial Textiles, Inc.)*,
227 B.R. 606 (Bankr. S.D.N.Y. 1998) ...........................................................27

*Holloway* v. *Internal Revenue Serv. (In re Odom Antennas, Inc.)*,
340 F.3d 705 (8th Cir. 2003) .........................................................................32

*Holt* v. *Fed. Deposit Ins. Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146
(5th Cir. 1989)................................................................................................14

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990) ...................................2

*In re Iridium Operating LLC*, No. 01 Civ. 5429, 2005 WL. 756900
(S.D.N.Y. April 4, 2005)..................................................................................2

*Katchen* v. *Landy*, 382 U.S. 323 (1966) ........................................................30, 35

*Keppel* v. *Tiffin Sav. Bank*, 197 U.S. 356 (1905).................................................31

*Lamie* v. *United States Trustee*, 540 U.S. 526 (2004) .........................................28

*In re Lifschultz Fast Freight*, 132 F.3d 339 (7th Cir. 1997) ....................17, 19, 20

*Merrimac Paper Co., Inc.* v. *Harrison (In re Merrimac Paper Co., Inc.)*,
420 F.3d 53 (1st Cir. 2005)........................................................................20, 21

*In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003)................11, 33, 34, 35

*N.L.R.B.* v. *Bildisco and Bildisco*, 465 U.S. 513 (1984)................................37, 41

*Natural Res. Def. Council, Inc.* v. *Muszynski*, 268 F.3d 91 (2d Cir. 2001) ........28

*New Jersey Steel Corp.* v. *Bank of New York*, No. 95 CIV. 3071 (KMW),
1997 WL 716911 (S.D.N.Y. Nov. 17, 1997)...................................................14

## TABLE OF AUTHORITIES
(Continued)

Pages

*Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley
& Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002)....17, 18

*Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232
(1st Cir. 1997) ........................................................................................29, 32, 37

*Section 1102(A)(1) Comm. of Unsecured Creditors v. Williams Patterson, Inc.
(In re Wood & Locker, Inc.)*, No. MO 88 CA 011, 1988 U.S. Dist.
LEXIS 19501 (W.D. Tex. June 17, 1988) ...........................................12, 29, 35, 36

*SPC Plastics Corp. et al. v. Griffith (In re Structurlite Plastics Corp.)*,
224 B.R. 27 (6th Cir. BAP 1998)............................................................................20

*Schulman v. California (In re Lazar)*, 237 F.3d 967 (9th Cir. 2001) ................................18

*Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*,
322 B.R. 440 (Bankr. N.D. Okla. 2003) ...................................................................31

*Shropshire, Woodliff, & Co. v. Bush*, 204 U.S. 186 (1907)............................................24, 25

*Smart World Techs., LLC v. Juno Online Svcs., Inc.
(In re Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005) ............................26

*Spacek v. Thomen (In re Universal Farming Indus.)*, 873 F.2d 1334
(9th Cir. 1989)..........................................................................................................18

*Swarts v. Siegel*, 117 F.13 (8th Cir. 1902)................................................................11, 34, 35

*Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992)...........................................................36

*United States v. Noland*, 517 U.S. 535 (1996)................................13, 16, 17, 20, 21, 25, 26

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) .........................................................28

*United States v. Reorganized CF & I Fabricators of
Utah, Inc.*, 518 U.S. 213 (1996)......................................................................21, 25

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ...........................................28

*United States v. Venturella*, 391 F.3d 120 (2d Cir. 2004) .................................................28

## TABLE OF AUTHORITIES
(Continued)

Pages

*Virtual Network (In re Virtual Network Services Corp.)*, 902 F.2d 1246
(7th Cir. 1990)..................................................................................................19

### STATUTES

11 U.S.C. § 502(d) ..................................................................................... *passim*

11 U.S.C. §507(a)(4)..........................................................................................24

11 U.S.C. § 510(c)(1)................................................................................. *passim*

11 U.S.C. § 550.............................................................................28, 29, 36

28 U.S.C. § 158(a) ...............................................................................................1

N.Y. U.C.C. §§ 3-305, 7-502, 8-202, 8-510 .................................................23

Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98
Stat. 333 .......................................................................................................37

### TREATISES

4 ALAN N. RESNICK, ET AL., COLLIER ON BANKRUPTCY ¶ 510.05[1]
(15th ed. 2005) .......................................................................................29, 30

BRIAN A. BLUM, BANKRUPTCY & DEBTOR / CREDITOR EXAMPLES & EXPLANATIONS
§ 14.1 (2d ed. 1999) ...................................................................................6

### PERIODICALS

Rachel E. Albanese, *Assignment of Claims Does Not Prevent Equitable Subordination
Attack*, BANKR. BULL.: CURRENT ISSUES IN RESTRUCTURING AND
REORGANIZATION, VOL. 13, No. 2 (Feb. 2006).......................................39

Kenneth N. Klee, *Legislative History of the New Bankruptcy Code*, 28 DEPAUL L. REV.
941 (1978) ....................................................................................................15

Lawrence Kotler, *Claims Purchasers Beware: No Good-Faith Defense to Equitable
Subordination*, 25-1 AM. BANKR. INST. J. 22 (2006) ..............................39

Adam J. Levitin, *The Limits of Enron: Counterparty Risk in Bankruptcy Claims
Trading*, 15 J. BANKR. L. & PRAC. 4 (2006).......................................23, 26

## TABLE OF AUTHORITIES
(Continued)

Pages

Dan Schecter, *Equitable Subordination As to One Claim May Affect Unrelated Parties, Even if Unrelated Claims Have Been Transferred to Third Parties*, COM. FIN. NEWSL. (Nov. 24, 2005)................................................................................................39

## MISCELLANEOUS

124 CONG. REC. 32350, 32398 (1978)........................................................................15, 16

124 CONG. REC. 33989, 33998 (1978)........................................................................15, 16

H.R. 8200, 95th Cong. § 510 (1977)...................................................................................16

H.R. REP. No. 95-595, 95th Cong., 1st Sess. (1977)..............................................14, 15, 16

S. REP. No. 95-989, 95th Cong., 2d Sess. (1978) ........................................................14, 16

To the United States District Court for the Southern District of New York:

Pursuant to 28 U.S.C. § 158(a), Rules 8009 and 8010 of the Federal Rules of Bankruptcy Procedure, and the Agreed Scheduling Order dated February 16, 2007, Citibank, N.A. ("Citibank" or "Intervenor Bank") respectfully submits this opening brief in support of the appeal (the "Appeal") in *Enron Corp.* v. *Springfield Associates, L.L.C., et al.* (*In re Enron Corp.*), Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. No. 05-01025 (AJG) (Bankr. S.D.N.Y. filed Jan. 10, 2005) (the "Springfield Action") brought by defendant Springfield Associates, L.L.C. ("Springfield" or "Transferee") from the (a) Order Denying Defendant's Motion to Dismiss Plaintiff's First Cause of Action Against Springfield Associates, L.L.C. for Equitable Subordination (the "Subordination Order") and (b) Order Denying Defendant Springfield Associates, L.L.C.'s Motion to Dismiss Plaintiff's Second Cause of Action Against Springfield Associates, L.L.C. Seeking Disallowance of Claims Pursuant to 11 U.S.C. § 502(d) (the "Disallowance Order") entered by the Bankruptcy Court for the Southern District of New York (Gonzalez, J.) (the "Bankruptcy Court") on December 23, 2005 and November 6, 2006, respectively.

## JURISDICTION

This Court has jurisdiction pursuant to section 158(a)(3) of title 28 of the United States Code.

## ISSUES PRESENTED

As set forth in the Court's Memorandum Opinion and Order dated January 30, 2007, the issues on appeal are:

1.      Did the Bankruptcy Court err in holding that equitable subordination under Section 510(c) of the Bankruptcy Code ("Section 510(c)") can be applied, as a matter of law, to claims held by a transferee to the same extent that it would be applied to the claims if

they were still held by the transferor, based solely on alleged acts on the part of the transferor; and

2.       Did the Bankruptcy Court err in holding that disallowance under Section 502(d) of the Bankruptcy Code ("Section 502(d)") can be applied, as a matter of law, to claims held by a transferee to the same extent that it would be applied to the claims if they were still held by the transferor, based solely on the alleged receipt of and failure to repay an avoidable transfer by the transferor?[2]

## APPLICABLE STANDARD OF REVIEW

These issues involve pure questions of law subject to *de novo* review. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990) (explaining that a district court reviews a bankruptcy court's conclusions of law *de novo*); *In re Iridium Operating LLC*, No. 01 Civ. 5429, 2005 WL 756900, at *4 (S.D.N.Y. April 4, 2005) (same).

## PRELIMINARY STATEMENT

The Bankruptcy Court ruled, as a matter of law, that claims held by a transferee are subject to equitable subordination and disallowance under Sections 510(c) and 502(d) of the Bankruptcy Code, respectively, based solely on the alleged conduct of the transferor. These rulings ignore express terms of the applicable statutes, contradict well-settled case law, and threaten to disrupt severely the critically important markets for bankruptcy and other distressed debt claims. They should be reversed.

---

[2]    The Court phrased the issue as "whether equitable subordination under 510(c) and disallowance under 502(d) can be applied, as a matter of law, to claims held by a transferee to the same extent they would be applied to the claims if they were still held by the transferor based on alleged acts or omissions on the part of the transferor." (Memorandum Opinion and Order dated January 30, 2007 at 3.)

2

The Bankruptcy Court's interpretation of Section 510(c) is both unprecedented and fundamentally at odds with the statute's purpose. Equitable subordination under Section 510(c) is an equitable remedy designed to punish a *creditor* that has engaged in unjust conduct. Section 510(c) prohibits the imposition of such a remedy unless its use is consistent with well-established "principles of equitable subordination," and courts repeatedly have cautioned that this harsh remedy be used only sparingly. Courts widely regard the three-part test announced by the Fifth Circuit in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977), as presenting the clearest and most comprehensive distillation of these principles. Under the first prong of *Mobile Steel's* three-part test -- and as reflected in the legislative history of Section 510(c) -- equitable subordination requires a finding of misconduct on the part of the particular claimant asserting the claim against the estate.

While purporting to apply the *Mobile Steel* test, the Bankruptcy Court entirely ignores its first element. *Mobile Steel* and every other case to consider equitable subordination -- until the Bankruptcy Court ruling here -- subordinated a claim only where the party asserting the claim had engaged in misconduct (or where the claim was a penalty or equity-based claim, narrow exceptions with no relevance here and of doubtful viability in any case). No allegation exists that Springfield, the transferee, engaged in any misconduct. The Bankruptcy Court, however, disregarded these principles in its zeal to visit the alleged sins of transferors upon the transferees.

But the Bankruptcy Court's decision to subordinate transferee claims has no grounding in the well-established "principles of equitable subordination," as Section 510(c) demands, nor is it supported -- or supportable -- on any other basis. Indeed, neither the Bankruptcy Court nor Enron offered below *any* authority for the proposition that principles of

3

equitable subordination permit lowering the priority of claims in the hands of transferees based solely on transferor conduct. Instead, the Bankruptcy Court, without authority or support, purported to justify its decision by expanding the definition of claimant beyond all recognition to include not only the claimant but *any party that had previously held the claim* -- a definition that defies common sense and ordinary usage, and that contradicts *Mobile Steel* and virtually every other reported equitable subordination decision issued.

The Bankruptcy Court likewise erred in its ruling that Section 502(d) permits disallowance of a claim held by a transferee to the same extent that it would apply to the claim if the transferor still held it. The Bankruptcy Court erroneously concluded that Section 502(d) focuses exclusively on the claim rather than on the particular entity asserting the claim. But Section 502(d) cannot support such an interpretation. By its plain terms, disallowance applies only to claims held by parties that received and can return an avoidable transfer. Here, Enron does not allege that Springfield received and failed to return any avoidable transfer. As a result, the Bankruptcy Court's ruling upholding Enron's disallowance claim is fatally flawed.

The Bankruptcy Court's decision is inconsistent not only with the express language of Section 502(d), but also with the statute's manifest purpose. Section 502(d) seeks to promote equality in the distribution of a bankruptcy estate by preventing creditors that have received and failed to repay avoidable transfers from sharing in the estate's assets. That statutory purpose is not implicated here. No allegation exists that Springfield, the entity asserting the claim, has received an avoidable transfer. No risk exists that Springfield will both retain an avoidable transfer and obtain a distribution from the estate on its claim.

Finally, the Bankruptcy Court's decisions, if left to stand, will substantially damage the markets for bankruptcy and other distressed debt claims. As trade organizations

4

representing virtually every participant in the current distressed debt market make clear in their proposed amici brief, the Bankruptcy Court's decision would sharply -- and needlessly -- alter long-established market expectations, limit the availability of credit for distressed companies and imperil market liquidity for the numerous creditors who depend on liquidating their claims promptly after a bankruptcy.

The Bankruptcy Court's rulings would allow Enron to recover indirectly from transferees although it is pursuing comparable direct damage claims against transferors for essentially the same alleged wrongs. These decisions compound legal error with bad policy. They should be reversed.

## STATEMENT OF THE CASE

Enron Corporation ("Enron") was a borrower under certain loan agreements extended by a syndicate of banks, including Citibank. On December 2, 2001 (the "Petition Date"), Enron filed for protection under chapter 11 of the Bankruptcy Code. Thus, on the Petition Date, Citibank and the other syndicate banks held claims against Enron under these loan agreements. At various times after the Petition Date, Citibank and certain other syndicate banks (collectively, the "Transferors") transferred some portion of their claims, directly or indirectly, to other entities (the "Transferees").

As alleged in the complaint filed in the Springfield Action, on or about May 15, 2002, Springfield (one of the Transferees) purchased a claim in the amount of approximately $5,000,000 under one of the loan agreements that Citibank (a Transferor) held as of the Petition Date. (Amended Complaint filed in *Enron Corp. v. Springfield Associates, L.L.C., et al. (In re Enron Corp.)*, Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. No. 05-01025 (AJG) (Bankr. S.D.N.Y. filed Jan. 10, 2005) (the "Springfield Action Complaint") (App. 1 at ¶ 39).)

5

On September 24, 2003, almost two years after the Petition Date, and more than sixteen months after Springfield purchased its claim, Enron filed an action in the Bankruptcy Court (Adversary Proceeding No. 03-09266, the "MegaClaim Action") against Citibank and the other Transferors seeking, among other things, (i) equitable subordination of the Transferors' claims pursuant to Section 510(c) of the Bankruptcy Code based on allegations that the Transferors engaged in inequitable conduct, (ii) disallowance of the Transferors' claims under Section 502(d) of the Bankruptcy Code based on the Transferors' alleged receipt of, and failure to repay, certain avoidable transfers,[3] and (iii) compensatory and punitive damages from the Transferors based on allegations that the Transferors aided and abetted fraud and breach of fiduciary duty, and engaged in unlawful civil conspiracy with Enron insiders (the "Common Law Counts"). (See, e.g., Fourth Amended Complaint filed in MegaClaim Action (the "MegaClaim Complaint"), Appendix at Tab 1, Ex. A ¶¶ 1256-66A, 1267-79, 1532, 1595-1601 (hereinafter App. __ at __ ).) Significantly, the Common Law Counts form the basis of Enron's allegations against the Transferors (and the Transferees in the Coordinated Actions) seeking equitable subordination of their claims. Citibank vigorously contests Enron's allegations in the MegaClaim Action, and those allegations have yet to be adjudicated.

Beginning on January 10, 2005, Enron filed a series of adversary proceedings against each of the Transferees (the "Coordinated Actions").[4] In each proceeding, Enron asserts

---

[3]  As a general matter, an "avoidable transfer" is a transfer by the debtor that a trustee in bankruptcy may recover for the benefit of the debtor's creditors. BRIAN A. BLUM, BANKRUPTCY & DEBTOR/CREDITOR EXAMPLES & EXPLANATIONS § 14.1 (2d ed. 1999).

[4]  The Coordinated Actions comprise the following adversary proceedings: In re Enron Corp., Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. Nos. 05-01025, 05-01029, 05-01074 and 05-01105 (AJG), which have been coordinated, along with certain other adversary

6

two causes of action: (i) equitable subordination of the transferee's claims under Section 510(c), based solely on the alleged misconduct of the transferee's predecessor-in-interest, a Transferor (the "Subordination Count"), and (ii) disallowance of the transferee's claims under Section 502(d), based solely on the allegation that its predecessor-in-interest, a Transferor, received and failed to repay avoidable transfers (the "Disallowance Count"). Enron's allegations in the Coordinated Actions derive entirely from -- and incorporate by reference -- its allegations in the MegaClaim Action; indeed, Enron included the MegaClaim Complaint as an exhibit to the complaints in each of the Coordinated Actions. (*See, e.g.*, Springfield Action Complaint (App. 1 at ¶¶ 1, 45-46, 49-51), attaching the MegaClaim Complaint as an exhibit.) Notably, Enron makes no allegations that Springfield engaged in misconduct or failed to return an avoidable transfer.

On April 1, 2005, Springfield and certain other Transferees filed motions to dismiss the respective Coordinated Actions (the "Motions to Dismiss") on the grounds that: (i) Section 510(c) does not permit subordination of their claims based solely on the alleged misconduct of a predecessor-in-interest and (ii) Section 502(d) does not apply to claims held by parties, such as the Transferees, that had not received avoidable transfers. On April 27, 2005, the Bankruptcy Court entered an order (the "Coordinated Scheduling Order") in each of the Coordinated Actions that, among other things, set coordinated briefing of the issues presented in the Motions to Dismiss[5] and authorized the Transferors to intervene in the Coordinated Actions

_____

proceedings, by the Bankruptcy Court's Coordinated Scheduling Order (defined on the following page).

[5]  The Coordinated Scheduling Order defined the "Issue" as: Whether a claim asserted by a transferee that acquired its claim on or after December 2, 2001 . . . directly or indirectly, from a defendant in the [MegaClaim Action] (each, a "MegaDefendant") that is alleged to have held such claim on the Petition Date, is subject to (a) subordination under section 510(c) of

7

to submit briefs on and argue those issues before the Bankruptcy Court and on any subsequent appeals. (App. 2.)

On November 28, 2005 the Bankruptcy Court issued an opinion denying Springfield's Motion to Dismiss with respect to the Subordination Count only (the "Subordination Opinion"). (App. 3.) The Bankruptcy Court issued virtually identical Subordination Opinions in each of the Coordinated Actions around the same time. On January 19, 2006, Springfield and certain of the other Transferees filed motions for leave to appeal the respective Subordination Opinions, and the Transferors filed a brief in support of the motions. Enron opposed the motions for leave to appeal the Subordination Opinions.

On March 31, 2006, the Bankruptcy Court issued an opinion in one of the Coordinated Actions, Adv. Pro. No. 05-01029 (the "Fleet Action"), denying defendants' Motion to Dismiss the Disallowance Count (the "Fleet Disallowance Opinion") (*Enron Corp., et al. v. Ave. Special Situations Fund II, LP, et al. (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006)). (App. 4.)[6] On May 26, 2006, the Transferees in the Fleet Action filed a motion for leave to appeal the Fleet Disallowance Opinion, and certain of the Transferors filed a brief in support of that motion. Enron again opposed the motion for leave to appeal.

the Bankruptcy Code solely because such MegaDefendant transferor is found to have engaged in wrongful or inequitable conduct that would warrant equitable subordination of such claim in the hands of such MegaDefendant transferor, or (b) disallowance under section 502(d) of the Bankruptcy Code to the extent that a MegaDefendant transferor(s) that held the claim on or after the Petition Date is found to be an entity from which property is recoverable, or a transferee of avoidable transfers, under section 502(d) of the Bankruptcy Code.

6    Due to an administrative oversight, the Bankruptcy Court did not issue decisions on the Motions to Dismiss the Disallowance Count in the remaining Coordinated Actions contemporaneously with its opinion in the Fleet Action. (Final Transcript of Status Conference Before the Honorable Arthur J. Gonzalez, Oct. 24, 2006, Adv. Pro. Nos. 05-01025, 05-01029, 05-01074, 05-01105, at p. 18). (App. 5.)

8

By Opinion and Order dated September 5, 2006, this Court granted the motions for leave to appeal the Subordination Opinions and the Fleet Disallowance Opinion (the "September 5 Order"). (App. 6.) Enron's subsequent settlements with various Transferors resolved certain of the Coordinated Actions, including the Fleet Action. As a result, this Court stayed briefing on the Appeal to permit defendants to obtain an order from the Bankruptcy Court on the Disallowance Count in the remaining Coordinated Actions.

On November 6, 2006, the Bankruptcy Court entered an order denying Springfield's Motion to Dismiss with respect to the Disallowance Count (the "Springfield Disallowance Order") for the reasons set forth in the Fleet Disallowance Opinion (hereinafter, the "Disallowance Opinion"). (App. 7.) On November 16, 2006, Springfield filed a motion for leave to appeal the Springfield Disallowance Order and Citibank filed a brief in support of that motion. Enron again opposed the motion for leave to appeal and sought reversal of this Court's September 5 Order.

By Memorandum Opinion and Order dated January 30, 2007 (the "January 30 Order") (App. 8), this Court granted in part and denied in part Springfield's motion for leave to appeal from the Disallowance Order and modified in part its September 5 Order. Specifically, this Court granted Springfield's motion for leave to appeal the Bankruptcy Court's rulings that "equitable subordination under Section 510(c) and disallowance under Section 502(d) apply, as a matter of law, to claims held by a transferee to the same extent they would apply to the claims if they were still held by the transferor based on alleged acts or omissions on the part of the transferor." (January 30 Order at 3.)[7]

---

[7]  This Court also ruled that the question of whether, as a matter of law, a transferee can avail itself of a good faith defense -- which the Bankruptcy Court answered in the negative under

9

## THE BANKRUPTCY COURT'S OPINIONS

### I.    THE SUBORDINATION OPINION

In its Subordination Opinion, the Bankruptcy Court held, among other things, that a claim subject to equitable subordination in the hands of a transferor remains equally subject to subordination in the hands of a transferee. (Subordination Op. at 50.) The Bankruptcy Court first determined that the three-part *Mobile Steel* test, *Benjamin* v. *Diamond (In re Mobile Steel)*, 563 F.2d 692 (5th Cir. 1977), provides the applicable standard for deciding whether to equitably subordinate a claim under Section 510(c). (Subordination Op. at 17-18.) With respect to *Mobile Steel's* first requirement, that "the claimant must have engaged in inequitable conduct," the Bankruptcy Court found that no case had expressly limited a court, in the context of a transferred claim, to considering "only the conduct of the current holder." *Id.* at 30. The Bankruptcy Court turned to case law concerning assignment and the statutory priority of wage claims in holding that a court could properly consider the conduct of a prior holder in determining whether to subordinate a claim. According to the Bankruptcy Court, these cases, which stand for the proposition that "[t]he transfer of a claim does not change the nature of the claim against the transferor," apply to the question of equitable subordination under Section 510(c). *Id.* at 28-30. The Bankruptcy Court concluded that a claim's susceptibility to the priority adjustment of equitable subordination in the hands of a particular claimant "attaches to such claim and it travels with any subsequent transfer." *Id.* at 31.

---

both Sections 510(c) and 502(d) -- did not meet the criteria for interlocutory appeal because even if the Court found that the good faith defense is not foreclosed as a matter of law, the parties would still have to litigate the factual issue of the Transferee's good faith to determine if it could invoke the defense. (January 30 Order at 4.)

10

The Bankruptcy Court also defended the policy ramifications of its decision, reasoning that a contrary holding would place an administrative burden on a debtor's estate by forcing it to initiate direct lawsuits against transferors that had engaged in inequitable conduct. Such litigation, it stated, would delay distributions and create uncertainty concerning recovery for the estate. *Id.* at 34. The Bankruptcy Court concluded that this potential harm to other creditors outweighed the harm that the transferees would face as a result of its decision, because, according to the opinion, claims purchasers should know the risks inherent in these purchases and should, where possible, protect their interests through contractual indemnities or similar arrangements. *Id.* at 37-39.[8]

## II.    THE DISALLOWANCE OPINION

In its Disallowance Opinion, the Bankruptcy Court held, among other things, that a claim subject to disallowance in the hands of a transferor remains subject to disallowance in the hands of a transferee. *In re Enron Corp.*, 340 B.R. at 210. The Bankruptcy Court relied principally on another bankruptcy court decision, *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), as well as a century-old subrogation case from the Eighth Circuit, *Swarts v. Siegel*, 117 F.13, 15 (8th Cir. 1902). Relying upon *Metiom* and *Swarts*, the Bankruptcy Court determined that Section 502(d) focuses on the claim, rather than the current holder of the claim, and that once a claim is subject to disallowance in the hands of a transferor, that claim defense attaches to the claim and travels with it in any subsequent transfer. *In re Enron Corp.*, 340 B.R.

---

[8]    In its Subordination Opinion, the Bankruptcy Court also concluded that, where equitable subordination is warranted, a court may subordinate any of a claimant's claims and is not restricted to subordinating only those claims related to the underlying misconduct. (Subordination Op. at 26.) Further, the Bankruptcy Court concluded, as a matter of law, that a transferee cannot avail itself of a "good faith" defense. *Id.* at 49-50. Those rulings are not part of this interlocutory appeal.

11

at 196-98. The Bankruptcy Court also relied on state law principles of assignment, which deny a transferee rights greater than those of its transferor. *Id.* at 199. The Bankruptcy Court rejected as unpersuasive a contrary district court ruling -- *Section 1102(A)(1) Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D. Tex. June 17, 1988) -- which held that the plain language of Section 502(d) made clear that a claim in the hands of a transferee is subject to disallowance only if the transferee itself received and failed to return an avoidable transfer. *In re Enron Corp.*, 340 B.R. at 197-98.

The Bankruptcy Court then concentrated on the "policy ramifications" of its result, finding that a contrary ruling would undermine the purpose of Section 502(d). *Id.* at 199-205. It found a debtor's ability to sue the transferor directly to recover an avoidable transfer irrelevant to the disallowance of the transferred claim in a transferee's hands. The Bankruptcy Court concluded that "[w]hen one balances the harm to the other members of the injured-creditor class as against the risk of a claims purchaser who voluntarily becomes a participant in the bankruptcy process, the interests of the other members of the injured-creditor class prevail." *Id.* at 205.[9]

---

[9]    The Bankruptcy Court made other rulings in the Disallowance Opinion. The Bankruptcy Court concluded that Section 502(d) disallowance applies to any claim held by the creditor, not just claims arising from the allegedly avoidable transfer. *In re Enron Corp.*, 340 B.R. at 194. It also ruled that an action for disallowance under Section 502(d) could proceed even though there was, as yet, no determination that a creditor (whether the transferor or transferee) had received an avoidable transfer. *Id.* at 193. Finally, the Bankruptcy Court held, as a matter of law, that a transferee cannot avail itself of a "good faith" defense. *Id.* at 206, 209-10. This interlocutory appeal does not involve any of these rulings.

## ARGUMENT

### I.    A TRANSFEREE'S CLAIM CANNOT BE SUBORDINATED BASED SOLELY ON THE ALLEGED ACTS OF ITS PREDECESSOR-IN-INTEREST

#### A.    Traditional "Principles Of Equitable Subordination" Require That The Claimant Must Have Engaged In Inequitable Conduct

Section 510(c) of the Bankruptcy Code provides that, "after notice and a hearing, the court may --

> under *principles of equitable subordination*, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]"

11 U.S.C. § 510(c)(1) (emphasis added).

##### 1.    The Letter Of The Statute And Its Legislative History

Section 510(c), by its terms, is limited to circumstances where "principles of equitable subordination" apply. 11 U.S.C. § 510(c). Because the statute does not define these principles, its legislative history provides the primary guidance in construing Section 510(c)'s meaning. *United States* v. *Noland*, 517 U.S. 535, 539 (1996) (relying on legislative history in construing § 510(c)); *Burden* v. *United States (In re Burden)*, 917 F.2d 115, 117 (3d Cir. 1990) ("The Bankruptcy Act does not explicitly define the phrase 'equitable subordination' and therefore it is necessary to draw inferences of congressional intent from the legislative history of the Act."); *Enron Corp.* v. *Springfield Assocs.*, 2006 WL 2548592, at *6 n.56 (S.D.N.Y. Sept. 5, 2006) (same). When Congress enacted the Bankruptcy Code, it had a clear understanding of the scope of the "principles of equitable subordination," and it viewed misconduct by the holder of the claim as a prerequisite to its application.

Congress intended Section 510(c) to codify the judge-made doctrine of equitable subordination as embodied in well-settled case law at the time that Congress enacted the

13

Bankruptcy Code in 1978. *See* S. REP. NO. 95-989, 95th Cong., 2d Sess. 74 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5860 ("[A]ny subordination ordered under this provision must be based on principles of equitable subordination. These principles are defined by case law. . . . "); H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 359 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6315 ("[Section 510(c)] is intended to codify case law, such as *Pepper* v. *Litton* . . . and *Taylor* v. *Standard Gas and Electric Co.* . . ."); *see also Holt* v. *Fed. Deposit Ins. Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148 (5th Cir. 1989) (noting that Congress intended Section 510(c) to "incorporate doctrines that had been well-developed in the courts for several decades preceding the enactment of the Bankruptcy Code"); *New Jersey Steel Corp.* v. *Bank of New York*, No. 95 CIV. 3071 (KMW), 1997 WL 716911, at *2 (S.D.N.Y. Nov. 17, 1997) ("Equitable subordination is a judicially created doctrine derived from bankruptcy law which Congress codified, but failed to define, in the Bankruptcy Act of 1978.").

At the time of the statute's enactment, Congress viewed misconduct by the entity seeking recovery on the claim as essential to equitable subordination under Section 510(c). Thus, the Senate Report expressly states that a "claim may normally be subordinated only if its *holder* is guilty of misconduct." S. REP. NO. 95-989 at 74 (emphasis added). Floor statements by Congressmen DeConcini and Edwards similarly affirm that Section 510(c) requires misconduct by the claimant, *i.e.*, *the holder of the claim*:

> It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts development of this principle. To date, under existing law, a claim is generally subordinated *only if [sic] holder of such claim is guilty of inequitable conduct*, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor.

14

124 CONG. REC. 33989, 33998 (1978) (statement of Sen. DeConcini) (emphasis added); 124

CONG. REC. 32350, 32398 (1978) (statement of Rep. Don Edwards) (same).[10]

Moreover, Congress understood that equitable subordination did not permit courts

to subordinate claims of creditors that had not engaged in inequitable conduct simply because

doing so would, in the court's view, reach a "just" or "equitable" result.

> Professor Kripke has made clear that . . . *the doctrine of equitable subordination is inapplicable as between two innocent third parties.* His statement is supported by the opinion of the Second Circuit in *In Re Credit Industrial Corp.*, in which the court noted:
>
>> "Equitable subordination, which is founded upon estoppel, is the doctrine invoked by the courts to *deny equal treatment to creditors based on some inequitable or unconscionable conduct in which they have engaged*, or a special position which they occupy vis-à-vis the bankrupt that justifies subordination of their claims. . . ."

H.R. REP. NO. 95-595 at 196 (discussing section 510(b) of the Bankruptcy Code) (emphasis

added).

This limit on the principles of equitable subordination -- that is, the requirement

of inequitable conduct by the claimant -- prompted Congress to enact a specific statutory

provision, Section 510(b) of the Bankruptcy Code, to achieve its desired subordination of

securities law claims. *See* 11 U.S.C. § 510(b). Congress recognized that it could not rely on the

doctrine of equitable subordination to achieve its desired result of subordinating shareholder

---

[10] The floor statements of Congressmen DeConcini and Edwards are generally regarded as persuasive evidence of Congressional intent with respect to the Bankruptcy Code. *Begier* v. *I.R.S.*, 496 U.S. 53, 64 n.5 (1990); Kenneth N. Klee, *Legislative History of the New Bankruptcy Code*, 28 DEPAUL L. REV. 941, 957-58 (1978) (noting floor statements of Edwards and DeConcini are best source of legislative history to aid in interpretation of Bankruptcy Code).

rescission claims to the claims of other creditors where the shareholders asserting the rescission claims had not themselves engaged in any inequitable conduct.

Finally, while Congress expected that courts would develop existing principles of equitable subordination, *see, e.g., Noland*, 517 U.S. at 540 (noting "Congress meant to give courts some leeway to develop the doctrine"), Congress never intended to provide courts with a blank check simply to "do equity" under Section 510(c). Indeed, had Congress been of that view, it would not have needed to enact section 510(b) of the Bankruptcy Code; courts could have simply relied on principles of equitable subordination to "do equity" and achieve Congress' view of the just and equitable distribution of a debtor's estate by subordinating shareholder rescission claims.

Tellingly, Congress specifically considered and rejected statutory language that would have granted courts the power to subordinate claims untethered to the traditional principles of equitable subordination. The House of Representatives' first version of Section 510(c) provided for the subordination of claims "on equitable grounds." H.R. 8200, 95th Cong. § 510 (1977). The report accompanying H.R. 8200 emphasized that this language provided broader powers than the existing doctrine of equitable subordination because it would allow courts to order "subordination on any equitable grounds." H.R. REP. NO. 95-595 at 359. The final form of Section 510(c), however, limits a court to proceeding "under principles of equitable subordination." *See* S. REP. NO. 95-989 at 74; 124 CONG. REC. 33989, 34016 (1978) (statement of Sen. DeConcini); 124 CONG. REC. 32350, 32416 (1978) (statement of Rep. Edwards). The legislative history thus confirms that Congress deliberately limited the scope of Section 510(c) to the historically rooted principles of equitable subordination (principles that require misconduct by the entity seeking recovery from the estate as a prerequisite to subordination), rather than

16

incorporating broader conceptions of equity unmoored to those historic principles. *E.g., In re Lifschultz Fast Freight*, 132 F.3d 339, 349 (7th Cir. 1997) ("inequitable conduct is still the general rule for equitable subordination.").

### 2. Equitable Subordination Applies Only Where The Claimant Engaged In Misconduct

The *Mobile Steel* case, *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977), provides the leading statement of the "principles of equitable subordination." *United States v. Noland*, 517 U.S. 535 (1996) (recognizing *Mobile Steel's* authority); *Lifschultz*, 132 F.3d at 343 (citing cases); Subordination Op. at 17-18. Under *Mobile Steel*, equitable subordination requires that:

> (i)   The *claimant* must have engaged in some type of inequitable conduct; [11]
>
> (ii)  The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Mobile Steel*, 563 F.2d at 700 (citation omitted) (emphasis added). As the Seventh Circuit explained:

> *Mobile Steel* directs us to search for inequitable conduct as the first step. If there is none, then a bankruptcy court cannot subordinate a claim. This insistence on first finding inequitable conduct was the law before codification in 11 U.S.C. § 510(c), and it remained so afterwards. The creditor must have done something inequitable[.]

*Lifschultz*, 132 F.3d at 344.

---

[11]  Courts require a greater showing when the claimant is not an insider of the debtor. The conduct of a non-insider claimant, such as Springfield, must be "egregious" and "severely unfair" to other creditors to warrant equitable subordination of its claims. *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002).

17

The Bankruptcy Court endorsed *Mobile Steel* as providing the standard for equitable subordination (Subordination Op. at 18), but went to great lengths to avoid that decision's result. *Mobile Steel* and its progeny limit equitable subordination to cases where the *holder of the claim* engaged in misconduct: "[t]he claimant must have engaged in some type of inequitable conduct." *Mobile Steel*, 563 F.2d at 700. A "claimant" is the creditor currently asserting the claim. *See* THE AMERICAN HERITAGE COLLEGE DICTIONARY 257 (3d ed. 2000) (defining "claimant" as "a party that makes a claim"); BLACK'S LAW DICTIONARY 241 (7th ed. 1999) (defining "claimant" as "[o]ne who asserts a right or demand, esp. formally"). Once a claim is transferred, the transferor can no longer assert the claim and, thus, no longer qualifies as "the claimant."

Only by supplying its own definition of "claimant" -- wherein "claimant" means "the claimant *or any party that previously held the claim*" -- can the Bankruptcy Court reconcile its decision with the *Mobile Steel* test. This reading of "claimant" defies common sense and common usage and contradicts the clear language of *Mobile Steel* and virtually every other decision that has addressed equitable subordination. *See, e.g., Schulman* v. *California (In re Lazar)*, 237 F.3d 967, 985 n.19 (9th Cir. 2001) ("Equitable subordination requires that . . . the *claimant* who is to be subordinated has engaged in inequitable conduct") (citation omitted) (emphasis added); *Spacek* v. *Thomen (In re Universal Farming Indus.)*, 873 F.2d 1334, 1337 (9th Cir. 1989) (noting that equitable subordination is only appropriate when "*the claimant who is to be subordinated has engaged in inequitable conduct*") (emphasis added); *Aguilar* v. *United States (In re Aguilar)*, 312 B.R. 394, 399 (D. Ariz. 2003) (same); *Esposito* v. *Noyes (In re Lake Country Invs.)*, 255 B.R. 588, 604 (Bankr. D. Idaho 2000) (same); *Official Comm. of Unsecured Creditors of Sunbeam Corp.* v. *Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)* 284 B.R. 355,

18

363 (Bankr. S.D.N.Y. 2002) (the purpose of Section 510(c) is "to subordinate an otherwise legally valid claim when the claimant has engaged in conduct that makes it unjust or unfair for the *claimant* to share pro rata with similarly situated creditors") (emphasis added).

### 3. The Two Putative "Exceptions" To The Rule Conditioning Equitable Subordination On Claimant Misconduct Have No Relevance Here

Two narrow exceptions arguably exist to the rule that claimant misconduct is required: penalty claims (typically, tax related) and claims based in substance on equity interests. In fact, these putative "exceptions" arguably are no exceptions at all, and their continued viability is an open question. In all events, they hardly justify the fundamental departure from the established principles at issue in the Subordination Opinion.

As the Seventh Circuit emphasized in *Lifschultz*, 132 F.3d at 348, the exception for tax penalties derives from "the fact that the tax penalty claim d[oes] not represent an actual loss." The rationale for this limited and historically-rooted exception[12] hardly authorizes the wholesale abandonment of the general requirement of claimant misconduct. Indeed, the *Lifschultz* court itself specifically cautioned against this very argument:

> [T]he trustee mistakes the birth of an exception for the death of a rule. The rule is that equitable subordination is predicated upon creditor misconduct; the exception of *Virtual Network* [*In re Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir. 1990)] is for a class of tardy tax penalties. . . . *Virtual Network* did not authorize a bankruptcy court to reorder claims in a free-for-all. . . . [W]e assume the trustee is right to say that after *Virtual Network*, creditor misconduct is no longer an absolute requirement in this circuit "in all circumstances" and "in every instance." [citation omitted] That is quite different, however, from saying that creditor misconduct is no longer a requirement in any circumstance or instance, which is incorrect.

---

[12] As the floor statements of Congressmen DeConcini and Edwards (quoted *supra* pp. 14-15) make clear, a limited exception for penalties was contemplated by Congress at the time Section 510(c) was enacted.

19

*Lifschultz*, 132 F.3d at 348.

Furthermore, the supposed exception for claims based on equity interests arguably is no exception at all. Rather, subordination of these claims rests on a type of misconduct by the party asserting the claim whereby it seeks to elevate the priority of an equity interest to debt -- thereby circumventing the Bankruptcy Code's debt-over-equity distribution scheme. As the First Circuit recently observed, the "driving force" behind decisions that subordinate stock redemption claims "is the desire to prevent stockholders from subverting [the principle that creditors stand ahead of investors] by structuring hastily engineered stock redemption agreements as a means of substituting debt for equity (and, thus, sharing company assets ratably with creditors)." *Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.)*, 420 F.3d 53, 59-60 (1st Cir. 2005); *see also id.* at 62-63 (exception is rooted in "core principle . . . that equity holders should not be able artificially to evade the debt-over-equity paradigm [embodied in the Bankruptcy Code]"); *SPC Plastics Corp. et al. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 35 (6th Cir. BAP 1998) ("to give the redemption claim parity with the claims of other creditors is opposed to the priority which creditors enjoy over stockholders in bankruptcy"); *In re Burden*, 917 F.2d at 122 (Alito, J., concurring in part and dissenting in part) (observing that stock redemption claims involve creditor misconduct, and subordination of such claims is consistent with "the concept that equitable subordination must be based on the conduct of the individual claimant.").[13]

Indeed, it is an open question whether, under Section 510(c), there can be any exception to the requirement of claimant misconduct. In *Noland*, the Supreme Court specifically

---

[13]   *See also Lifschultz*, 132 F.3d at 344 (describing question of whether insiders' secured loan was in truth a capital contribution (*i.e.*, a claim that is in essence based on equity interests) as a question of whether "a masquerade of something for what it is not" was involved).

20

declined to decide the question of "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." 517 U.S. at 543. The Supreme Court did, however, significantly rein in (if not altogether eliminate) the putative exception for tax penalties, declining to subordinate tax penalties solely because the penalties reflect no loss by the IRS. *Id.* at 540-41.

In *Noland*, the bankruptcy court had found no misconduct by the Internal Revenue Service ("IRS"), but subordinated its tax penalty claim based on the perceived unfairness of allowing the IRS, in the absence of any loss, to take equally (or ahead of) creditors that had given value to the debtor and now suffered a loss. *Noland*, 517 U.S. at 537. The Supreme Court reversed, holding that this "rationale was inappropriately categorical in nature" because it would apply to the entire category of noncompensatory tax penalty claims. *Id.* at 543. The Court held that "[d]ecisions about the treatment of categories of claims in bankruptcy proceedings . . . are not dictated or illuminated by principles of equity and do not fall within the judicial power of equitable subordination." (quoting *In re Burden*, 917 F.2d at 122 (Alito, J., concurring in part and dissenting in part)); *see also United States* v. *Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213 (1996) (bankruptcy court may not equitably subordinate claim based on its status as a tax penalty).

Based on *Noland*, the First Circuit recently reversed longstanding precedent in that circuit subjecting stock redemption claims to equitable subordination without any showing of inequitable conduct on the claimant's part. *Merrimac*, 420 F.3d at 59, 62. Instead, the court held, as a matter of law, that "it was improper for the bankruptcy court, in the absence of misconduct on the part of the noteholder or any other special circumstance, to impose equitable subordination on [such] a claim." *Id.* at 65.

21

To the extent that these putative "exceptions" to the requirement of creditor misconduct remain viable, they have no relevance here. In any case, their existence certainly does not pave the way for the wholly new exception that the Bankruptcy Court created.[14]

### 4.    Case Law Regarding Assignments And The Statutory Priority Of Wage Claims Has No Relevance Here

In reaching its conclusion that it could equitably subordinate a transferee's claim under Section 510(c) based solely on the transferor's conduct, the Bankruptcy Court did not rely on cases involving equitable subordination. None supports this proposition. Instead, the Bankruptcy Court relied by analogy on case law regarding claim assignments and the statutory priority of wage claims. (*See* Subordination Op. at 28-33.) These analogies are not apt and these cases cannot support the Bankruptcy Court's decision.

#### (i)    *Assignments*

Resorting to case law concerning claims assignments, the Bankruptcy Court reasoned that "[t]he transfer of a claim does not change the nature of the claim." (Subordination Op. at 28). But in invoking that principle, the Bankruptcy Court has assumed its own conclusion. If, as the Bankruptcy Court posits, a claim's susceptibility to equitable subordination in the hands of a predecessor-in-interest becomes an attribute of a claim, the law of assignment might have something to say about whether that attribute travels with the claim upon transfer. However, if, as the legislative history of Section 510(c) and the relevant case law establish, equitable subordination operates as a remedy available only against particular claimants, then the law of assignment has no applicability -- and provides no guidance -- whatsoever.

---

[14]    Indeed, the Bankruptcy Court's policy rationale for the subordination of transferee claims was also "inappropriately categorical in nature." (*See* Subordination Op. at 39) (noting burden on estate if required to sue transferors directly).

22

Moreover, the Bankruptcy Court's opinion overstates the law of assignment. The Bankruptcy Court quoted *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942), for the proposition that "[a]n assignee stands in the shoes of the assignor and subject to all equities against the assignor." (*See* Subordination Op. at 28.)[15] But there are a number of circumstances in which the rights of an assignee exceed those of the assignor. *See, e.g.*, N.Y. U.C.C. LAW §§ 3-305 (holders in due course take instruments free of all defenses of any party to the instrument with whom the holder has not dealt, other than certain so-called "real" defenses); 7-502 (holder of a negotiated document of title that has been duly negotiated obtains greater rights than those of its transferor); 8-202 (securities with defect going to validity are valid, subject to limited exceptions, in the hands of a purchaser for value and without notice of the particular defect); and 8-510 (action based on an adverse claim to a financial asset or security entitlement may not be asserted against a person who purchases a security entitlement if the purchaser gives value, does not have notice of the adverse claim and obtains control) (McKinney 2006).[16] Thus, the law of claims assignments -- even if it were analogous to the issue here -- does not support the Bankruptcy Court's holding.

### (ii)    *Statutory Priority of Wage Claims*

To support its conclusion that the potential for equitable subordination against a particular prior holder becomes "attached to such claim and . . . travels with any subsequent

---

[15]    The Bankruptcy Court's reliance on *Goldie* is misplaced for another reason: That decision expressed the principle that an assignee fares no better than its assignor "in dictum and in the context of claim validity, not priority, and is thus of little guidance [here]." Adam J. Levitin, *The Limits of Enron: Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 4, 17 (2006).

[16]    We cite these U.C.C. provisions solely to illustrate the Bankruptcy Court's overstatement of the law of assignment, not to interject questions of "good faith" or "holder in due course," neither of which is the subject of the Appeal.

23

transfer" (Subordination Op. at 31), the Bankruptcy Court also drew upon a case involving the statutory priority of wage claims, *Shropshire, Woodliff, & Co.* v. *Bush*, 204 U.S. 186, 189 (1907). *Shropshire* stands for the unremarkable principle that an assignment does not affect a claim's statutory priority -- in that case, the priority of wage claims. *Id.* at 189 ("[T]he character of the debts was fixed when they were incurred, and could not be changed by an assignment. They were precisely of one of the classes of debts which the statute says are 'debts to have priority.'").

Recognizing that *Shropshire* dealt with the statutory priority of claims (Subordination Op. at 29), the Bankruptcy Court nonetheless concluded that its principles applied equally to the judicial doctrine of equitable subordination and held that "the priority of a claim resulting from equitable subordination should not be impacted by a transfer." *Id.* But the statutory priority of wage claims rests on the intrinsic "character" of those *claims. See* 11 U.S.C. § 507(a)(4) (2006) ("The following . . . claims have priority in the following order: . . . Fourth, allowed unsecured claims . . . for wages, salaries or commissions . . ."). The availability of equitable subordination to adjust claim priorities under Section 510(c) depends on the "character" of a particular *claimant's conduct* -- regardless of the "character" of the claims. (*See* Subordination Op. at 26) ("equitable subordination is not limited to only those claims related to the inequitable conduct"). Indeed, Section 510(c) expressly refers to "allowed" claims, that is, claims that are entitled to the same treatment as other allowed claims (absent equitable subordination). Moreover, the Court in *Shropshire* adhered to an express Congressional mandate that wage claims are entitled to priority -- unlike the Bankruptcy Court here, which interpreted Section 510(c) in a manner inconsistent with its legislative intent.

Once again, the Bankruptcy Court simply assumed the truth of the proposition it sought to prove: that the potential for "equitable subordination" in the hands of a predecessor-in-interest becomes an attribute of a claim rather than a remedy only available against a particular type of claimant. *Shropshire* provides no legal authority for the Bankruptcy Court's conclusion that the potential for equitable subordination in the hands of a particular prior holder "attaches to" and "travels with" a claim.

**B.    The Bankruptcy Court Operated At A "Level Of Policy Choice" Reserved For Congress**

Focusing on the "policy ramifications" of its decision, the Bankruptcy Court regarded its ruling as necessary to "ensure that the purposes of the bankruptcy statute is achieved." (Subordination Op. at 33.) Specifically, the Bankruptcy Court concluded that the debtor would face an undue "administrative burden" if it could not subordinate claims of transferees based on misconduct by their predecessors-in-interest, but could only sue the wrongdoer directly. (*See* Subordination Op. at 34.) According to the Bankruptcy Court, this "administrative burden" would "delay the ultimate distributions by the debtor, which delay is contrary to the goal of the Bankruptcy Code." *Id.* at 34-35.

Based on this (highly questionable) assessment of "administrative burden" and "delay," the Bankruptcy Court balanced the equities of claim transferees against the interests of other co-equal creditors and determined that the claim transferees were somehow less deserving: "When one balances the harm to the other members of the injured creditor class as against the risks to a claim-purchaser, the interests of the other members of the injured creditor class prevail." *Id.* at 39. But the Supreme Court was clear in *Noland* and *Reorganized CF&I* that the sort of "policy judgments" and "categorical distinctions" employed by the Bankruptcy Court are an inappropriate basis for equitable subordination. "[T]he circumstances that prompt a court to

25

order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." *Noland*, 517 U.S. at 543; *see also id.* ("court cannot set up a subclassification of claims . . . and fix an order of priority for the sub-classes according to its theory of equity") (citation omitted). A bankruptcy court may exercise a conditional grant of power, such as Section 510(c), only when the condition applies, and not whenever the court might deem it consistent with a broad reading of the statute's purpose. [17]

In any case, the Bankruptcy Court has vastly overstated the burdens that a debtor would face if it were forced to proceed solely against a transferor. In discussing the supposed cost and delays associated with a direct action against the wrongdoer, the Bankruptcy Court ignored the fact that, even if equitable subordination "travels with the claim" as it held, a debtor still has to establish sufficient grounds to equitably subordinate a transferor's claim before it can subordinate the claim in the hands of a transferee. Whether that factual question is litigated in an equitable subordination action against the transferee or in a direct action by the debtor against the alleged wrongdoer, the burden or attendant delay will not be significantly different. *See* Levitin, *supra* note 15, at 408 ("[T]here is no cause to believe that a direct action would take significantly longer to prosecute than an equitable subordination motion."). The Bankruptcy Court's concern over a delay in distributions to other creditors is unfounded for the same reason, and ignores the

---

[17] *See, e.g., Noland*, 517 U.S. at 539 (recognizing that Section 510(c) does not permit a court to "adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable") (citation omitted); *Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir. 2005) (noting that "[t]he statutory language [of Section 105(a)] supports [a] limit on the equitable powers of the bankruptcy court" and that "[t]he equitable power conferred . . . by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.") (citation omitted).

fact that its ruling delays distributions to a whole new class of creditors -- transferees who themselves have not engaged in any misconduct -- pending resolution of the debtor's equitable subordination proceeding. As is the case with Enron, a debtor typically holds in reserve monies to which a claimant is otherwise entitled pending the debtor's adjudication of an equitable subordination action against the claimant. Thus, if the Subordination Opinion stands, any distribution on a claim subject to an "equitable subordination taint" has to await the outcome of either the equitable subordination proceeding (whether against the transferor or transferee) or a direct cause of action against the wrongdoer;[18] no reason exists to believe that the wait will be significantly different in either case.[19]

---

[18] Because Enron has already brought the MegaClaim Action, any concern about increased administrative burdens in this case is entirely hypothetical. Enron has asserted its damages claims against Citibank notwithstanding that the law prohibits Enron from recovering both damages from Citibank and equitably subordinating Springfield's claims based on the same conduct. *See Hirsch* v. *Penn. Textile Corpl, Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) ("[A] trustee cannot recover damages and equitably subordinate a claim based upon the same wrong."). Nor is any concern about delaying distributions to third party creditors warranted here. Even if the Subordination Opinion stands, Enron would have to prove its allegations against Citibank in the MegaClaim Action before it could subordinate Springfield's claims and distribute to third party creditors the monies held in reserve with respect to those claims. And if the Subordination Opinion is reversed, Enron would still have to prove its allegations against Citibank in the MegaClaim Action before it could distribute the proceeds of that Action to third party creditors. Thus, whether or not equitable subordination "travels with the claim," potential distributions to third party creditors would have to await the final (and successful) resolution of the direct action against the wrongdoer.

[19] Enron previously has advanced the policy argument that "shielding transferred claims from subordination" would encourage creditors who engaged in misconduct "to 'wash' [their] claims free of any possibility of equitable subordination by simply transferring them." (Subordination Op. at 31.) The Bankruptcy Court expressly declined to rely on this policy concern (*id.* at 32-33), and with good reason: A wrongdoer that transfers all its claims remains subject to a direct action by the debtor for the same wrongdoing.

27

II.    A TRANSFEREE'S CLAIM CANNOT BE DISALLOWED BASED SOLELY ON
       ITS PREDECESSOR-IN-INTEREST'S RECEIPT OF, AND FAILURE TO
       REPAY, AN AVOIDABLE TRANSFER

      A.    The Plain Language Of Section 502(d) Does Not Authorize Disallowance Of
             Claims Held By Claimants That Did Not Receive Avoidable Transfers

Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court
> shall disallow any claim of any entity from which property is
> recoverable under section 542, 543, 550, or 553 of this title or that
> is a transferee of a transfer avoidable under section 522(f), 522(h),
> 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or
> transferee has paid the amount, or turned over any such property,
> for which such entity or transferee is liable under section 522(i),
> 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

Construction of Section 502(d) begins with the language of the statute. *Lamie* v.

*United States Trustee*, 540 U.S. 526, 534 (2004) (in construing a section of the Bankruptcy Code,

"[t]he starting point in discerning congressional intent is the existing statutory text"); *United*

*States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("The task of resolving the dispute

over the meaning of [a section of the Bankruptcy Code] begins where all such inquiries must

begin: with the language of the statute itself."). Where "the statute's language is plain, 'the sole

function of the courts is to enforce it according to its terms.'" *Ron Pair Enters., Inc.*, 489 U.S. at

241 (quoting *Caminetti* v. *United States*, 242 U.S. 470, 485 (1917)); *see also United States* v.

*Venturella*, 391 F.3d 120, 125 (2d Cir. 2004). If the text does not reveal a plain meaning, courts

may consider other interpretative aids such as the statute's purpose and canons of construction.

*Adams Fruit Co., Inc.* v. *Barrett*, 494 U.S. 638, 642 (1990); *United States* v. *Ford*, 435 F.3d 204,

210 (2d Cir. 2006); *Natural Res. Def. Council, Inc.* v. *Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001).

The plain language of Section 502(d) does not apply to the Transferee's claim. It

applies to "any entity from which property is recoverable . . . or that is a *transferee of [an*

28

*avoidable transfer]* . . . unless such entity . . . has paid the amount, or turned over any such property, for which such entity . . . is liable . . . ." 11 U.S.C. § 502(d); *see Petitioning Creditors of Melon Produce, Inc.* v. *Braunstein*, 112 F.3d 1232, 1237 (1st Cir. 1997) ("The language of Section 502(d) of the Bankruptcy Code is not complex. A proof of claim must be disallowed unless *the [avoidable transfer] recipient* pays the amount for which *he* is 'liable' under 11 U.S.C. § 550.") (emphasis added).

Enron does not allege that Springfield received (let alone received and failed to return) any avoidable transfer. As a result, Enron has not satisfied the threshold requirement of Section 502(d). Nothing on the face of the statute suggests that claims asserted by a transferee that did not itself receive an avoidable transfer may be disallowed. *See In re Wood & Locker,* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501, at *8-9 (W.D. Tex. June 17, 1988) (holding that Section 502(d) does not permit disallowance of a claim of a transferee based upon transferor's receipt of avoidable transfer because the transferee is not the "kind of creditor who is liable" under the Bankruptcy Code sections referenced in Section 502(d)).

The Bankruptcy Court erroneously concluded that Section 502(d) focuses on the claim rather than on the *entity* asserting the claim. *In re Enron Corp.*, 340 B.R. at 195 ("The identity of the holder of the claim is irrelevant when the estate takes action against such claim under section 502(d) . . ."). But Section 502(d) cannot bear this interpretation; disallowance applies to "*any claim of any entity . . . that is a transferee [of an avoidable transfer].*" 11 U.S.C. § 502(d) (emphasis added). The focus of the statute is thus on the characteristics of the entity asserting the claim, not on the characteristics of the claim itself. As the Collier treatise notes:

> The point of section 502(d) is that the claim is disallowed if the holder of that claim is subject to action by the trustee for the avoidability of a transfer or the recovery of property. *Rather than*

29

> *addressing itself solely to claims, the focus of section 502(d) is*
> *upon creditors who received voidable transfers.*

4 Collier on Bankruptcy ¶ 502.05[3] (emphasis added).  *See also Katchen* v. *Landy,* 382 U.S. 323, 331 n.5 (1966) (noting that Section 502(d)'s predecessor statute, Section 57g of the Bankruptcy Act of 1898, "is concerned with creditors rather than claims. . . .");[20] *Am. Standard, Inc.* v. *Nass (In re Jack Kardow Plumbing Co.),* 451 F.2d 123, 133 (5th Cir. 1971); *Caliolo* v. *Saginaw Bay Plastics, Inc. (In re Cambridge Indus. Holdings, Inc.),* No. 00-1919, 2006 WL 516764, at *2 (D. Del. Mar. 2, 2006).

The final clause of Section 502(d), which provides the "cure" to disallowance of the claim, confirms that the statutory focus is on the characteristics of the entity that asserts the claim.[21]  Section 502(d) provides that "the court shall disallow any claim of any entity [that received an avoidable transfer] *unless such entity* . . . has paid the amount . . . for which *such entity* is liable."  11 U.S.C. 502(d).  Only the recipient of an avoidable transfer -- and not a claims transferee of that entity -- is liable for or capable of returning the transferred funds to the estate and thus availing itself of the "cure" provided by the statute.  The statutory language is clear that the entity ("any entity") whose claims are subject to disallowance is the same entity ("such entity") liable for the avoidable transfer and capable of effecting the cure.

---

[20]  Without exception, subsequent case law finds that *Katchen* applies fully to the construction of the modern Section 502(d).  *See, e.g., In re America's Shopping Channel, Inc.,* 110 B.R. 5, 8 (Bankr. S.D. Cal. 1990) ("Section 57(g) of the Act is very similar to section 502(d) of the Code, and the essential import of section 57(g) appears unchanged.  Thus, the teachings of *Katchen* v. *Landy* remain relevant."); *Edelman* v. *Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen Foods, Inc.),* 80 B.R. 848, 850 (Bankr. W.D. Mich. 1987) (same).

[21]  *See FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citation omitted).

**B.      Disallowing A Transferee's Claim Based Solely On The Transferor's Receipt And Failure To Return Avoidable Transfers Is Inconsistent With The Statutory Purpose**

The Bankruptcy Court's decision is not only inconsistent with the plain language of Section 502(d), but also inconsistent with its underlying purpose.  Section 502(d) seeks to promote equality in the distribution of the bankruptcy estate by preventing creditors that have received and failed to repay avoidable transfers from sharing in the estate's assets.  The Supreme Court, interpreting section 57g of the Bankruptcy Act of 1898 (the predecessor to Section 502(d)), explained the statute's purpose as follows:

> We think it clear that the fundamental purpose of the provision in question was to secure an equality of distribution of the assets of a bankrupt estate.  This must be the case, since, if a *creditor having a preference retained the preference, and at the same time proved his debt and participated in the distribution of the estate*, an advantage would be secured not contemplated by the law.

*Keppel* v. *Tiffin Sav. Bank*, 197 U.S. 356, 361 (1905) (emphasis added).

That statutory purpose is not implicated here.  Springfield -- the entity asserting the claim -- has not received an avoidable transfer; thus, there is no risk that it will both retain an avoidable transfer and obtain a distribution from the estate on its bankruptcy claims.  *See also Campbell* v. *United States (In re Davis)*, 889 F.2d 658, 662-63 (5th Cir. 1989) ("We find the legislative history and purpose behind Section 502(d) to be assuring the bankruptcy estate that a creditor will not be allowed to assert a claim without first paying his own debts . . . "); *Sharp* v. *Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 322 B.R. 440, 452 (Bankr. N.D. Okla. 2003) ("The purpose of Section 502(d) is to deny a claimant against the estate the right to participate in distribution of the estate if that claimant has property to which the estate is entitled."). Depriving Springfield, which itself does not hold an avoidable transfer,

31

of any share in the distributions of the estate does not serve the principal purpose of Section 502(d).

Moreover, the Bankruptcy Court's interpretation of Section 502(d) is at odds with another related purpose of the statute -- to coerce compliance with judicial orders to return avoidable transfers. *In re Davis*, 889 F.2d at 661 ("The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders."); *accord Holloway* v. *Internal Revenue Serv. (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) ("the purpose of section 502(d) is to ensure compliance with judicial orders"). A transferee cannot be coerced to return avoidable transfers that it does not hold, and it has no legal or equitable obligation to pay the cash equivalent to the estate; disallowance of claims in the hands of transferees serves only to punish (rather than coerce) the transferees and, thus, contradicts Section 502(d)'s purpose. *In re Davis*, 889 F.2d at 661 ("Section 502 was not intended to have a punitive effect and consequently does not apply in this case."). The purpose of Section 502(d) is "not to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors." *Melon Produce*, 112 F.3d at 1239 (citation omitted). A transferee that received no avoidable transfers has no such option.

The Bankruptcy Court suggested that its ruling does serve the coercive purpose of Section 502(d), albeit indirectly, because indemnity agreements between a transferee and its transferor will provide the necessary pressure on the transferor to return an avoidable transfer. *In re Enron Corp.*, 340 B.R. at 202-03. The Bankruptcy Court would thus dramatically expand the reach of Section 502(d) to conscript transferees to collect debts owed to the estate. Nothing in the statutory language or legislative history supports the view that Congress intended this result,

32

and such conscription would be neither *effective* nor fair. It would not be effective because, as the Bankruptcy Court acknowledged, *In re Enron Corp.*, 340 B.R. at 203-04 & n.23, in many cases transferees will not have indemnity agreements and indemnity agreements will not always exert sufficient pressure to compel a transferor to return avoidable transfers. Moreover, it is fundamentally unfair to deny a claimant a distribution to which it would otherwise be entitled merely to coerce an unrelated third party. That is particularly true where the estate has direct remedies against the recipient of an allegedly avoidable transfer -- as in this case, where Enron has asserted counts in the MegaClaim Action against the Intervenor Bank.

C.    ***Metiom*, On Which The Bankruptcy Court Relied, Misapplied A Fundamentally Different 100-Year-Old Case And Was Wrongly Decided**

The Bankruptcy Court relied on *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), to support the disallowance of a claim in the hands of a transferee based solely on its transferor's receipt of, and failure to return, an avoidable transfer. *See, e.g., In re Enron Corp.*, 340 B.R. at 194-96. In *Metiom*, the transferor, Intira, filed a claim against the debtor's estate. It then sold all its assets, including its claim against the estate, to another party, divine Acquisition, Inc. ("divine"). *Metiom*, 301 B.R. at 637. The liquidating trustee sought to disallow divine's claim under Section 502(d) based on an allegedly preferential payment to Intira. The *Metiom* court held that the claim in the hands of divine was subject to disallowance unless Intira returned the preferential payment for which it was liable. *Id.* at 643.

*Metiom* was wrongly decided. *First, Metiom* ignored the plain language of Section 502(d), which restricts disallowance to "any claim of any entity [who received and failed to return an avoidable transfer]." The *Metiom* court, like the Bankruptcy Court, essentially rewrote the statute to reach "any claim *previously held by* an entity [who received and failed to

33

return an avoidable transfer]" or perhaps any "claim held as of the date of the petition date by an entity [who received and failed to return an avoidable transfer]."

*Second*, *Metiom* relied on principles of assignment law in finding that a transfer should not "improve" a claim, as did the Bankruptcy Court. But this reliance assumes the very conclusion that the Bankruptcy Court set out to prove. Assignment law might have some relevance if susceptibility to disallowance becomes an "attribute" of the claim that travels with it upon a transfer; on the other hand, it has no relevance if (as the statutory language makes clear) disallowance is a personal remedy available against particular creditors based on the creditor's own conduct.[22]

*Third*, *Metiom* relied on a single, century-old case -- *Swarts* v. *Siegel*, 117 F. 13 (8th Cir. 1902) -- a decision readily distinguishable from the facts in *Metiom* and those of this appeal. The claims in *Swarts* were not held by a transferee, but rather, by a surety. Specifically, the debtor had issued $25,000 in promissory notes to a bank, endorsed by the claimant. *Swarts*, 117 F. at 14. During the prepetition preference period, the debtor, while insolvent, paid the bank $14,600 on the notes. *Id.* Postpetition, the claimant paid the bank the balance due on the debtor's notes (for which it was liable to the bank as an endorser). The claimant then filed a claim against the debtor's estate for the amount due on the notes, including interest and charges. *Id.* The court disallowed the claimant's claim until the $14,600 preferential payment made to the bank was returned. *Id.* Thus, the claimant in *Swarts* was not a transferee of a claim, but rather, a

---

[22]  In all events, as discussed in Part I(A)(4)(i), *supra, Metiom* and the Bankruptcy Court overstate the law of assignment. In a number of circumstances, a transferee can obtain better rights than its transferor; certain defenses and infirmities are personal and simply do not travel with the claim.

surety. As such, it stood in the shoes of the bank and became liable for the bank's preference under principles of subrogation. *Id.* at 16.

Finally, *Metiom's* interpretation of *Swarts* is inconsistent with the Supreme Court's subsequent reading of the same statutory provisions. *See Katchen*, 382 U.S. at 331, n.5 (noting that Section 502(d)'s predecessor statute, Section 57g of the Bankruptcy Act of 1898, "is concerned with creditors rather than claims . . . ").

Notably, no decision other than *Metiom* (and the Bankruptcy Court's Disallowance Opinion) has applied Section 502(d) or its predecessors to disallow a claim asserted by a third-party transferee who is not itself a recipient of an avoidable transfer. The 100 years of judicial silence provides strong evidence that courts and practitioners have understood that this remedy applies only to claimants who themselves hold avoidable transfers -- and not to their transferees.[23]

In fact, a district court that also considered this precise issue (the only other court to do so) reached the correct result and refused to apply Section 502(d) to disallow a claim asserted by a transferee that did not itself receive an avoidable transfer. *See In re Wood & Locker*, 1988 U.S. Dist. LEXIS 19501, at *5. In *In re Wood & Locker*, a party assigned its claim against the debtor to a bank postpetition. *Id.* at *5. The debtor and the creditors' committee later sued the assignor seeking to recover allegedly avoidable transfers. The committee also sought to disallow the assigned claim in the hands of the bank because the assignor had received, and had not repaid, an avoidable transfer. *Id.* at *2. Affirming the bankruptcy court's summary judgment for the bank, the district court explained:

---

[23]  Over the same 100 years, parties have been able to transfer claims. *See In re Bevins*, 165 F. 434, 435 (2d Cir. 1908) (recognizing creditors' right to purchase claims to obtain the required number of creditors petitioning for involuntary bankruptcy).

35

> The analytical tool to unlock the mysteries of Sec. 502(d) is to
> examine the enumerated sections to determine whether the
> transferee has liability. Where there is no liability under those
> sections, Sec. 502(d) is not triggered.

* * * *

> [T]here is no reason in law to overturn the Bankruptcy Court's
> finding that because the Bank is not the 'kind of creditor' from
> whom the trustee can recover property under Sec. 550, or the kind
> of creditor who is liable under Sec. 547, Sec. 502(d)['s]
> disallowance provision is not triggered.

*Id.* at *7-8,*9. Like the bank in *In re Wood & Locker*, the Transferee does not hold any property

or money payable to the estate under any of the Bankruptcy Code sections enumerated in

Section 502(d). Therefore, its claim cannot be disallowed.

### D.    The Bankruptcy Court Engaged In Judicial Legislating

As with its Subordination Opinion, the Bankruptcy Court's Disallowance Opinion

devotes considerable attention to the "policy ramifications" of its decision. *In re Enron Corp.*,

340 B.R. at 199-205. The Bankruptcy Court reasoned that "[w]hen one balances the harm to the

other members of the injured-creditor class as against the risks to a claim-purchaser who

voluntarily becomes a participant in the bankruptcy process, the interests of the other members

of the injured-creditor class prevail." *Id.* at 205. However, no basis exists for preferring one

group of co-equal creditors over another and the Bankruptcy Court's apparent desire to "do

equity," as it perceived that outcome, cannot justify ignoring a statute's plain language and

purpose; the so-called "balanc[ing] of harms" here is an exercise appropriately left to Congress,

not the courts.

Under well-settled law, a court must enforce the plain language of a statute

regardless of the court's personal view of desirable policy. *See Taylor v. Freeland & Kronz*,

503 U.S. 638, 644 (1992) (following the plain meaning of Section 522(l) of the Bankruptcy Code

36

and Federal Rule of Bankruptcy Procedure 4003(b), even where such meaning creates improper incentives); *N.L.R.B.* v. *Bildisco and Bildisco*, 465 U.S. 513, 534 (1984) (holding that the language of Section 365 of the Bankruptcy Code permits a debtor-in-possession to reject collective-bargaining agreements under the business judgment standard despite the public interest in promoting such agreements), *superseded by statute*, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (enacting Section 1113 of the Bankruptcy Code, which imposes stringent conditions on a debtor-in-possession's right to reject a collective-bargaining agreement); *DeKalb County Div. of Family and Children Servs.* v. *Platter (In re Platter)*, 140 F.3d 676, 683 (7th Cir. 1998) (recognizing that the court cannot "usurp[] the authority of [Congress] through an act of judicial legislation [nor] ignor[e] the plain meaning" of Section 523(a)(5) of the Bankruptcy Code, even where the plain meaning produces an inequitable result).

Enforcing Section 502(d) according to its terms does not generate inequitable results. Section 502(d) (like its predecessor) was meant, among other things, to provide the creditor with the option to keep an avoidable transfer and give up distributions from the estate or surrender the transfer and share equally with other creditors. *Melon Produce*, 112 F.3d at 1239. The Bankruptcy Court's extension of Section 502(d) to transferees that never received an avoidable transfer is inequitable because the transferees have no such "option." The debtor, however, retains all its direct causes of action against the transferor that received the avoidable transfer.[24]

---

[24]    As in the case of Section 510(c), Enron previously has advanced the policy argument that "shielding transferred claims from disallowance" would encourage creditors who received avoidable transfers "to 'wash' [their] claims free of any possibility of disallowance by simply transferring them." *In re Enron Corp.*, 340 B.R. at 199. The Bankruptcy Court, again,

37

## III.    THE BANKRUPTCY COURT'S DECISIONS MAY SEVERELY DISRUPT THE DISTRESSED DEBT MARKETS AND FRUSTRATE THE REHABILITATIVE PURPOSES OF CHAPTER 11

The plain language, legislative histories and applicable case law of Sections 510(c) and 502(d) amply support reversing the Bankruptcy Court's rulings. If this Court gives any consideration to the policy implications of the Bankruptcy Court's decisions, then the Second Circuit directs the Court to consider the potential for market disruption. *Elliott Assocs., L.P.* v. *Banco de la Nacion*, 194 F.3d 363, 380 (2d Cir. 1999). While the Bankruptcy Court's interpretation of Sections 510(c) and 502(d) may benefit a debtor's estate in the short run, its long-term effect will disrupt the distressed debt market and decrease liquidity for distressed companies.

In focusing on the short-term benefit a debtor's estate receives from the ability to subordinate and disallow claims of transferees based on the conduct of transferors, the Bankruptcy Court minimized the consequences that its decision would have on the distressed debt market. The court presumed that "[p]articipants in the claims-transfer market are aware, or should be aware of, the risks and uncertainties inherent in the purchase of claims," including the risk of subordination and disallowance based solely on the conduct of a predecessor-in-interest. (Subordination Op. at 37; *In re Enron Corp.*, 340 B.R. at 202.) In fact, trade organizations representing virtually every active participant in the current distressed debt market make clear in their proposed amici brief that participants in the distressed debt market had no such awareness, given that the Subordination and Disallowance Decisions made a dramatic departure from

---

expressly declined to rely on this concern (*id.* at 200), and with good reason: A recipient of an avoidable transfer that sells all its claims remains subject to a direct action by the debtor to recover the avoidable transfer.

existing law.[25] (*See* Brief of Amici Curiae The Bond Market Association, The International Swaps And Derivatives Association, The Securities Industry Association, And The Loan Syndications And Trading Association ("Industry Amici") In Support Of Appellants at 18-20) ("Amici Brief"). Numerous commentators agree, characterizing the Bankruptcy Court's decisions as "an urgent warning,"[26] cautioning market participants to "take special note" of the decisions,[27] and predicting that the decisions will have a "drastic effect" on the claims trading market.[28] The Subordination and Disallowance Decisions will radically change the risk assessment by potential claim transferees.

---

[25]   The Bankruptcy Court noted that a particular trade association's suggested claim-transfer contract includes a warranty against equitable subordination; however, the inclusion of such a provision is hardly informative as to the weight, if any, that claim buyers place on such warranties. (Notably, the source of the form to which the Bankruptcy Court referred, The Loan Syndication and Trading Association, is one of the associations seeking to submit an amici brief in the Appeal.)  In any case, the Bankruptcy Court acknowledged that various categories of claims involve trading markets where parties *cannot* freely negotiate representations, warranties and indemnities. (*See* Subordination Opinion at 39, n.15; *In re Enron Corp.*, 340 B.R. at 204, n.23 (discussing bonds and notes).)

[26]   *See, e.g.*, Lawrence Kotler, *Claim Purchasers Beware: No Good-Faith Defense to Equitable Subordination*, 25-1 AM. BANKR. INST. J. 22, 69 (2006) ("[The Subordination Decisions] should serve as an urgent warning to those in the business of buying and selling distressed debt/unsecured claims.").

[27]   Enron's own bankruptcy counsel posted a bulletin on its website advising its clients to "take special note" of the decision and predicting that claims purchasers will respond by, *inter alia*, "adjusting the market price" they pay for claims. Rachel E. Albanese, *Assignment of Claims Does Not Prevent Equitable Subordination Attack*, BANKR. BULL.: CURRENT ISSUES IN RESTRUCTURING AND REORGANIZATION, VOL. 13, NO. 2, p.14 Feb. 2006 (Weil, Gotshal & Manges LLP), *available at* http://www.weil.com (follow "Resources" hyperlink, then "Bankruptcy Bulletin" hyperlink, then "Archive" hyperlink, and finally "February 2006" hyperlink) (last visited March 11, 2007).

[28]   Dan Schechter, *Equitable Subordination As to One Claim May Affect Unrelated Parties, Even if Unrelated Claims Have Been Transferred to Third Parties*, COM. FIN. NEWSL., Nov. 24, 2005 (noting that "[i]f [the Bankruptcy Court's Decision] is affirmed on appeal, it will have a drastic effect on the emerging market in claims trading").

In the Subordination and Disallowance Opinions, the Bankruptcy Court suggests that participants in the distressed debt markets can protect themselves by obtaining indemnities from their transferors, or discount the price they are willing to pay for claims, or simply exit the market. (Subordination Op. at 37-38; *In re Enron Corp.*, 340 B.R. at 202-03.) Industry Amici generally agree. According to Amici, claim buyers' likely response to the Bankruptcy Court's decisions -- increased due diligence and reluctance to participate in the market except at deep discounts -- will negatively impact the market's liquidity and reduce the availability of new credit for distressed companies. (Amici Brief at 14-15, 18-20, 28-29.) Given the new risk that transferees will be forced to bear, claim buyers will conduct extensive due diligence on the lineage of the claims and conduct of previous claim owners before purchasing a claim. To backstop their due diligence efforts, claim buyers will likely demand indemnities from their sellers.[29] Claim buyers will thus also need to conduct due diligence into the financial wherewithal of their sellers to assess the value of the indemnities.

Indemnities, even from financially sound indemnitors, are hardly a panacea, though. Claim buyers will still have to bear the cost and expense of any litigation necessary to

---

[29] Significantly, the Bankruptcy Court proposed that the scope of its decisions extended beyond the bank debt claims at issue in these cases to reach the securities markets, (Subordination Op. at 39, n.15 *In re Enron Corp.*, 340 B.R. at 204, n.23 ("based on the Court's previous policy analysis, no legal and policy basis supports the premise that transferees of bonds or notes should be treated differently than those holding the transferred loan claims")), and prepetition agreements, (Subordination Op. at 39, n.15 ("a party who enters into a pre-petition agreement under which such party agrees to accept a transfer of proofs of claim in the event of the bankruptcy of a party to such agreement, should fair [sic] no better that [sic] a post-petition claim-purchaser")), such as credit default swaps. Bonds, notes and similar instruments trade in public markets on an almost daily basis -- it is impossible to impose a requirement of transfer agreements and indemnification provisions on such an active marketplace. The scope of the Bankruptcy Court's decision will result in the disruption of all markets in postpetition claims.

40

enforce their indemnification rights. In some circumstances, multiple claim transfers may require a series of such litigations to reach up the chain to the transferor that engaged in the misconduct.

In the end, Industry Amici expect that claim purchasers will either significantly discount their bids to reflect the new risks or exit the market. *See id.* at 14-15, 18-20. Fewer claim buyers and higher risk premiums result in less liquidity in the secondary distressed debt market, which in turn translates into higher credit costs for all borrowers. In making credit decisions, a lender considers its ability to stem losses if the borrower defaults. "Exit-by-sale" is one of the lender's primary mechanisms for limiting its losses; the viability of this exit strategy depends on a liquid market for claims against distressed debtors. If claim buyers demand greater discounts when purchasing claims, "exit-by-sale" becomes a less attractive option and lenders will demand more stringent terms (such as higher interest rates) from borrowers. Distressed borrowers, in particular, may be priced out of the credit markets, which will translate into more bankruptcies.[30]

Decreased participation in the claims market will also negatively impact the ability of debtors to reorganize. As noted, the liquidity of the claims trading market directly affects the cost of capital available to troubled companies, which in turn affects such companies' ability to reorganize, and thus implicates a fundamental purpose of the Bankruptcy Code, that of facilitating the reorganization of such companies. *See Bildisco*, 465 U.S. at 528 (noting that the "[f]undamental purpose of reorganization [under the Bankruptcy Code] is to prevent a debtor

---

[30]    *See* "Banks Can Appeal Loss On Enron Debt Trading Cases," *Dow Jones Newswires*, Federal Filings via Dow Jones (September 7, 2006) (discussing the September 5 Opinion and noting that "[d]isturbance in the distressed debt market at large could have huge ramifications not just for investors, but for companies struggling to stay afloat.").

41

from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources" and that "[i]n some cases reorganization may succeed only if new creditors infuse the ailing firm with additional capital").

While the Bankruptcy Court dismissed the market impact of its equitable subordination and disallowance decisions,[31] the Second Circuit has treated the potential for market disruption as a matter of critical importance in construing a statute. In *Elliott Associates*, 194 F.3d at 380, the Second Circuit recognized the important role that the secondary market in sovereign debt plays in providing lenders with an incentive to extend credit and the Court took care not to adopt a construction of New York's champerty statute that would disrupt that market. In stark contrast to the Second Circuit's concern over the market implications of a tenuous interpretation of a statute, the Bankruptcy Court largely ignored the impact that its decisions would have on the market. Just as the Second Circuit rejected as "unreasonable" a construction of the New York champerty statute that risked harming the secondary market in sovereign debt claims, so too should this Court reverse the Bankruptcy Court's decisions adopting an unprecedented interpretation of Sections 510(c) and 502(d), and undo the harm to the market for bankruptcy claims resulting from that interpretation.

---

[31]   In its Disallowance Opinion, the Bankruptcy Court acknowledged that obstructing the active participation of transferees in the distressed debt market may well have a "significant influence" on a debtor's bankruptcy proceeding, but asserted that this impact could be disregarded because "the claims trading market is not a fundamental part of the bankruptcy process" and because any problems should be dealt with by Congress. *In re Enron Corp.*, 340 B.R. at 204.

42

## CONCLUSION

For the foregoing reasons, this Court should reverse the Subordination Order and

the Disallowance Order.

Dated: New York, New York
       March 12, 2007

        /s/ Stephen J. Shimshak
    Brad Karp (BK-3702)
    Stephen J. Shimshak (SS-8822)
    Douglas R. Davis (DD-0874)
    Claudia L. Hammerman (CH-9005)
    PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    Telephone:  (212) 373-3000

    Attorneys for Citibank, N.A.

43