UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
                                    :
In re                               :        OPINION AND ORDER
                                    :
ENRON CORP., et al.,                :
                                    :        Chapter 11
                                    :        No. 01-16034
        Reorganized Debtors.        :        Jointly Administered
                                    :
-------------------------------------------------X
ENRON CORP.,                        :
                                    :
                                    :        Adversary Proceeding
        Plaintiff,                  :        No. 05-01025
                                    :
                                    :        ┌─────────────────────────┐
    -against-                       :        │ USDC SDNY               │
                                    :        │ DOCUMENT                │
                                    :        │ ELECTRONICALLY  FILED   │
SPRINGFIELD ASSOCIATES, L.L.C.      :        │ DOC #: _____        │
and WESTPAC BANKING                 :        │ DATE FILED: 8/27/07     │
CORPORATION,                        :        └─────────────────────────┘
                                    :
        Defendants.                 :
-------------------------------------------------X
SPRINGFIELD ASSOCIATES, L.L.C.,     :
                                    :
                                    :        06 Civ. 7828 (SAS)
        Appellant,                  :
                                    :        07 Civ. 1957 (SAS)
    -against-                       :
                                    :
                                    :
ENRON CORP.,                        :
                                    :
        Appellee.                   :
-------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Defendant Springfield Associates, L.L.C. ("Springfield") and

intervenor Citibank, N.A. ("Citibank") (collectively, "Appellants") in the above-

captioned coordinated adversary proceeding bring this interlocutory appeal from

the orders of the Bankruptcy Court of the Southern District of New York denying

defendant's motion to dismiss an equitable subordination claim under section

510(c) of the Bankruptcy Code (the "Subordination Order")[1] and a disallowance

claim pursuant to section 502(d) of the Bankruptcy Code (the "Disallowance

Order")[2] filed by Enron Corp.[3] and certain of its affiliates (collectively, "Enron" or

"Appellee").  The question presented, as the Court stated in its January 30, 2007

Opinion granting leave to file this interlocutory appeal, is "whether equitable

subordination under 510(c) and disallowance under 502(d) can be applied, as a

matter of law, to claims held by a transferee to the same extent they would be

applied to the claims if they were still held by the transferor based on alleged acts

---

[1]     *See Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*
("Subordination Order"), Nos. 01-16034, 05-01025, slip op. (Bankr. S.D.N.Y.
Nov. 28, 2005).

[2]     *See Enron Corp. v. Avenue Special Situations Fund II, LP (In re
Enron Corp.)* ("Disallowance Order"), 340 B.R. 180 (Bankr. S.D.N.Y. 2006).

[3]     Effective March 1, 2007, Enron Corp. changed its name to Enron
Creditors Recovery Corp.

or omissions on the part of the transferor."[4]

This question, although fairly simply stated, is complex and of first

impression in this Circuit, and will have serious ramifications well beyond the

parties involved in this particular appeal. Hundreds of pages of material have

been submitted by the parties and hundreds more by the various *amici curiae*, and

all parties were heard at a lengthy oral argument. In resolving the difficult issues

presented by this appeal, the Court has undertaken a careful review of the

voluminous record, including a close reading of the Bankruptcy Court's two

opinions, and the statutes, case law and ultimately, the policy considerations raised

by the parties.

That review has revealed that the two opinions below unnecessarily

reached beyond the facts of the cases before the court.[5] That overreaching resulted

---

[4]     *See Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),*
No. M47, 2007 WL 313470, at *1 (S.D.N.Y. Feb. 1, 2007) (*"Enron II"*).

[5]     The Bankruptcy Court applied its holding in each opinion to market
purchasers of distressed debt, even though no such purchasers were transferees
before the court. *See, e.g.,* Subordination Order, slip op. at 39 n.15 ("The purchase
of bonds and notes are not at issue before the Court in the instant proceeding.
However, the Court notes that the post-petition purchaser of such debt instruments
either knows or should know that the issuer of these securities is a debtor, so the
prices of these transfers would reflect the attendant risks that the claims might be
subordinated. Under those circumstances, the purchaser may well not have any
available indemnity remedy against the seller, as is the case with the claims
trading. But it is the market place that should address such risks in its pricing. . . .

-3-

in the outcry from commentators and *amici curiae*, who have expressed great

concern that the effect of these opinions will wreak havoc in the markets for

distressed debt. While I cannot claim to avoid the use of *dicta* altogether, the

conclusions of law here cleave tightly to the facts presented. For the reasons

discussed below, the Subordination Order and Disallowance Order are vacated and

the matter is remanded to the Bankruptcy Court for proceedings consistent with

this Opinion.

## II.   BACKGROUND

### A.   Facts

Enron was a borrower under a short-term credit agreement extended

by a syndicate of banks, including Citibank. The aggregate liability under the

short-term credit agreement was $1,754,024,000 plus unliquidated amounts. On

December 2, 2001, Enron filed for protection under Chapter 11 of the Bankruptcy

Code (the "Petition Date"). Accordingly, on the Petition Date, Citibank and the

other syndicate banks held claims against Enron under those loan agreements. At

---

[B]ased on the Court's previous policy analysis, no legal and policy basis supports
the premise that transferees of bonds or notes should be treated differently than
those holding the transferred loan claims. *All the post-petition transferees assume
the risk that their claims may be subject to subordination.*" (emphasis added));
Disallowance Opinion, 340 B.R. at 201 n.23 (stating the same, but substituting
"disallowed" for "subordinated" and "section 502(d) disallowance" for
"subordination").

various times after the Petition Date, Citibank and certain other syndicate banks

transferred, directly or indirectly, some portion of their claims to other entities.

Many of the agreements evidencing the transfers contained warranties and

indemnities against any acts or conduct of the transferor that may result in the

claim receiving less favorable treatment. One of the transferees is Springfield,

which acquired a claim of approximately $5,000,000 of the indebtedness arising

under the Short-Term Credit Agreement that Citibank held as of the Petition Date.

Specifically, on February 22, 2002, Citibank transferred its interest in the subject

claim to Deutsche Bank (previously Bankers Trust Company) pursuant to a

Purchase and Sale Agreement (the "Citi-BT PSA"), as well as an Assignment and

Acceptance (the "Citi-BT Assignment"). On May 15, 2002, Deutsche Bank

transferred its interest in the claim to Springfield again pursuant to a Purchase and

Sale Agreement (the "DB-Springfield PSA") and an Assignment and Acceptance

(the "DB-Springfield Assignment").[6] The Citi-BT PSA and the DT-Springfield

---

[6]    The Citi-BT PSA is part of the record on appeal. The Citi-BT Assignment, the DB-Springfield PSA and the DB-Springfield Assignment are not part of the record on appeal. *See* August 8, 2007 Letter from Brad S. Karp, counsel for Citibank, to the Court ("8/8/07 Citibank Letter") at 2 n.1. At the request of the Court, Citibank submitted all four documents. *See* Appendix of Supplemental Documents attached to 8/8/07 Citibank Letter ("8/8/07 Citibank Letter App."). Enron did not object to their submission. *See* August 9, 2007 Letter from David M. Stern, counsel for Enron, to the Court ("8/9/07 Enron Letter") at 1. Accordingly, all four documents are properly before the Court on

PSA both provide for a warranty and indemnity for equitable subordination and disallowance.[7]

On September 24, 2003, Enron filed an action in the Bankruptcy Court against Citibank and the other transferors seeking, *inter alia*: (1) equitable subordination of the transferors' claims pursuant to section 510(c) of the Bankruptcy Code based on allegations that the transferors engaged in inequitable conduct; (2) disallowance of the transferors' claims under section 502(d) of the Bankruptcy Code based on allegations that the transferors received and failed to repay certain avoidable transfers; and (3) compensatory and punitive damages from the transferors based on allegations that the transferors aided and abetted fraud and breach of fiduciary duty, and engaged in an unlawful civil conspiracy with Enron insiders (the "MegaClaim Action").[8] The allegations in the MegaClaim Action are contested, and have not yet been adjudicated.

On January 10, 2005, Enron filed a series of adversary proceedings against each of the transferees, including Springfield, in which Enron asserted two

this appeal.

[7] *See* Citi-BT PSA, attached as Document 1 to the 8/8/07 Citibank Letter App., §§ 4.1(h), 6.1; DB-Springfield PSA, attached as Document 3 to the 8/8/07 Citibank Letter App., §§ 4.1(h), 6.1.

[8] *See In re Enron Corp.*, Nos. 01-16034, 03-09266.

-6-

causes of action: (1) equitable subordination of the transferee's claims under

section 510(c) based solely on the alleged misconduct of the transferor of the

claims; and (2) disallowance of the transferee's claims under section 502(d) based

solely on the allegation that a transferor received and failed to repay an avoidable

transfer. The complaints against the transferees contain no allegations of

misconduct or receipt of and failure to return an avoidable transfer on the part of

the transferees. Following Enron's commencement of the transferee actions, some

of the transferees, including Springfield, sued their transferors to enforce their

indemnities.

On April 1, 2005, Springfield and certain of the other transferees

moved to dismiss the transferee actions on the grounds that neither section 510(c)

nor section 502(d) may be applied as a matter of law to the claims held by the

transferees based solely on the alleged conduct of the transferors of those claims.

The transferors intervened to submit briefs and argue the issues on behalf of the

transferees. On November 28, 2005, the Bankruptcy Court issued the

Subordination Order denying the motion to dismiss the equitable subordination

count. Certain transferees moved for leave to file an interlocutory appeal of the

Subordination Order, which Enron opposed. On March 31, 2006, the Bankruptcy

Court issued the Disallowance Order, denying the motion to dismiss the

-7-

disallowance count, but the order was not issued in the Springfield action until November 6, 2006.  Springfield then moved for leave to file an interlocutory appeal of the Disallowance Order, which again was opposed by Enron.

## B.    The Interlocutory Appeal

This Court, in an Opinion and Order dated September 5, 2006, granted certain defendants and intervenors, including Appellants, leave to file an interlocutory appeal from the Bankruptcy Court's Subordination Order (the "September 5 Opinion").[9]  Subsequently, all of the transferee litigations, with the exception of Springfield, settled.  In an Opinion and Order dated January 30, 2007, this Court granted in part and denied in part leave to file an interlocutory appeal in the remaining transferee litigation from the Bankruptcy Court's Disallowance Order, and modified the September 5 Opinion to deny in part the interlocutory appeal of the Subordination Order (the "January 30 Opinion").[10]  Familiarity with the September 5 Opinion and the January 30 Opinion, and terms defined therein, is presumed.

The Court directed the parties to brief the issues raised by the

---

[9]     *See Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, No. M47, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006).

[10]    *See Enron II*, 2007 WL 313470.

Subordination Order and Disallowance Order together.  Citibank filed its brief in

support of Appellants on March 12, 2007.[11]  Enron submitted its Appellee's brief

on April 16, 2007.[12]  Citibank submitted Appellants' reply brief on May 14,

2007.[13]

          Various *amici curiae* requested leave to file *amicus* briefs on the

issues raised in this appeal.  The Securities Industry and Financial Markets

Association, the International Swaps and Derivatives Association, and the Loan

Syndications and Trading Association, submitted an *amicus* brief in Support of

Appellants on March 12, 2007 (collectively,"Industry Amici").[14]  Certain of

Enron's Creditors, namely Abrams Capital, LLC, Blavin & Company, Inc., and

Citadel Investment Group, L.L.C., submitted an *amicus* brief in support of

---

[11]    *See* Opening Brief of Permitted Intervenor Bank Citibank, N.A. on the Issue of Equitable Subordination and Disallowance of Transferred Claims ("Appellants Mem.").

[12]    *See* Appellee's Brief in Support of Affirmance of the Bankruptcy Court's Rulings Denying Defendants' Motion to Dismiss ("Enron Mem.").

[13]    *See* Reply Brief of Permitted Intervenor Bank Citibank, N.A. on the Issue of Equitable Subordination and Disallowance of Transferred Claims ("Appellants Reply Mem.").

[14]    *See* Brief of *Amici Curiae* the Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, and the Loan Syndications and Trading Association in Support of Appellants ("Industry Amici Mem.").

Appellee on April 13, 2007.[15]  The Commercial Law League of America submitted

an *amicus* brief in support of Appellee on April 16, 2007.[16]  Jeffrey Morris,

Professor of Law at the University of Dayton School of Law, of counsel at an Ohio

law firm, and Reporter to the Advisory Committee on Bankruptcy Rules, also

submitted an *amicus* brief in support of Appellee on April 13, 2007.[17]  All of the

requests for leave to file *amicus* briefs are granted.[18]

## III.  STANDARD OF REVIEW

A district court acts as an appellate court in reviewing judgments

rendered by bankruptcy courts.[19]  Findings of fact are reviewed for clear error.[20]  A

---

[15]     *See* Brief of *Amici Curiae* Abrams Capital, LLC, Blavin & Company, Inc. and Citadel Investment Group, L.L.C. in Support of Appellee and Affirmance of the Bankruptcy Court's Orders.

[16]     *See Amicus Curiae*, Commercial Law League of America's, Brief Supporting the Bankruptcy Court's Decisions Denying Defendants' Motion to Dismiss.

[17]     *See* Brief of *Amicus Curiae*, Professor Jeffrey W. Morris, in Support of Equitable Subordination and Disallowance of Transferred Claims.

[18]     Enron Creditors Amici rely on several public filings in this and other bankruptcies and request judicial notice of those documents.  Judicial notice of public records such as court filings, is clearly appropriate.  *See* Fed. R. Evid. 201(b)(2).  *Accord Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (noting that "courts routinely take judicial notice of documents filed in other courts").

[19]     *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993) ("[Appellant] relies on several cases for the reasonable proposition that the district

finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been committed.'"[21] A bankruptcy court's conclusions of law, by contrast, are reviewed de novo.[22] The Subordination Order and Disallowance Order at issue on this appeal were based on the Bankruptcy Court's conclusions of law, at the motion to dismiss stage, that equitable subordination and disallowance could be applied to a claim in the hands of a transferee based solely on conduct of the transferor. Accordingly, I review those decisions de novo.[23]

---

court acts as an appellate court in reviewing a bankruptcy court's judgments.").

[20]    See Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Applied Theory Corp.*, — F.3d —, No. 06-3390, 2007 WL 1965012, at *2 (2d Cir. July 9, 2007); *In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003).

[21]    *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[22]    *See In re Applied Theory*, 2007 WL 1965012, at *2; *In re Cody*, 338 F.3d at 94; *In re 139-141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y. 2004).

[23]    The parties do not dispute that this appeal is subject to de novo review. *See* Appellants Mem. at 2; Enron Mem. at 2 (stating that the "appeal presents a question of law").

-11-

## IV.   APPLICABLE LAW

### A.   Statutory Construction

When interpreting a statute, the well-established rules of statutory construction instruct that "the inquiry begins with the plain language of the statute and 'where the statutory language provides a clear answer, it ends there as well.'"[24] The Court must determine "'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"[25] "A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong."[26]

In determining whether the plain meaning of the statute is ambiguous, the Court should look to "the existing statutory text, and not the predecessor

---

[24]    *Peralta-Taveras v. Gonzales*, 488 F.3d 580, 584 (2d Cir. 2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). *Accord United States v. Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005) ("'Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.'" (quoting *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003))); *In re Caldor Corp.*, 303 F.3d 161, 167 (2d Cir. 2002) ("The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code 'begins where all such inquires must begin: with the language of the statute itself.'" (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989))).

[25]    *In re Caldor*, 303 F.3d at 168 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

[26]    *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 461 (1999).

-12-

statutes."[27] The Court must read the Bankruptcy Code as a whole, taking care that it does not construe any provision "in a manner that would place it in conflict with other provisions."[28] "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."[29]

Nonetheless, a court may depart from the plain language "if literal application of the statute will produce a result demonstrably at odds with the intentions of [the statute's] drafters."[30] Accordingly, if the statutory language is ambiguous and resort to canons of construction does not clarify the meaning, the Court may look to the legislative history of the statute to discern Congress's

---

[27]   *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (citation omitted) (analyzing the meaning of section 330 of the Bankruptcy Code and finding that the Circuit Court's reliance on the predecessor statute's construction as a basis for ambiguity in the current statute was erroneous).

[28]   *In re Smart World Techs., LLC*, 423 F.3d 166, 183 (2d Cir. 2005) (citing *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("Statutory construction is a holistic endeavor . . . . [T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (internal quotations omitted))). However,"where a conflict between a Rule and a statutory provision exists . . . the Rules Enabling Act requires that [the Court] apply the statutory provision." *Id.* at 181.

[29]   *Ron Pair Enters.*, 489 U.S. at 240-41.

[30]   *Id.* at 242.

intent.[31]  Finally, "'[s]tatutes should be interpreted to avoid untenable distinctions

and unreasonable results whenever possible.'"[32]  To that end, it is proper to

consider the effect that the court's interpretation would have on the markets.[33]

## B.    Equitable Subordination

"'Under the doctrine of equitable subordination . . . a bankruptcy

court may subordinate a particular claim if it finds that the creditor's claim[], while

not lacking a lawful basis nonetheless results from inequitable behavior on the part

of that creditor.'"[34]  Equitable subordination is specifically authorized by section

510(c), which provides, in pertinent part,

---

[31]    *See United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006)
(citing *Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir.
2005)).

[32]    *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 371 (2d
Cir. 1999) (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982)).

[33]    *See id.* at 380 (interpreting New York's champerty statute in a way to
avoid unreasonable results, namely that "[a] well-developed market of secondary
purchasers of defaulted sovereign debt would [] be disrupted and perhaps
destroyed").

[34]    *Musso v. Ostashko*, 468 F.3d 99, 109 (2d Cir. 2006) (quoting
*Kelleran v. Andrijevic*, 825 F.2d 692, 697 (2d Cir. 1987) (Blumenfeld, J.,
dissenting)). *See also id.* ("By exercising its equitable powers, the bankruptcy
court may thus 'sift the circumstances surrounding any claim to see that injustice
or unfairness is not done in administration of the bankruptcy estate.'" (quoting
*Kelleran*, 825 F.2d at 697-98 (Blumenfeld, J., dissenting) (citing *Pepper v. Litton*,
308 U.S. 295, 307-08 (1939)))).

-14-

> [A]fter notice and a hearing, the court may . . . (1) under
> principles of equitable subordination, subordinate for purposes of
> distribution all or part of an allowed claim to all or part of another
> allowed claim or all or part of an allowed interest to all or part of
> another allowed interest . . . .[35]

"Although Congress included no explicit criteria for equitable subordination when

it enacted [section] 510(c)(1), the reference in [section] 510(c) to 'principles of

equitable subordination' clearly indicates congressional intent at least to start with

existing doctrine."[36] At the time of enactment, courts had uniformly adopted the

three-pronged test set forth by the Fifth Circuit in *In re Mobile Steel Co.* for

evaluating whether to equitably subordinate a claim: (1) the subordinated creditor

must have engaged in "some type of inequitable conduct"; (2) the misconduct

must have "resulted in injury to the creditors of the bankrupt or conferred an unfair

advantage on the claimant"; and (3) equitable subordination of the claim must "not

be inconsistent with the provisions of the Bankruptcy Act."[37] Even after the

---

[35]     11 U.S.C. § 510(c).

[36]     *United States v. Noland*, 517 U.S. 535, 539 (1996) (relying on
"principles of statutory construction . . . [and] statements in the legislative history
that Congress 'intended that the term 'principles of equitable subordination'
follow existing case law and leave to the courts development of this principle'"
(citing 124 Cong. Rec. 32398 (1978) (Rep. Edwards); *id.* at 33998 (Sen.
DeConcini)) (additional citations omitted)).

[37]     563 F.2d 692, 700 (5th Cir. 1977).

-15-

enactment of section 510(c), the vast majority of courts have continued to apply

the *Mobile Steel* test, as recognized by the Supreme Court.[38]

Inequitable conduct under the first prong of the *Mobile Steel* test is

generally defined as either (1) fraud, illegality, or breach of fiduciary duties; (2)

undercapitalization; or (3) the claimant's use of the debtor as a mere

instrumentality or alter ego.[39]  The second requirement is met where the general

creditors are less likely to collect their debts as a result of the alleged inequitable

---

[38]    *See, e.g., Noland*, 517 U.S. at 538; *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991) (quoting *In re Universal Farming Indus.*, 873 F.2d 1334, 1337 (9th Cir. 1989) ("[E]quitable subordination [is] appropriate when '(1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants . . . and (3) subordination is not inconsistent with bankruptcy law.'")); *In re Marketxt Holdings Corp.*, 361 B.R. 369, 385 (Bankr. S.D.N.Y. 2007) (collecting cases).

[39]    *See, e.g., New Jersey Steel Corp. v. Bank of New York*, No. 95 Civ. 3071, 1997 WL 716911, at *4 (S.D.N.Y. Nov 17, 1997) (citing *In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir. 1981)); *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 45 (Bankr. E.D.N.Y. 2006) (citing *In re KDI Holdings, Inc.*, 277 B.R. 493, 513 (Bankr. S.D.N.Y. 1999); *In re 80 Nassau Assocs.*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). *See also In re Adelphia Commc'ns Corp.*, Nos. 02-41729, 03-04942, 2007 WL 1673928, at *28 (Bankr. S.D.N.Y. June 11, 2007) ("'Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia*, a secret or open fraud; lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.'" (quoting *In re 80 Nassau Assocs.*, 169 B.R. at 837)).

-16-

cons

conduct.[40] "'If the misconduct results in harm to the entire creditor body, the

[trustee] need not identify the injured creditors or quantify their injury, but need

only show that the creditors were harmed in some general, concrete manner.'"[41]

The third requirement "has been read as a reminder to the bankruptcy court that

although it is a court of equity, it is not free to adjust the legally valid claim of an

innocent party who asserts the claim in good faith merely because the court

perceives that the result is inequitable."[42]

"The purpose of equitable subordination is to undo wrongdoing by an

individual creditor in the interest of the other creditors."[43] Nevertheless, many

---

[40]     *See In re 80 Nassau Assocs.*, 169 B.R. at 840. *See also In re KDI Holdings*, 277 B.R. at 514.

[41]     *In re 80 Nassau Assocs.*, 169 B.R. at 840.

[42]     *Noland*, 517 U.S. at 539 (quotation omitted). Some courts have concluded that the enactment of section 510(c) has rendered the third prong of the *Mobile Steel* test moot. *See, e.g., In re 80 Nassau Assocs.*, 169 B.R. at 841 ("[S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot." (citation omitted)). I need not decide that issue here, but note that the Supreme Court's analysis of the *Mobile Steel* test in *Noland* explicitly referred to the third prong and made no mention of its mootness or irrelevance.

[43]     *In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006) (citing *In re Lockwood*, 14 B.R. 374, 380-81 (Bankr. E.D.N.Y. 1981) ("The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.")), *aff'd*, 2007 WL 1965012.

courts view equitable subordination as a "drastic and unusual remedy."[44]

Moreover, "the doctrine is remedial, not penal, and should be applied only to the

extent necessary to offset specific harm that creditors have suffered on account of

the inequitable conduct."[45]  As the Bankruptcy Court below itself acknowledged,

"the power to subordinate an allowed claim is not boundless and courts cannot use

equitable principles to disregard unambiguous statutory language of the

Bankruptcy Code."[46]

---

[44]    *In re Radnor Holdings Corp.*, 353 B.R. 820, 840-42 (Bankr. D. Del.
2006) (quotations omitted).  *Accord In re SubMicron Sys. Corp.*, 291 B.R. 314,
327-29 (D. Del. 2003) ("Courts have recognized that equitable subordination is an
unusual remedy which should be applied only in limited circumstances." (citing
*Holt v. Federal Deposit Ins. Corp.*, 868 F.2d 146, 148-49 (5th Cir. 1989))); *In re
M. Paolella & Sons, Inc.*, 161 B.R. 107, 117 (E.D. Pa. 1993) (stating that equitable
subordination is an "extraordinary" departure from the "usual principles of
equality of distribution and preference for secured creditors" (citation omitted)); *In
re Kenny*, 75 B.R. 515, 527 (Bankr. E.D. Mich. 1987) ("Equitable subordination is
a harsh remedy.  It is a remedy that is not to be lightly invoked." (quotation and
citation omitted)); *In re Tinsley & Groom*, 49 B.R. 85, 90 (Bankr. W.D. Ky. 1984)
("[E]quitable subordination is a harsh remedy that is not to be lightly invoked.");
*In re Allied Tech., Inc.*, 25 B.R. 484, 499 (Bankr. S.D. Ohio 1982) (Equitable
subordination "should only be used sparingly to rectify obvious inequities.").

[45]    *In re SubMicron*, 291 B.R. at 327 (citing *Trone v. Smith*, 642 F.2d
1174, 1178 (9th Cir. 1981)).

[46]    Disallowance Order, 2005 WL 3832053, at *9 (citing *Noland*, 517
U.S. at 543 ("[T]he circumstances that prompt a court to order equitable
subordination must not occur at the level of policy choice at which Congress itself
operated in drafting the Code.")).

-18-

## C. Disallowance

"Section 502(d) requires a court to disallow an entity's claim against

the bankruptcy estate if the estate is entitled to recover property from that entity,

such as because of a voidable preference, but that entity has failed to first transfer

this property back to the bankruptcy estate."[47] Section 502(d) provides, in

pertinent part,

> [T]he court shall disallow any claim of any entity from which
> property is recoverable under section 542, 543, 550, or 553 of this
> title or that is a transferee of a transfer avoidable under section
> 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title,
> unless such entity or transferee has paid the amount, or turned
> over any such property, for which such entity or transferee is
> liable under section 522(i), 542, 543, 550, or 553 of this title.[48]

The twin aims of section 502(d) are "to assure an equality of distribution of the

assets of the bankruptcy estate"[49] and "to have the coercive effect of insuring

compliance with judicial orders."[50] Moreover, section 502(d) was "not [intended]

---

[47]  *In re McLean Indus., Inc.*, 30 F.3d 385, 388 (2d Cir. 1994). *Accord Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323, 1327 (2d Cir. 1993) ("Under the Bankruptcy Code a court must disallow 'any claim of any entity from which property is recoverable' because of a preferential transfer or fraudulent conveyance." (quoting 11 U.S.C. § 502(d))).

[48]  11 U.S.C. § 502(d).

[49]  *In re Davis*, 889 F.2d 658, 662 (5th Cir. 1989).

[50]  *Id.* at 661. *Accord In re Shared Techs. Cellular, Inc.*, 293 B.R. 89, 97 (D. Conn. 2003) (same).

-19-

to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors."[51]

### D. Transfers

#### 1. Assignments and Sales

An assignment is a contractual transfer of a right, interest, or claim from one person to another. The word "assignment" is not synonymous with "sale," although each is a type of transfer.[52] "Whether or not a particular transfer is an assignment or a sale or some other transaction depends on the terms of the transfer."[53] It "depends, not on the name by which it calls itself, but on the legal effect of its provisions."[54]

---

[51]   *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997) (quotation omitted). *Accord Smith v. American Founders Fin., Corp.*, No. Civ. A. H-05-1779, 2007 WL 781949, at *20 (S.D. Tex. Mar. 10, 2007) (same).

[52]   *See, e.g.*, *Feder v. Goetz*, 264 F. 619, 624-25 (2d Cir. 1920) (distinguishing between a transfer "by way of an assignment" and a transfer "by means of a sale").

[53]   6A C.J.S. *Assignments* § 5.

[54]   *Id.* *Cf. International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991) ("The use of terms such as 'lease' or 'landlord' and 'tenant' does not automatically transform an agreement into a bona fide lease . . . ; rather, a court must look to the economic substance of the transaction and not its form." (quotation omitted)).

-20-

Sales and assignments can have very different consequences for the transferee. With respect to assignments, "[a]n assignee stands in the shoes of the assignor and subject to all equities against the assignor."[55] In other words, "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor."[56] These principles are a corollary to the well-established doctrine of *nemo dat qui non habet*: an assignor cannot give more than he has.[57] By contrast, these assignment law principles do not apply to sales. A purchaser does not stand in the shoes of the seller and, as a result, can obtain more than the transferor had in

---

[55]   *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942). *Accord Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) ("Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor."). *See also Ward v. Sun Valley Foods Co., Inc.*, 212 Fed. Appx. 386, 391 (6th Cir. 2006) (unpublished) ("[I]t is a fundamental rule of the law of contract that the assignee stands in the shoes of the assignor, possessing the same rights and remaining subject to the same defenses as the assignor.").

[56]   *Caribbean S.S. Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S.*, 598 F.2d 1264, 1266-67 (2d Cir. 1979). *Accord* 29 Williston on Contracts § 74:47 (4th ed. 2003) (stating that an assignee is "subject to all defenses that the obligor may have against the assignor, including . . . defenses . . . that relate to the assigned obligation itself, but also rights . . . [that] aris[e] out of separate matters that the obligor might have asserted against its original creditor, the assignor").

[57]   *See Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047, 2002 WL 31174470, at *32 n.39 (S.D.N.Y. Sept. 26, 2002) (citing Black's Law Dictionary (6th ed. 1990)).

certain circumstances.[58]

These distinctions apply with the same force to transfers of debt and

claims. An assignee of a claim takes no more than the assignor had to give. A

purchaser of a claim may take more.[59] Although characteristics that inhere in a

claim may travel with the claim regardless of the mode of transfer, the same

cannot be said for personal disabilities of claimants. A personal disability that has

attached to a creditor who transfers its claim will travel to the transferee if the

claim is *assigned*, but will not travel to the transferee if the claim is *sold*.[60]

---

[58]     *See, e.g.*, N.Y. U.C.C. § 8-202(d) (stating that all defenses of the
issuer of a security with enumerated exceptions, are "ineffective against a
*purchaser* for value who has taken the security without notice of the particular
defense" (emphasis added)).

[59]     *See id.* Section 8-202 of the N.Y. U.C.C. has been held to apply to
certain debts. *See, e.g.*, *Highland Capital Mgmt. LP v. Schneider*, 8 N.Y.3d 406,
412 (2007) (after the Second Circuit certified the question of whether the eight
promissory notes issued in that case fell within the definition of a security under
Article 8 of the New York Uniform Commercial Code, the New York Court of
Appeals held that the promissory notes did meet the U.C.C. section 8-102(a)(15)
definition of security); *Vigilant Ins. Co. of Am. v. Housing Auth. of City of El
Paso, Tex.*, 87 N.Y.2d 36, 43 (1995) (stating that article 8 "governs stocks, bonds
and other evidences of indebtedness").

[60]     *See In re Latham Lithographic Corp.*, 107 F.2d 749, 750 (2d Cir.
1939) (after holding that section 44 of the Bankruptcy Act "creates a personal
disability only," stating that "[i]f a creditor who would be disqualified to vote the
claim in the debtor's bankruptcy assigns it in good faith *to a purchaser* who is not
disqualified, we can see no reason to bar the latter from voting it" (emphasis
added)).

## 2.    Exceptions to Assignment Law

### a.    Holder in Due Course

An exception to assignment law's rule that an assignor cannot give more than he has exists for holders in due course of a negotiable instrument.[61] A holder of a negotiable instrument qualifies as a holder in due course if it takes the instrument: "(a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."[62] If the holder qualifies as a holder in due course, "he takes the instrument free from (1) all claims to it on the part of any person; and (2) all defenses of any party to the instrument with whom the holder has not dealt [with certain exceptions]."[63]

---

[61]    Under N.Y. U.C.C. § 3-104, in order for a writing to qualify as a negotiable instrument, the writing must:

> (a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer.

[62]    *Id.* § 3-302.

[63]    *Id.* § 3-305.  Post-petition purchasers of claims, even if the claims qualify as negotiable instruments, cannot qualify as holders in due course because they cannot take the instrument "without notice that it is overdue" as required by

### b.    Third Party Latent Equities Doctrine

Under the third party latent equities doctrine, an assignee without

notice takes the property free from the latent equities of third parties other than the

debtor.  However, many states do not recognize the doctrine of latent equities in

the context of transfers of choses in action, including New York.[64]  Most

bankruptcy claims are choses in action.[65]

## V.    DISCUSSION

It is undisputed that Springfield is not alleged to have itself acted

inequitably or received any preference that would subject its claims to equitable

subordination or disallowance.  Nevertheless, the Bankruptcy Court held that

claims in the hands of Springfield, the transferee, could be both subordinated

---

the N.Y. U.C.C.

[64]    *See, e.g., Central Trust Co. v. West India Co.*, 169 N.Y. 323, 323-24
(1901) ("It is further the settled law of this state, though a different rule prevails
not only in England, but in the federal courts and in some of the states, that a bona
fide purchaser for value of a chose in action takes it subject not only to the equities
between the parties, but also to latent equities in favor of third persons . . . ."). *See
also* 29 Williston on Contracts § 74:46 ("[I]n a majority of jurisdictions the
assignee takes subject to an equitable claim against the assignor existing at the
time of the assignment in favor of a third person.").

[65]    *See Elliott Assocs.*, 194 F.3d at 363 (analyzing New York's
champerty statute, New York Judiciary Law § 489, which characterizes bonds,
promissory notes and other debts as choses (things) in action).

and/or disallowed based solely on the conduct of Citibank, the transferor.

Enron argues that the Bankruptcy Court's rulings should be affirmed essentially on two grounds. *First*, Enron argues that the general principle of bankruptcy law that all rights among competing claims to a bankruptcy estate are fixed and determined as of the date of petition, as set forth by the Supreme Court in *Sexton v. Dreyfus* and *United States v. Marxen*,[66] applies to equitable subordination and disallowance. Thus, Enron argues that because Citibank held the claims on the Petition Date and that Citibank is subject to equitable subordination and/or disallowance, Citibank's claims were forever tainted on the Petition Date. *Second*, Enron argues that principles of assignment law dictate that a transferee of a claim can have no greater rights than the transferor would have if it still held the claim, and that because the claims in the hands of Citibank were tainted, the transfer of the claim to Springfield cannot cure that taint. Each of Enron's contentions are addressed in turn.

## A.    Equitable Subordination and Disallowance Are Not Fixed as of the Petition Date

The issue of whether *Sexton* and *Marxen* apply to equitable subordination and disallowance of claims begins and ends with the plain language

---

[66]    *See* Enron Mem. at 14 (citing *Sexton v. Dreyfus*, 219 U.S. 339 (1911), and *United States v. Marxen*, 307 U.S. 200 (1939)).

of the statutes.  With respect to equitable subordination, the language of section

510(c) reveals that equitable subordination cannot be fixed on the petition date.

*First*, court action is a prerequisite to application of section 510(c).  The statute

states that "after notice and a hearing, the court may" equitably subordinate a

claim.  Equitable subordination must be court-ordered, and can be so ordered only

*after* notice and a hearing.  *Second*, equitable subordination is permissive — not

mandatory.  The statute makes clear that it is within the discretion of the

bankruptcy court, which "may"[67] or may not equitably subordinate a claim under

the facts and circumstances of each case.  *Third*, equitable subordination can be

based on post-petition inequitable conduct,[68] which obviously cannot be

ascertained or fixed on the petition date.  *Fourth*, because *Mobile Steel* dictates

that equitable subordination is not available to creditors who suffered no injury,

creditors who acquired their claims post-petition and after the alleged misconduct

that forms the basis for the equitable subordination may not be entitled to that

---

[67]     11 U.S.C. § 510(c).

[68]     *See, e.g.*, *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998); *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1558 (11th Cir. 1990).

-26-

remedy.[69] Thus, the circumstances of other creditors can become relevant post-petition and may alter the availability of equitable subordination.

Likewise, with respect to disallowance, the plain language of section 502(d) reveals that disallowance cannot be fixed on the petition date. *First*, like equitable subordination, court action is necessary in order to disallow a claim. Section 502(d) states that "the court shall disallow" a claim if it meets the requirements of the statute. Thus, it is the court that must determine whether the claim is of the type to which disallowance is properly applied.[70] *Second*, disallowance of a claim under the terms of section 502(d) is completely contingent on the refusal or failure to return the avoidable transfer by the recipient of that

---

[69]    *See In re W.T. Grant Co.*, 4 B.R. 53, 78 (Bankr. S.D.N.Y. 1980), *aff'd on other grounds*, 20 B.R. 186 (S.D.N.Y. 1982), *aff'd*, 699 F.2d 599 (2d Cir. 1983).

[70]    *See, e.g., In re Red Dot Scenic, Inc.*, 313 B.R. 181, 186 (Bankr. S.D.N.Y. 2004) ("'[T]o prevent abuse of [section 502(d)] this initial disallowance should be made by judicial determination, whether it be obtained in a claim objection or by some form of declaratory judgment action.'" (quoting 4 Collier on Bankruptcy Procedure § 502.05[2][a] (15th ed. 2004))). *See also In re Atlantic Computer Sys.*, 173 B.R. 858, 862 (S.D.N.Y. 1994) (section 502(d) "clearly envisions some sort of determination of the claimant's liability before its claims are disallowed, and in the event of an adverse determination, the provision of some opportunity to turn over the property."). Of course, the court's action is not discretionary as it is with section 510(c). *Compare* 11 U.S.C. § 502(d) ("[T]he court *shall* disallow any claim . . . ." (emphasis added)), *with id.* § 510(c) ("[T]he court *may* . . . subordinate . . . an allowed claim . . . ." (emphasis added)).

-27-

avoidable transfer. *Third*, disallowance can be applied based solely on the post-petition receipt of (and failure to return) an avoidable transfer,[71] which again clearly cannot be determined on the petition date.

Accordingly, under the plain language of the statutes, equitable subordination and disallowance cannot be fixed as of the petition date, and thus, the principles of *Sexton* and *Marxen* have no application here. Enron's citation to cases holding that statutory priorities become fixed on the petition date and travel with the claim are readily distinguishable. Statutory priorities, such as the wage priority[72] and the United States government priority[73] are capable of being ascertained on the petition date. They are non-discretionary, do not require court action, and are not contingent in any way on the petition date. Thus, while certain

---

[71]    *See* 11 U.S.C. § 502(d) (disallowing claims of an entity that is a transferee of a transfer avoidable under enumerated sections, including section 549, which specifically addresses post-petition avoidable transfers).

[72]    *See Shropshire, Woodliff, & Co. v. Bush*, 204 U.S. 186 (1907) (applying section 507(a)(4)).

[73]    *Marxen*, 307 U.S. at 202-03 (applying section 64(b)(7) of the Bankruptcy Act, which conferred priority upon debts owing to any person, including the United States, who is entitled to priority under the laws of the United States, and section 3466 of the Revised Statutes, which provided that "[w]henever any person indebted to the United States is insolvent . . . the debts due to the United States shall be first satisfied; and the priority hereby established shall extend . . . to cases in which an act of bankruptcy is committed.").

-28-

priorities become fixed and immutable at the petition date, this is not true for

claims of equitable subordination or disallowance.

## B.     Equitable Subordination and Disallowance Are Personal Disabilities of the Claimant and Travel with the Claim Only When the Claim Is Assigned, Not When It Is Sold

The parties do not, and cannot, dispute that the outcome of this case

depends on whether the principle that an assignee has no greater rights than its

assignor applies to equitable subordination and disallowance.[74]  That issue raises a

threshold question of law that the Court must decide: are equitable subordination

under section 510(c) and disallowance under section 502(d) attributes of a claim

or are they personal disabilities of particular claimants.  If they are attributes of the

claim, they will travel with the claim regardless of the method of transfer, whereas

if they are personal disabilities, their application to transferees depends on whether

the transfer was by way of a sale or assignment.[75]  As discussed below, I find that

equitable subordination and disallowance are both personal disabilities that do not

inhere in the claim.  Thus, unless there was a pure assignment (or other basis for

the transferee to step in the shoes of the transferor), as opposed to a sale of the

claim, the claim in the hands of the transferee is not subject to equitable

---

[74]     *See* August 7, 2007 Transcript of Oral Argument ("Tr.") at 50.

[75]     *See supra* Part IV.D.1.

-29-

subordination or disallowance based solely on the conduct of the transferor.[76]

## 1.    Equitable Subordination Is a Personal Disability

The issue of whether equitable subordination under section 510(c)
travels with the claim and can be applied to a transferee based solely on the
conduct of a transferor is a matter of statutory interpretation. Both parties concede
that there is no case directly on point. The Bankruptcy Court below was the first
court to address the question, and this Court conducts a de novo review of that
decision.

Enron stresses a plain language approach to section 510(c), arguing
that the statute's reference to subordination of "an allowed claim" demonstrates
that equitable subordination becomes an attribute of that claim. The phrase cited
by Enron, however, cannot be read in a vacuum. The statute expressly invokes
"principles of equitable subordination,"[77] which indisputably was intended to
incorporate the doctrine as developed by the courts.[78] Thus, I turn to the

---

[76]    Accordingly, the concerns raised by Industry Amici with respect to
the effects of the Bankruptcy Court's rulings on the markets for distressed debt are
no longer present. See Industry Amici Mem. at 10-20. Equitable subordination
and disallowance arising out of the conduct of the transferee will not be applied to
good faith open market purchasers of claims.

[77]    11 U.S.C. § 510(c).

[78]    See Noland, 517 U.S. at 539.

-30-

legislative history and case law to determine whether the legislative intent was to create a characteristic of a claim or rather a personal disability of claimants.

The legislative history and case law both demonstrate that Congress intended to create a personal disability. The legislative history's various references to the requirement of misconduct on the part of the "holder" of the claim demonstrate that Congress intended equitable subordination under section 510(c) to be specific to the individual who acted inequitably. For example, the legislative history states that "[t]o date, under existing law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor."[79] In fact, Congress specifically rejected a broader wording of the statute that was

_____

[79]     124 Cong. Rec. 32398 (Rep. Edwards); *id.* at 33998 (Sen. DeConcini). The juxtaposition between the two clauses of this statement also highlights the focus on the holder in this context. According to the legislative history, the two circumstances where equitable subordination would be present are: (1) if the *holder* has acted inequitably, or (2) the *claim itself* is historically subject to subordination, such as penalties (*i.e.*, punitive claims, which are generally disfavored as against claims for actual losses) or shareholder claims alleging fraud by the debtor. *See, e.g.*, *In re Stirling Homex Corp.*, 579 F.2d 206, 213 (2d Cir. 1978) (holding that the claims of defrauded shareholders could be subordinated to the claims of general creditors, even though both were presumably innocent). The present appeal does not involve any penalty or shareholder claims. Accordingly, Congress intended that the holder must be guilty of inequitable conduct before equitable subordination can be imposed.

proposed by the House of Representatives, which provided for subordination "on equitable grounds."[80] The enacted version actually *limits* the scope of equitable subordination.

Moreover, at the time of the enactment of section 510(c), courts routinely required misconduct on the part of the creditor asserting the claim before the court would equitably subordinate a claim. Indeed, as already mentioned above, Enron can point to no case, let alone a case pre-enactment, that applied equitable subordination to a transferee of a claim based on the conduct of the transferor. In light of the legislative history's references to inequitable conduct on the part of the holder of the claim, and the lack of any case law existing at the time of enactment that applied equitable subordination absent misconduct on the part of the holder, I find that Congress did not intend section 510(c) to be applied to a transferee of a claim — who has not acted inequitably — merely because that claim was transferred, directly or indirectly, by a bad actor.

This result is further supported by the case law following the enactment of section 510(c). Courts consistently have focused on the claimant,

---

[80] H.R. 8200, 95th Cong. § 510 (1977).

rather than the claim, for purposes of applying equitable subordination.[81]  For

example, the Second Circuit has stated that "equitable subordination is

appropriate, *inter alia*, when the *subordinated claimant* has engaged in inequitable

conduct that injures competing claimants."[82]  The Second Circuit thus recognized

that the appropriate focus is on the claimant, not the claim.  Indeed, one of the

Bankruptcy Court's other holdings in the Subordination Order, which is not being

appealed, is that a creditor's inequitable conduct can result in equitable

subordination of any or all of that creditor's claims, as opposed to only those

---

[81]      *See, e.g.*, *In re Monahan Ford*, 340 B.R. at 44 ("Pursuant to equitable subordination, a claim may be subordinated if *that claimholder* is guilty of misconduct." (emphasis added) (citing 4 Collier on Bankruptcy Procedure § 510.05[1])); *In re Kreisler*, 352 B.R. 671, 676-77 (N.D. Ill. 2006) ("Having correctly determined [the claimant's] insider status, the bankruptcy court then focused, again correctly, on whether [his] conduct was inequitable.").

[82]      *Musso*, 468 F.3d at 109 (emphasis added) (citing *Sure-Snap*, 948 F.2d at 876).  *Accord Sure-Snap*, 948 F.2d at 876 ("[E]quitable subordination [is] appropriate when '(1) the *claimant who is to be subordinated* has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants . . . and (3) subordination is not inconsistent with bankruptcy law.'" (quoting *In re Universal Farming*, 873 F.2d at 1337)); *In re Hohenberg*, 191 B.R. 694, 704 (Bankr. W.D. Tenn. 1996) (reciting the first prong of the *Mobile Steel* test as "the *subordinated claimant* must have engaged in some type of inequitable conduct" and the second as the "misconduct must have resulted in injury to the [other] creditors or conferred an unfair advantage on the *[subordinated] claimant*" (alterations in original and emphasis added)).

claims related to the misconduct.[83]  Application of equitable subordination to

unrelated claims based solely on the fact that they are held by a bad actor

demonstrates that the proper focus is on the claimant personally, not the claim.

In fact, one of the cases Enron relies upon as the champion of its

cause, *In re Multiponics, Inc.*,[84] actually supports the conclusion that equitable

subordination focuses on the holder of the claim rather than the transferor.  In

*Multiponics*, the claimant had acquired its claim from two innocent banks.  An

insider of the claimant had acted inequitably.  The district court had found that the

claimant was the alter ego of the insider and thus the court imputed the bad acts of

the insider to the claimant and equitably subordinated the claim.  The circuit court

reversed the district court's finding that the claimant was the alter ego of the

insider, and thus held that the claim in the hands of the claimant should not have

been subordinated.[85]  Thus, the holding of the Fifth Circuit comports with this

Court's reading of the statute, namely that the focus of section 510(c) is on the

claimant, not the claim.

---

[83]     *See* Subordination Order, slip op. at 26.

[84]     622 F.2d 709 (5th Cir. 1980).

[85]     *See id.* at 725.

-34-

The Bankruptcy Court placed heavy reliance on *Goldie v. Cox*[86] and general principles of assignment law to support its holding. Reliance on *Goldie*, however, is misplaced for two reasons. *First*, *Goldie* stands for the general proposition that an assignee takes a claim subject to all defenses that the *obligor* has against the assignor. Equitable subordination is a remedy that belongs to the *creditors* — not the debtor.[87] *Second*, the Bankruptcy Court assumed assignment law's application without deciding whether equitable subordination was an attribute of the claim or a personal disability.

Several other cases cited by Enron support this Court's holding. The cases relied upon by Enron in which courts have applied equitable subordination to a party based on the conduct of a third party are cases where the claim holder has stepped into the shoes of the third party bad actor. For example, in *In re 604 Columbus Avenue Realty Trust*, the court held that the Federal Deposit Insurance Corporation (the "FDIC"), acting as receiver, steps in the shoes of the failed bank

---

[86]     *See* 130 F.2d at 695.

[87]     *In re Applied Theory*, 345 B.R. at 59 ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors." (citing *In re Lockwood*, 14 B.R. at 380-81)). Indeed, a debtor acting on its own behalf lacks standing to bring an action for equitable subordination. *See id.* at 59 n.1 (citing *In re Riccitelli*, 14 Fed. Appx. 57, 58 (2d Cir. 2001) (unpublished)).

-35-

for purposes of equitable subordination.[88]  But the court expressly acknowledged

that the receivership is unique, and that the FDIC in its corporate capacity

purchasing the claim does not step in the shoes of the seller and is protected from

application of equitable subordination.[89]

The Bankruptcy Court expressly extended its holding to all transfers

of bankruptcy claims.  By doing so, it ignored the distinction between assignments

and sales and never addressed whether equitable subordination travels with the

claim or is a personal disability.  Where a claimant has purchased its claim, as

opposed to receiving it by assignment, operation of law, or subrogation,

assignment law principles have no application with respect to personal disabilities

of claimants.[90]  Thus, purchasers are protected from being subject to the personal

disabilities of their sellers.

The distinction is particularly imperative in the distressed debt market

context, where sellers are often anonymous and purchasers have no way of

ascertaining whether the seller (or a transferee up the line) has acted inequitably or

received a preference.  No amount of due diligence on their part will reveal that

[88]    *See* 968 F.2d 1332, 1353 (1st Cir. 1992). ʹ

[89]    *See id.*

[90]    *See supra* Part IV.D.1.

-36-

information, and it is unclear how the market would price such unknowable risk. Parties to true assignments, by contrast, can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee.

This is not to say that every purchaser of a claim will be automatically exempt from equitable subordination. This Court's analysis would not apply to bad faith purchasers. Indeed, purchasers of claims with actual notice of the inequitable conduct of the seller may be subject to equitable subordination based on their own misconduct.

Nor does this Court mean to imply that every assignee will automatically be subject to equitable subordination if the assignor has acted inequitably. For example, the assignee may qualify as a holder in due course and thus take the claim free from all defenses of any party to the instrument with whom the holder has not dealt.[91]  In addition, the doctrine of third party latent

---

[91]     If the assignee took the claim post-petition, it could not qualify as a holder in due course. *See supra* Part IV.D.2.a. Nevertheless, according to Citibank, the majority of the transferred claims that were before the Bankruptcy Court below were transferred as a result of pre-petition credit-default swap contracts. *See* Appellants Reply Mem. at 25. The holder in due course doctrine may apply in those circumstances. The application of the holder in due course doctrine to the specific transfer at issue on this appeal is discussed below. *See infra* Part V.C.

-37-

equities may apply as an exception the assignment law's application in certain cases, depending on which state law governs the assignment contract.[92]

At bottom, equitable subordination is a drastic and unusual remedy. As a result, it is important to apply section 510(c) narrowly.

## 2.   Disallowance Is a Personal Disability

Much like equitable subordination, the issue of whether disallowance under section 502(d) is personal to the claimant or inheres in the claim is a matter of statutory interpretation. Unlike equitable subordination, however, this issue has been addressed twice before — but only once at the district court appellate level. Apart from the Bankruptcy Court below, the parties have come up with one decision on each side, but neither is binding on this Court, and neither was appealed.

Once again, the Court begins with an analysis of the plain language. Section 502(d) requires disallowance of "any claim of any entity from which property is recoverable . . . or that is a transferee of a transfer avoidable . . . unless such entity or transferee has paid the amount, or turned over any such property, for

---

[92]    *See supra* Part IV.D.2.b.

-38-

which such entity or transferee is liable."[93]  The language and structure of the

statute is plain, and requires the entity that is asserting the claim be the same entity

(*i.e.*, "such entity") that is liable for the receipt of and failure to return property.

Enron stresses that the language of the statute cuts the other way, arguing that the

phrase "claim of any entity . . . or transferee . . ." means the same thing it means in

other parts of section 502, namely "claim of a lessor" in section 502(b)(6) and

"claim of an employee" in section 502(b)(7).  However, those terms are

distinguishable because whether a claim is a claim of a lessor or an employee is

fixed as of the petition date, as expressly stated in section 502(b).[94]  The plain

language of section 502(d) focuses on the claimant as opposed to the claim and

leads to the inexorable conclusion that disallowance is a personal disability of a

claimant, not an attribute of the claim.

       This result comports with one of the main purposes of section 502(d),

namely to coerce the return of assets obtained by preferential transfer.  That

purpose would not be served if a claim in the hands of a claimant could be

---

    [93]    11 U.S.C. § 502(d).

    [94]    *See* 11 U.S.C. § 502(b) (stating that if an objection to a claim is made,
"the court, after notice and a hearing, shall determine the amount of such claim in
lawful currency of the United States *as of the date of the filing of the petition*, and
shall allow such claim in such amount," except to the extent that the claim falls
into one of the nine enumerated categories).

disallowed even where that claimant never received the preference to begin with, and as a result, could not be coerced to return it. It seems implausible that Congress would have intended such a result. This is especially so given that section 502(d) was not intended to punish, but rather "to give *creditors* an option to keep *their* transfers (and hope for no action by the trustee) or to surrender *their* transfers and *their* advantages and share equally with other creditors."[95] Applying section 502(d) to purchasers of claims would be punitive because they have no option to surrender something they do not have, which means they have not personally obtained any advantage that they could surrender.

Enron argues that the existence of indemnity agreements, such as the one that exists between Citibank and Springfield, would suffice to fulfill this coercive purpose, albeit one step removed. In other words, the transferee, whose claim will be disallowed unless and until the preference is returned, can in turn coerce the transferor to return it through enforcement of the indemnity agreement. There are two problems associated with relying on indemnity agreements to carry the day. *First*, it is undisputed that standardized indemnity agreements, such as the Loan Syndications and Trading Association ("LSTA") boilerplate indemnity

---

[95]     *Melon Produce*, 112 F.3d at 1239 (emphasis added) (quotation omitted).

forms,[96] were not in use until years *after* section 502(d)'s enactment.[97]  Thus, it is doubtful at best that Congress intended to rely on the creation of such indemnity agreements to protect claims purchasers from having their claims disallowed based on the receipt of and failure to return an avoidable transfer on the part of a prior holder of those claims.  *Second*, such indemnity agreements simply do not exist in a large area of claims trading, such as the anonymous trading of claims in the distressed debt markets.  The Bankruptcy Court's holding applies broadly to all transferees of claims, including all purchasers on the open market.  The inability of those purchasers to enter into such agreements with often anonymous sellers cripples any reliance on those agreements as sufficient protection.  Indeed, it punctuates the need to distinguish between pure assignments and sales.  Classic assignments very well may be accompanied by such indemnity agreements or other protections.

     As mentioned above, the parties have each cited one case in support of their position.  Appellants cite a 1988 memorandum opinion and order in a

---

[96]     The model LSTA contains standard warranties and indemnities that include the risk that a transferred claim may be equitably subordinated or disallowed based on the conduct of the transferor.

[97]     *See* Appellants Reply Mem. at 17 (stating that the LSTA standard terms "were not developed until 1996, at the earliest").

Texas federal district court, *In re Wood & Locker, Inc.*[98] in support of their

position.  Enron cites a 2003 bankruptcy court decision in the Southern District of

New York, *In re Metiom, Inc.*[99] in support of affirmance of the Bankruptcy Court's

Disallowance Order.  Interestingly, neither case is persuasive.

In *Wood & Locker*, the court focused on the claimant rather than the

claim to determine whether the transferee had received a preference.  Thus, the

decision can be read to support the view that section 502(d) is personal to

claimants rather than an attribute of the claim.  But the *Wood & Locker* court

failed to analyze whether there was a basis to impute the conduct of the transferor

to the transferee based on the nature of the transfer.  The court never addressed

whether the claim was assigned or sold and thus, never decided whether

assignment law principles should apply to require the transferee to step in the

shoes of the transferor.

The same flaws are found in *Metiom* (and the Bankruptcy Court's

decision below that followed *Metiom*).  Neither decision made any distinction

---

[98]     *See* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D. Tex.
June 17, 1988) (refusing to disallow a claim in the hands of a transferee based on
the conduct of the transferor because the transferee did not have any liability for a
receipt of a preference under any of the sections enumerated in section 502(d)).

[99]     *See* 301 B.R. 634 (Bankr. S.D.N.Y. 2003) (disallowing a claim in the
hands of the transferee based on the transferor's receipt of a preference).

-42-

between a claim purchaser and a claim assignee. Rather, both conclusorily

invoked assignment law principles to hold that disallowance applies to transferees.

Once application of assignment law is assumed, however, the result is a foregone

conclusion, regardless of whether the disability at issue is personal to the claimant

or a characteristic of a claim.[100]   That analysis is incomplete at best, careless at

worst. Nevertheless, as it turns out, *Metiom* may have reached the correct result

because the facts of that case indicate that the claim was transferred by an

assignment.[101]   In such circumstances, reliance on assignment law principles is

proper.[102]   But blind reliance on *Metiom*'s analysis will lead to incorrect results in

many cases where the transfer is not a pure assignment. The better (and correct)

approach is to do what both *Metiom* and the Bankruptcy Court below should have

---

[100]     *See* Appellants Mem. at 22 ("Resorting to case law concerning claims
assignments, the Bankruptcy Court reasoned that the transfer of a claim does not
change the nature of the claim. But in invoking that principle, the Bankruptcy
Court has assumed its own conclusion." (quotation omitted)).

[101]     In *Metiom*, the transferor itself was having financial difficulty and as
a result, the court approved a sale of all of the transferor's assets to the transferee,
which included an assignment of the claim against Metiom. *See id.* at 636-37.

[102]     Likewise, reliance on cases like *Swarts v. Siegel*, 117 F. 13 (8th Cir.
1902), where the court disallowed a claim in the hands of a surety who was
subrogated to, *i.e.*, stepped into the shoes of, the bad actor would also be proper.

done, which is to take a step back and decide first whether disallowance is a claim characteristic or personal disability, and if the latter, whether assignment law has any application to the transfer at issue.

Once again, it bears noting that this Court's analysis does not apply to bad faith purchasers. And a claim purchaser with actual notice of the seller's receipt of an avoidable transfer may be subject to equitable subordination for its own misconduct. Moreover, as the Court discussed with respect to equitable subordination, it should not follow from this analysis that every assignee will automatically be subject to disallowance if the assignor has received (and failed to return) a preference. An exception to the general assignment rule of *nemo dat*, such as holder in due course or third party latent equities, may apply under the facts of some cases.

## C. The Case Is Remanded for a Finding of Whether the Transfer at Issue Was an Assignment or a Sale, and Thus, Whether Citibank's Conduct May Be Imputed to Springfield

Because the Court holds that equitable subordination under section 510(c) and disallowance under section 502(d) are not attributes of the claim but rather are personal disabilities of individual claimants, whether equitable subordination and disallowance can be applied to a transferee depends on the nature of the transfer. As discussed above, the Bankruptcy Court did not address

-44-

this issue. Although the parties do not object to this Court's consideration of the four documents evidencing the transfer (only one of which was in the record below), it is appropriate for the Bankruptcy Court to address this issue in the first instance.[103] Accordingly, the proceeding is remanded to the Bankruptcy Court with instructions to determine whether the claims transferred to Springfield were transferred by way of a sale or whether they were transferred by way of a pure assignment. Of course, this is an interlocutory appeal of the Bankruptcy Court's decision to deny Springfield's motion to dismiss. If the Bankruptcy Court concludes that the nature of the transfer cannot be determined solely from the documents submitted, the issue may have to be decided at a later stage of the adversary proceeding.[104] But the nature of the transfer will determine whether Springfield's claims can be subject to equitable subordination and/or disallowance based on Citibank's conduct.

---

[103]    *See, e.g., Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 66 (2d Cir. 2006) (vacating the district court's dismissal of a breach of fiduciary duty claim, and remanding "to allow the district court to consider the remaining issues on this claim in the first instance").

[104]    It should be noted that while here the Bankruptcy Court must review the actual agreements between the parties in order to determine whether there was an assignment or a sale, this will not always be necessary. For instance, sales of claims on the open markets are indisputably sales and subrogation of a surety to the rights under a claim is indisputably an assignment.

-45-

Should the Bankruptcy Court find that the transfer to Springfield was by assignment, Springfield may argue that it is not subject to either equitable subordination or disallowance based on certain exceptions to the general rule that an assignee has no more rights than the assignor. I review that argument here for the guidance of the Bankruptcy Court on remand.[105] Springfield cannot be a holder in due course because this was a post-petition transfer.[106] Similarly, the transfer agreements between the parties are governed by New York law,[107] which as discussed above, does not recognize the doctrine of third party latent equities for choses in action such as these transfers of bank debt.[108] Nonetheless,

---

[105] *See, e.g., McKithen v. Brown*, 481 F.3d 89, 106 (2d Cir. 2007) (remand an issue to the district court "for its examination in the first instance" but also "providing the district court some guidance as to how its inquiry might proceed").

[106] *See* Tr. at 65; Citi-BT PSA (dated February 22, 2002); DB-Springfield PSA (dated May 15, 2002). *See also supra* Part IV.D.2.a.

[107] *See* Citi-BT PSA ¶ 20 ("This agreement, the rights and obligations of the parties under this agreement, and any claim or controversy directly or indirectly based upon or arising out of this agreement or the transactions contemplated by this agreement . . . shall in all respects be governed by and interpreted, construed and determined in accordance with, the internal laws of the State of New York . . . ."); DB-Springfield PSA ¶ 20 (same). *See also* Citi-BT Assignment, attached as Document 2 to the 8/8/07 Citibank Letter App., ¶ 7 ("This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York."); DB-Springfield Assignment, attached as Document 4 to the 8/8/07 Citibank Letter App., ¶ 7 (same).

[108] *See supra* Part IV.D.2.b.

-46-

Springfield will not be without recourse given that it had an indemnity agreement

that provides protection against this risk. Indeed, Springfield has already availed

itself of this alternative remedy.

## D.    Policy Concerns

It bears repeating that it is not for this Court, or any other court, to

make the policy choices assigned to the legislative branch.[109] I have found, based

on the plain language of the statutes, their legislative histories, and the case law,

that Congress's intent in enacting the equitable subordination and disallowance

statutes was to create personal disabilities, and that Congress did not intend that

those disabilities would travel to all transferees. The analysis ends there; the

Court will not adjust its legal analysis to fit the policy concerns raised by the

parties. Nevertheless, the policy concerns they raise with respect to the issues on

appeal merit some discussion.

Enron argues that preventing enforcement of equitable subordination

and disallowance to claims transferees would encourage "claims washing" on the

part of bad faith transferors. Appellants counter that the claim would not be

"washed" because the transferor remains subject to direct actions on both the

---

[109]    *See Noland*, 517 U.S. at 543.

equitable subordination allegations and the receipt of preference allegations.[110]
Indeed, Citibank is a defendant in the MegaClaim Action alleging both equitable
subordination and receipt of preference. This issue cuts both ways.[111]

Although Appellants are correct that the transferor will be subject to a
direct action for its misconduct or receipt of a preference, that remedy is not a
perfect substitute. There are burden of proof and time value of money issues
associated with pursuing the transferor in a direct action. However, those issues
are not as great as Enron would suggest. With respect to the burden of proof
differences, Enron argues that equitable subordination under section 510(c)
requires a lesser showing than for fraud or other common law claims. Whatever
the differences may be, it is unlikely that they will result in such a large gap that
transferors will routinely be able to immunize themselves through sales.

With respect to the time value of money issue, namely that it may take
years to pursue the transferor in a common law action for fraud as opposed to

---

[110] Citibank asserts that the majority of the transfers that were before the
Bankruptcy Court were made pursuant to credit-default swap contracts that were
executed *pre-petition*. *See* Appellants Reply Mem. at 25. Accordingly, the claims
washing concern simply would not apply to those types of transfers.

[111] Enron also alludes to the potential for collusion among transferors
and transferees as another claims washing scenario. This is of little to no concern
to the Court because such conduct could subject the colluding transferees to
equitable subordination *based on their own misconduct*. *See supra* Part V.B.1.

-48-

obtaining equitable subordination, this concern is somewhat exaggerated. In order

to obtain equitable subordination or disallowance, the debtor in possession must

file a complaint and litigate those issues. Contrary to Enron's suggestion, there

can be no immediate determination of either issue (which again highlights that

these remedies cannot be fixed on the petition date).[112] In fact, the adversary

proceeding for equitable subordination and disallowance of Springfield's claims

based on Citibank's misconduct may be adjudicated contemporaneously with the

MegaClaim Action against Citibank.[113] Thus, the creditors are no worse off, and

the time value of money concern is greatly diminished.

Enron also cites the risk of insolvency of the transferor as cause for

concern. Specifically, Enron raises the potential for overall loss to the estate in the

absence of disallowance of the transferee's claim if the transferor becomes

insolvent before the estate can recover the avoidable transfer. In Enron's example,

the transferor holds a $1,000 claim. Pre-petition, it receives a $200 preferential

payment on that claim, and sells the remainder of the claim, $800, to the

transferee. If the claim were permitted to be disallowed, it would be disallowed

unless and until the preference is returned. If it is not returned, the claim is

---

[112]   *See supra* Part V.A.

[113]   *See* Tr. at 36.

disallowed, and the total cost to the estate is $200, the amount of the preference that was paid. If it is returned, the full $1,000 claim can be pressed, and assuming the estate is paying 25 cents on the dollar, the estate pays out $250, for a total cost to the estate of $50 (it gets back $200 from the preference and pays out $250).

If the claim is *not* permitted to be disallowed in the hands of the transferee, however, the transferee is permitted to press its claim for $800. The transferee will then recover 25 cents on the dollar, which amounts to $200. In this scenario, the estate has spent a total of $400: $200 as the avoidable transfer, and $200 on the allowed claim of the transferee. The estate must then pursue the transferor for return of the $200 preference. This is not a problem if the transferor is solvent (although it does not take into account any time value of money issues as discussed above), but Enron argues that the estate as a whole will suffer if the transferor is insolvent.

Insolvency of the transferor is not of grave concern in the big picture. The possibility that a transferor who is able to sell its claim, as opposed to assign it, will be insolvent is not very great. The more likely scenario is that a lender who is in financial trouble and is therefore anxious to sell its claims would likely be forced to do so by an assignment that includes representations, warranties, and indemnities. In those circumstances, there is no concern of loss to the estate

-50-

because the transferee's claim *would* be disallowed. Similarly, that same lender might well have been unable to satisfy a judgment in an action brought by the estate, because its liability to the estate could eclipse the potential recovery on its bankruptcy claim. Here, it should be noted, no one disputes that Citibank is a very solvent entity.

At the end of the day, however, there can be no dispute that in limited circumstances, a bad faith transferor may be able to sell its claim to a bona fide purchaser for value, effectively "wash" its claim in the hands of the purchaser, take the proceeds and run, to the detriment of other creditors. However, the risk of that scenario is outweighed by the countervailing policy at issue, namely the law's consistent protection of bona fide purchasers for value. Enron focuses on the harm that will come to the creditors as a result, but the law protects bona fide purchasers for value, and this context is no different. This is a question of allocating the burden and risk of pursuing the bad actor transferor between two groups of innocents: the creditors as a whole or the transferee. The Court finds that the balance struck by the foregoing legal analysis is fair: the burden and risk is better carried by creditors as a whole in favor of the bona fide purchaser in the context of a sale, but better carried by the assignee in favor of the creditors in the context of an assignment, particularly given the ability of parties to an assignment

-51-

to obtain indemnities and warranties.

Moreover, in order to ensure that untenable distinctions and unreasonable results are avoided, it is proper to consider the effect that the Court's interpretation would have on the markets.[114] The unnecessary breadth of the Bankruptcy Court's decisions threatened to wreak havoc on the markets for distressed debt.[115] That result has now been avoided.

## VI.    CONCLUSION

For the reasons stated above, I conclude that equitable subordination under section 510(c) and disallowance under section 502(d) are personal disabilities that are not fixed as of the petition date and do not inhere in the claim. Nevertheless, Springfield may be subject to equitable subordination and disallowance based solely on the conduct of the transferor if the claims were transferred to Springfield by way of an assignment. Accordingly, the Bankruptcy Court's Subordination Order and Disallowance Order are VACATED, and the matter is REMANDED to the Bankruptcy Court to decide the motion to dismiss

---

[114]    *See Elliott Assocs.*, 194 F.3d at 380.

[115]    *See generally* Appellants Mem. at 38-42; Industry Amici Mem. at 10-20.

consistent with this Opinion.  The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Schendlin
U.S.D.J.

Dated:  New York, New York
        August 27, 2007

-53-

- Appearances -

**For Appellant Springfield Associates, L.L.C.:**

David Parker, Esq.
Edward Grosz, Esq.
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
551 Fifth Avenue
New York, NY 10176
(212) 986-6000

John J. Galban, Esq.
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
(212) 574-1200

**For Intervenor-Appellant Citibank, N.A.:**

Brad S. Karp, Esq.
Stephen J. Shimshak, Esq.
Douglas R. Davis, Esq.
Claudia L. Hammerman, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

**For Appellee Enron Creditors Recovery Corp., Reorganized Debtor:**

Kenneth N. Klee, Esq.
David M. Stern, Esq.
Lee R. Bogdanoff, Esq.
Stacia A. Neeley, Esq.
KLEE TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
(310) 407-4000

Edward A. Smith, Esq.
VENABLE LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 307-5500

Richard L. Wasserman, Esq.
Michael Schatzow, Esq.
VENABLE LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza, Suite 1800
Baltimore, MD 21201
(410) 244-7400

**For *Amici Curiae* The Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, and the Loan Syndications and Trading Association:**

James H. Millar, Esq.
WILMER CUTLER PICKERING HALE and DORR LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

Seth P. Waxman, Esq.
Louis R. Cohen, Esq.
Craig Goldblatt, Esq.
Joel Millar, Esq.
Amy Oberdorfer Nyberg, Esq.
WILMER CUTLER PICKERING HALE and DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

For *Amici Curiae* Abrams Capital, LLC, Blavin & Company, Inc., and
**Citadel Investment Group, L.L.C.:**

Isaac M. Pachulski, Esq.
Whitman L. Holt, Esq.
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600

**For *Amicus Curiae* Commercial Law League of America:**

Daniel L. Wallach, Esq.
Kathy E. Brewer, Esq.
Ivan J. Reich, Esq.
BECKER & POLIAKOFF, P.A.
Emerald Lake Corporate Park
3111 Stirling Road
Fort Lauderdale, FL 33312
(954) 987-7550

Louis S. Robin, Esq.
FITZGERALD, O'BRIEN & ROBIN
1200 Converse Street
Longmeadow, MA 01106
(413) 567-3131

**For *Amicus Curiae* Jeffrey W. Morris:**

Jeffrey W. Morris, Esq.
Samuel A. McCray, Chair in Law
University of Dayton School of Law
300 College Park
Dayton, OH 45419
(937) 229-3315

-56-